UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CALLAIS CAPITAL MANAGEMENT, LLC** | * | **CIVIL ACTION NO.** |
| **VERSUS** | ** | **SECTION** |
| **BRIAN WILHITE, EMMALEIGH WILHITE, MICHAEL WORLEY, BRIAN MAY, JOHN DURHAM, BRETT FAVRE, DIMITRIOS BACHADAKIS, JON GREGG, MIKE HAMMER, PONTCHARTRAIN CAPITAL, LLC, AND ANDREW GARCIA** | * | **MAGISTRATE** |
| | * | **JURY DEMAND** |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>COMPLAINT</u>

Plaintiff, Callais Capital Management, LLC ("***CCM***") respectfully alleges as follows:

## <u>PARTIES</u>

1.

CCM is a limited liability company operating and doing business in the Parish of Lafourche,

State of Louisiana.

2.

Defendant Brian Wilhite is a person of the full age of majority, domiciled in the State of California.

3.

Defendant Emmaleigh Wilhite is a person of the full age of majority, domiciled in the State of

California.

4.

Defendant Michael Worley ("***Worley***") is a person of the full age of majority, residing in the State

of Louisiana.

5.

Defendant Brian May ("*May*") is person of the full age of majority, domiciled in the State of Louisiana.

6.

Defendant John Durham ("*Durham*") is a person of the full age of majority, domiciled and residing in the State of California.

7.

Defendant Dimitrios Bachadakis ("*Bachadakis*) is a person of the full age of majority, domiciled and residing in Munich, Germany.

8.

Defendant Jon Gregg ("*Gregg*") is a person of the full age of majority, domiciled and residing in the State of California.

9.

Defendant Brett Favre ("*Favre*," together, with Brian Wilhite, Emmaleigh Wilhite, Worley, May, Durham and Gregg, the "*Sqor D&O Defendants*") is a person of the full age of majority, domiciled and residing in the State of Mississippi.

10.

Defendant Pontchartrain Capital, LLC ("*Pontchartrain*") is a Louisiana limited liability company doing business in the State of Louisiana.

11.

Defendant Michael Hammer ("*Hammer*") is a person of the full age of majority, domiciled and residing in the State of Louisiana.

12.

Defendant Andrew Garcia ("*Garcia,*" together, with Hammer and Pontchartrain, the "*Pontchartrain Defendants*") is a person of the full age of majority, domiciled and residing in the State of Louisiana. Collectively, the Pontchartrain Defendants and the Sqor D&O Defendants are referred to

in this Complaint as "***Defendants***."

## JURISDICTION AND VENUE

13.

Defendants are liable to CCM for violations of the Securities Act of 1933, 15 U.S.C. § 77a *et seq;* the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq;* the Louisiana Securities Law, La. R.S. 51:701 *et seq;* and intentional and negligent misrepresentation under Louisiana state law.

14.

Jurisdiction is proper under 28 U.S.C. §1331, as this is an action arising under the laws of the United States, namely, the Federal Securities laws. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

15.

Venue is proper under 28 U.S.C. §1391(b), as a substantial part of the events or omissions giving rise to the claim occurred in this District, and a substantial part of the property at issue is situated in this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

16.

The Sqor D&O Defendants were directors and/or officers of Sqor, Inc. ("***Sqor***") during all relevant time periods set forth as the basis for this Complaint.

17.

The Sqor D&O Defendants caused Sqor to engage in the issuance and sale of several unregistered securities to CCM, both individually and through the Pontchartrain Defendants, who are unlicensed broker-dealers taking a commission on the sale of unregistered securities to CCM.

18.

In particular, the Sqor D&O Defendants and Pontchartrain Defendants caused Sqor to issue the following securities to CCM: (a) that certain Loan and Security Agreement, dated July 31, 2015,

pursuant to which CCM invested $6,000,000 in the principal amount in Sqor (the "***First Investment***"); (b) that certain Supplement to Loan and Security Agreement, dated December 3, 2015, pursuant to which CCM invested $6,000,000 in principal into Sqor (the "***Second Investment***"); (c) that certain Supplement No. 2 to Loan and Security Agreement, dated April 1, 2016, pursuant to which CCM invested $2,000,000 in principal into Sqor (the "***Third Investment***"); (d) that certain Supplement No. 3 to Loan and Security Agreement, dated June 15, 2016, pursuant to which CCM made a $2,750,000 principal investment into Sqor (the "***Fourth Investment***"); (e) Series A-1 Preferred Stock, purchased for $150,000 ("***Stock***") (the First Investment, Second Investment, Third Investment, Fourth Investment, and Stock, are collectively referred to herein as the "***Securities***" and the total amount of principal and interest outstanding and purchase price paid for the Securities, the "***Investment Amount***").

19.

The Securities are "securities" under the federal and state securities laws.

20.

All Defendants are considered "sellers" under the federal and state securities laws.

21.

The Sqor D&O Defendants, individually and collectively, as members of the board of directors, controlling officers and controlling shareholders of Sqor, had the right to direct and control the activities of Sqor, including the solicitations, representations, omissions and manner of offering the Securities at issue in this lawsuit. Further, the Sqor D&O Defendants did actively exercise control with respect to the actions and omissions complained of by CCM in this Complaint.

22.

Each of the Sqor D&O Defendants are "controlling persons" of Sqor within the meaning of federal and state securities laws and had the right to and did exercise control over the securities offerings upon which this lawsuit is based.

23.

The Pontchartrain Defendants had direct communications with CCM for the purpose of soliciting them to purchase Securities. In all such communications, the Pontchartain Defendants were self-interested in receiving compensation for arranging for the sale of the Securities. The Pontchartrain Defendants are both "sellers' and "substantial factors" in the sale of the Securities to CCM.

24.

The communications and solicitations by the Pontchartrain Defendants commenced in July 2015 and continued until May 2017.

25.

The Pontchartrain Defendants are not licensed as brokers or dealers or as an investment bank under any federal or state securities laws nor are they licensed with any self-regulatory organization such as Financial Industry Regulatory Authority or the National Association of Securities Dealers.

26.

The Sqor D&O Defendants caused Sqor to pay the Pontchartrain Defendants compensation for structuring, soliciting and facilitating the investment by CCM in the Securities being issued by Sqor, and the compensation paid to the Pontchartrain Defendants by Sqor was a percentage commission on the Investment Amount invested by CCM, all of which is illegal under the federal and state securities laws. The Pontchartrain Defendants, upon information and belief, accepted all such commission based compensation relating to the sale of the Securities to CCM.

27.

The Securities purchased by CCM were not registered with the Securities and Exchange Commission, and the solicitation and sales of these Securities did not satisfy any of the exemptions from registration provided for by the Securities Act of 1933.

28.

The availability of the private placement exemption was continuously misstated and concealed (either intentionally or negligently), and CCM was not under any duty to investigate this fact earlier than April 2017, when the concealment and/or misrepresentation of the Defendants relating to the alleged exemption from registration based on the private placement exemption finally became apparent for the first time.

29.

In inducing CCM to purchase the Securities, Defendants failed to disclose all the material facts surrounding the purchases. CCM relied on the representations and omissions of Defendants in deciding to purchase the Securities.

30.

Defendants had no private placement exemption for the offer or sale of the Securities for the following non-exclusive reasons (in addition to others to be shown through discovery and/or trial):

- Defendants pursued a manner and method of offering devoid of establishing a substantive, pre-existing relationship with prospective investors;

- The Sqor D&O Defendants used an unlicensed broker-dealer, the Pontchartrain Defendants, to offer and sell the Securities, which eliminates reliance on any private placement exemption as a matter of law and fact;

- The Pontchartrain Defendants received an illegal commission on the sale of the Securities, which the Securities and Exchange Commission and several courts have determined eliminates any reliance on the private placement exemption;

- Defendants offered the Securities to a large number of prospective investors, using several links in a chain of distribution involving both the Pontchartrain Defendants and contacts of the Sqor D&O Defendants;

- Defendants failed to make any filing which would give rise to a presumption that there was a private placement exemption; and

- Defendants used the means and facilities of interstate commerce, such as emails sent to a wide audience, in connection with the offer and sale of the Securities.

31.

The Securities were sold to CCM by Sqor for its general business use, and the Securities were sold to CCM as intended to produce a large profit from Sqor's general operations and "global" expansion and growth. In all respects, the Securities were marketed and intended as a source of capital (characterized as a "bridge loan" or "bridge capital") in the nature of a venture capital deal for what was portrayed as a growing technology company.

32.

Commencing on July 31, 2015 and continuing until April 2017, both verbally and in the documentation effecting the offering and sale of the Securities, Defendants misrepresented to CCM that there was a valid exemption from registration of the Securities under the federal and state securities laws based on a private placement exemption.

33.

All Defendants misrepresented and concealed the fact that the Pontchartrain Defendants were not licensed to effect securities transactions, were not registered with any appropriate securities regulatory authorities or government agencies and the method and means of soliciting offers and sales of the Securities. These continuing misrepresentations and concealments initially began on July

31, 2015 and continued until April 2017, when it became apparent that the Pontchartrain Defendants were not licensed and the unavailability of the private placement exemption became apparent to CCM for the first time.

34.

Commencing in July 2015 and continuing until April 2017, Defendants made a series of continuing negligent and/or fraudulent misrepresentations (both verbal and written) to CCM to induce it to purchase the Securities.

35.

For example, in July 2015, Defendants sent a document entitled "Business Plan" (the "***Business Plan***") to CCM to solicit its interest in the Securities. The Business Plan was created and/or approved by all Defendants.

36.

The Business Plan provided to CCM clearly describes the investment being sought by CCM and others as a growth loan designed to help Sqor "fund immediate international growth, and allow the company to secure up to 10 major Sports Enterprises over the next six months." In addition, Sqor, through Defendants, represented to CCM that it would "be in the market raising a round of equity capital of up to $25mm in Q1 2016, and it is the company's intention to use this capital to repay all loans, and continued global growth opportunities." Further, Sqor represented to CCM as follows: "Sqor is seeking financing in order to continue operations, while expanding capacity to capture a larger market." In addition, Sqor provided an Executive Summary to CCM describing the investment as a "bridge loan" to raise equity financing, which would make underlying and additional Warrants and Stock being issued to investors extremely valuable. In several places, Sqor represented to CCM that it would raise additional growth equity capital to repay and "cover all loans and continued global growth opportunities." The Executive Summary further describes the Securities as an investment in "growth capital [to] fund our immediate international growth[.]" CCM believed that an investment in the Securities brought with it the promise of extremely high profits, far in excess of secured

business loans or other types of loans more common to banking activities.

37.

Defendants knew at the time they provided the Business Plan to CCM that Sqor would not or could not fund immediate international growth or secure up to ten (10) major Sports Enterprises over the next six (6) months. At the same time, Defendants knew Sqor could not raise round of equity capital of up to $25,000,000. Defendants also knew Sqor would not be able to repay all loans because Sqor would not be able to raise the $25,000,000 equity capital. Nevertheless, Defendants made and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities. Defendants continued  make these misrepresentations to CCM through April 2017, in the attempt to conceal these misrepresentations, forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional Securities to CCM's detriment and Sqor's benefit. Defendants misrepresented these facts to CCM so that Defendants alone would prosper from CCM's Investments and Securities purchases.

38.

Sqor's Business Plan also included a growth chart that negligently and/or fraudulently misrepresented Sqor's net income for 2016 to be $1.3 million, projected 2017 net income as $12.7 million, and projected 2018 net income as $44 million.

39.

Sqor materially misrepresented the number of its "fans" (which are the names of its "users") at 325,000,000 in the Business Plan. In other sections of the Business Plan, Sqor materially misrepresentedthat "Sqor has a total potential reach of current combined social reach of 350MM+ fans and growing." The Business Plan further falsely states, "In April of 2014 the first version of Sqor launched with Brett Favre as the featured athlete, now a little over a year later the company has over 1000 athletes, is on its fourth version, and has reached over 50 million fans."

40.

Defendants knew at the time they provided the Business Plan to CCM that Sqor did not have 325,000,000 fans or users, and Sqor did not have a social reach of 350MM fans or users. At the same time, Defendants knew Sqor did not have over 1000 athletes and had not reached over 50 million fans. Defendants made and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities. Defendants continued make these misrepresentations to CCM through April 2017, in the attempt to conceal these misrepresentations, forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional Securities to CCM's detriment and Sqor's benefit. Defendants misrepresented these facts to CCM to induce CCM to believe Defendants' statements and invest in the Securities so that Defendants alone would prosper from CCM's Investments and Securities purchases.

41.

Defendants even went so far as to misrepresent that the Sqor social media platform's user growth metrics exceeded that of many well-known and established technology companies, such as Twitter, LinkedIn, and others in its Business Plan, showing CCM and other investors the following social media growth metrics, none of which were accurate, as it became revealed in April 2017:



42.

Defendants knew at the time they provided the Business Plan to CCM that Sqor's user growth metrics did not exceed that of many well-known and established technology companies, such as Twitter, LinkedIn, and others in its Business Plan. Nevertheless, Defendants made and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities. Defendants continued make these misrepresentations to CCM through April 2017, in the attempt to conceal these misrepresentations, forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional Securities toCCM's detriment and Sqor's benefit. Defendants misrepresented these facts to CCM so that Defendants alone would prosper from CCM's Investments and Securities purchases.

43.

All Defendants actively or passively participated in the marketing of the Securities to CCM through various misrepresentations in July 2015 before CCM funded the first round under the First Investment and

continuing through the Fourth Investment, up until Spring June 2017, as Sqor's controlling persons and sellers continued to solicit CCM for further investment. Defendants engaged in these misrepresentations in person in meetings with CCM, via telephone and via email communications transmitting materially misleading information and/or information which contained material omissions regarding the business of Sqor.

44.

In a series of continuing written and verbal misrepresentations spanning from July 2015 until July 2017, Defendants negligently and/or fraudulently misrepresented Sqor's ability to attract additional investor capital, which only became apparent in April 2017 when it was revealed by Defendants that various investors had declined to invest further funds, that deals allegedly in the pipeline had collapsed and/or that investment bankers were unable or unwilling to market Sqor for further financing.

45.

From July 2015 until July 2017, Defendants consistently misrepresented the number of "users" of the Sqor application and platform, apparently attributing certain professional athletes' social media followers as "users" of Sqor for purposes of evaluating growth metrics. These misrepresentation and/or omissions relating to the actual number of users were made in verbal and written materials presented to CCM on a continuing basis and used in order to portray the Securities and Sqor as more valuable to CCM. Each of the Defendants at various points throughout these investment rounds misrepresented to CCM the number of users and potential users of the Sqor technology, realistic prospects for alleged deals in the pipeline and the financial projections. Until July 2017, none of the Defendants informed CCM of material facts that were omitted that would allow it to determine that the misrepresentations were untrue (for example, that it was conflacting the "followers" of certain athletes social media accounts as Sqor "users" or "fans" for purposes of the fundraising metrics). It was only revealed to CCM in April 2017 that Sqor had been misrepresenting the number of users by conflating the social media followers of athletes with supposed users of its technology.

46.

From July 2015 through May 2017, Defendants (in particular, Brian Wilhite, May, Worley and the

Pontchartrain Defendants) misrepresented the likelihood of several potential business developments, including without limitation, the likelihood of success of a partnership with FC Bayern Munich, Brett Favre promotional efforts, success of the Sqor application in the Apple Store, the likelihood and terms of having other football clubs and sports franchises and teams join Sqor and use its technology (including, without limitation, the LA Clippers, LA Angels, Chicago Bulls, Chicago Bears, Chicago Cubs, Chicago Blackhawks, NASCAR, NFL Players, Inc. (including a "verbal MOU" for a formal partnership with that organization)), the number of "users" of the Sqor application, the sales of athlete merchandise occurring like "hotcakes," the degree of "reach" relating to marketing efforts attributable to athletes' social media presence, the interest of Under Armor and other third party companies in deals with Sqor, the level of interest by investors in investing new capital and likelihood of receiving investment capital and revenues from various "opportunities" allegedly being pursued by Sqor. All of the controlling persons of Sqor knew or should have known of these misrepresentations and were complicit in the actions and commissions of Wilhite, May Worley, the Pontchartrain Defendants and other Defendants.

47.

On or about March 1, 2016, Hammer and/or Wilhite sent an email to CCM conveying that a prospective investor, the Mailman Group, was interested in investing in Sqor and purchasing a franchise license to Sqor China and other Asian countries. On or about that same day, Wilhite sent an email to CCM showing Sqor's "Global Footprint" by illustrating a "heatmap" of users across the globe. Later on or about May 4, 2016, Hammer forwarded an email to CCM from Wilhite and Gregg to provide a business development update, stating that ESPN was interested in discussing the Series B and other business development opportunities with Sqor. Further, on or about May 13, 2016, Hammer emailed CCM saying that Sqor heard some very good news from their conversations with Chase Bank.

48.

On or about March 2, 2016, Wilhite sent an email to CCM saying that he met with the president of NFL Players, Inc. a subsidiary of NFL Players Association and that they "parted with an understanding and

agreement (a 'Verbal MOU') to move forward to an 'official' partnership between us". Additionally, on or about March 16, 2016, Wilhite sent an email detailing a planned "media assault" to occur over the next 100 days. He said they have another 2 of the top 10 teams in the world that they will announce PSG and Juventas. Wilhite further stated that they met with LA Clippers, LA Angels, Chicago Bulls, Chicago Bears, Chicago Cubs, and Chicago Blackhawks and he said that every one of these teams indicated that they want to adopt the Sqor platform. As to all of these examples, all of the controlling persons of Sqor knew or should have known of these misrepresentations and were complicit in the actions and commissions of Wilhite, May Worley, Favre, the Pontchartrain Defendants and other Defendants.

49.

Defendants made the following additional material misrepresentations to CCM:

- November 17, 2015: Defendants emailed CCM to confirm that FC Barcelona would begin "aggressive" marketing and promotion as well as begin onboarding FC Barcelona in the next week or so.

- November 19, 2015 in an email correspondence between Hammer and CCM, Hammer asked CCM if it wanted to proceed with a second round of funding, and in the same email stated that Sqor met for a second time with the Dallas Cowboys organization, which he state was going to sign up with Sqor.

- December 1 2015: Sqor misrepresented to CCM via emails from Defendants that Sqor had undertaken a new revenue opportunity pipeline with would provide Sqor with $5.5 million in revenue.

- May 25-31, 2016: Defendants Hammer and Wilhite misrepresented to CCM via emails and telephone conferences that Sqor would partner with Under Armor, which would significantly enhance Sqor's user reach, popularity and value.

- May 25, 2016: Wilhite misrepresented Sqor's "revenue velocity" via spreadsheet and email to Defendants, and telephone calls around that date.

50.

During all relevant times, Defendant Favre knew or should have known that the other Sqor D&O Defendants (particularly, Brian Wilhite, Emmaleigh Wilhite and John Gregg but also May and Worley, and others) and Pontchartrain Defendants were conflating Favre's social media followers and fans with those of Sqor and misstating the influence of Sqor based on Favre's own social media and advertising reach. For example, the Defendants sent CCM a "Brand + Capabilities + Deck- 5.2016.pdf" (the "**Brand Capabilities Deck**") which specifically states that Sqor "developed HOF [(Hall of Famee)] Inductee Brett Favre to an emotional song and video for the brand Tide." In addition, the Brand Capabilities Deck states that Sqor had a "social post reach" of 2.5 million followers, with "10x" higher average engagement. The Brand Capabilities Deck prominently displays a photo of Favre as an endorser of Sqor, and Favre was a director and shareholder of Sqor during all of these times. In conversations and in written materials, Defendants portrayed the social media followers and users of other platforms (other than Sqor) as Sqor's own user base, confusing CCM and causing it to believe that Sqor's technology enjoyed widespread adoption among millions of users. Defendant Favre received benefits from Sqor in the form of equity, athlete payments and private jet costs, among other things.

51.

Defendants provided CCM with several financial statements and projections, beginning in October 2015 and until June 2017, which contained material misstatements and omissions relating to the actual number of users of Sqor technology, revenue pipeline and opportunities, use of funds by employees and other flaws, to be proven at trial.

52.

The Brand Capabilities Deck contained a host of other misrepresentations by stating that Sqor Sports

had activated millions of users of its platform to download games and view online ads using Sqor's

online social media platform and claimed that Sqor was being used by world famous athletes like Conor

McGregor to drive 16 million ad impressions with 344,000 users engaged; Ron Gronkowski to drive

downloads of the Mobile Strike game with 7.5 million impressions and 71,000 users engaged; and

partnerships with NFL Athletes (Richard Sherman, Rob Gronkowski and Odell Becham, Jr.), NFL

Retirees (Brett Favre, Matt Hasselback and Steve Marinucci) and "Sports Icons" (Allen Iverson, Conor

McGregor and Pele). As it turned out, none of these NFL Athletes, Retirees or Icons used the Sqor online

social media platform, nor did the social media platform have millions of users or hundreds of thousands

of users engaged on it. The Brand Capabilities Deck also misrepresented the endorsement of NBA

Players and the actual prospects and existence of a "Road to the Draft" program, which was to provide

an online Q&A Chat and Custom Content program on Sqor's social media platform. Sqor

misrepresented that it "has a collection of NBA Athletes, NBA Retirees and Sports Icons to activate

content and Fan-based experiences" and that these sports mega stars "will create content, provide unique

giveaway prizes and drive promotional support through their millions of Fan connections," all of which

was false.

53.

Defendants regularly misrepresented monthly active users ("**MAUs**") and daily active users ("**DAUs**")

of the "Sqor Platform" to CCM, including in various presentations, spreadsheets and conversations over

the course of 2015 until it became clear in April or May of 2017 that Sqor's platform did not have the

number of MAUs or DAUs that Defendants portrayed to CCM. By the time that CCM invested, Sqor

was representing its MAUs and DAUs as numbering in the millions when, in fact, it was substantially

lower.

54.

Defendants severely misstated or omitted material information regarding supposed agreements,

beginning in August 2016 (or, possibly July 2016) with Omnicom Media Group, which Sqor said would yield $7.5 million in revenue in the first year, $15 million in revenue in the second year and $25 million in the third year.

55.

Defendants knew at the time they made the aforementioned representations to CCM that they were false. Nevertheless, Defendants made and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities. Defendants continued to make these misrepresentations to CCM through April 2017, in the attempt to conceal these misrepresentations, forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional securities to CCM's detriment and Sqor's benefit. Defendants misrepresented these facts so that Defendants alone would prosper from CCM's Investments and Securities purchases, both past and future.

56.

The various misrepresentations and omissions only became reasonably noticeable and apparent in April 2017, when a representative of Bacahdakis met with CCM to reveal the misrepresentations and omissions being made by management and allowed to occur by various Sqor D&O Defendants, particularly with respect to the MAUs and DAUs.

57.

The Sqor D&O Defendants misrepresented the use of funds invested by CCM in various Securities by using such funds to pay back loans to certain individual directors, such as May and Worley and inflated salaries of Brian Wilhite and Emmaleigh Wilhite (and possibly, others), compensation to directors and

"athletes", in violation of applicable law. At the very least, if this fact was not intentionally concealed to CCM, the Defendants failed to disclose this fact to CCM even though each Defendant had a duty to disclose this information to CCM.

**CAUSE OF ACTION NO. 1:**
**SECTION 12(a)(1) OF THE SECURITIES ACT OF 1933**

58.

The Securities purchased by CCM were not registered with the Securities Exchange Commission, and the solicitation and sale of the securities did not satisfy any exemption to the Securities Act of 1933. Further, the disclosures which accompanied the solicitation and sale did not satisfy the Act.

59.

These violations of the Securities Act of 1933 entitle CCM to all appropriate relief, including but not limited to return of the purchase price, damages, and attorney's fees.

60.

The violations under Section 12(a)(1) of the '33 Act are timely because they are being brought within one year of the date that CCM knew or reasonably should have known of the unavailability of the private placement exemption following the continuing concealment and misrepresentations by Defendants relating to the purported private placement exemption and within three years of the date of the first sale of the Securities, in accordance with law.

61.

The Sqor D&O Defendants are all controlling persons under law by virtue of their ownership and ability to control the actions of Sqor. The Pontchartrain Defendants are sellers of the securities under law.

**CAUSE OF ACTION NO. 2:**
**SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND RULE 10b-5**

62.

In soliciting the purchase of the Securities by CCM, Defendants failed to accurately and completely disclose all material facts. This failure to adequately disclose all material facts was made with *scienter*. CCM justifiably and reasonably relied on the representations and omissions of Defendants and had little experience in investing in internet related business, and it believed that it could trust the various Defendants in their representations to CCM. CCM would not have invested in the Securities had it known of the misrepresentations and/or omissions being made by Defendants. Defendants are thus liable for violations of Section 10(b) of and Rule 10b-5 promulgated pursuant to the Securities and Exchange Act of 1934, 15 U.S.C. 78a *et seq.* (the "***'34 Act***")

63.

CCM is entitled to all appropriate damages, including but not limited to return of the purchase price, consequential damages, attorneys' fees, and interest as provided by law.

64.

The violations of the '34 Act and Rule 10b-5 are timely because they are being brought within one year of the date that CCM knew or reasonably should have known of the alleged misrepresentations and within three years of the first purchase of the Securities.

65.

CCM conducted all reasonable due diligence regarding the business of Sqor in light of the circumstances, but the fraudulent and/or negligent misrepresentations of Defendants made it impossible or unreasonable for CCM to uncover the actual facts relating to Sqor's business.

66.

The Sqor D&O Defendants are all controlling persons under law by virtue of their ownership and ability to control the actions of Sqor. The Pontchartrain Defendants are sellers of

the securities under law.

67.

The Sqor D&O Defendants and the Pontchartrain Defendants further conspired to violate the '34 Act for their personal enrichment and aided and abetted each other in the violations complained of herein. Specifically, the Pontchartrain Defendants continued to work closely with one or more Sqor D&O Defendants in order to conceal or obfuscate the true financial picture of Sqor on a continuing basis from July 2015, and the Pontchartrain Defendants further attempted to act as an intermediary to obtain more financing from CCM despite the poor performance of Sqor, all for the personal benefit of the Sqor D&O Defendants and the Pontchartrain Defendants.

## CAUSE OF ACTION NO. 3:
## VIOLATION OF THE LOUISIANA SECURITIES LAW

68.

The acts and omissions complained of in Paragraphs 17 through 58 constitute violations of the Louisiana Securities Law, La. R.S. 51:701 *et seq.* CCM is entitled to all appropriate damages, including return of the purchase price, consequential damages, attorney's fees, interest, and any other relief appropriate under the circumstances.

69.

The Sqor D&O Defendants are controlling persons under the Louisiana Securities Law, and the Pontchartrain Defendants acted as unlicensed dealers and/or salesmen under the Louisiana Securities Law.

## CAUSE OF ACTION NO. 4:
## NEGLIGENT AND INTENTIONAL MISREPRESENTATION

70.

The acts and omissions complained of in Paragraphs 17 through 58 constitute negligent and

intentional misrepresentation in violation of Louisiana state law. CCM is thus entitled to all appropriate damages, including but not limited to return of the purchase price, consequential damages, interest and attorneys' fees. All Defendants knew or should have known that the information being presented to solicit investment by CCM was either false or incomplete to the point that it was clearly misleading.

71.

All Defendants had a duty to inform CCM of material facts relating to its investment in the Securities by virtue of their affirmative acts and statements in soliciting investment from CCM, the fact that they personally benefitted from the CCM investments, their fiduciary relationships to CCM, the fact that they or their affiliates were in contractual privity with CCM and other legal duties imposed on them by law, among other facts and circumstances to be proven at trial.

72.

CCM reasonably relied on all of the misrepresentations and omissions to its detriment and suffered injury in the form of loss of their entire investment in CCM, attorneys' fees, professional services fees and other damages in an amount to be proven at trial.

**CAUSE OF ACTION NO. 5:**
**SECTION 15 OF '34 ACT (PONTCHARTRAIN DEFENDANTS ONLY)**

73.

Section 15(a) provides that it is unlawful for a broker or dealer who is not registered "to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security."

74.

The Pontchartrain Defendants engaged in the business of effecting the sale of the Securities to CCM and took a commission based transaction fee on such sale as compensation, all in violation of law.

75.

The Pontchartrain Defendants are not licensed to act as a broker, dealer, financial advisor or investment bank, and the Pontchartrain Defendants misled CCM as to their ability to legally conduct securities transactions from July 2015 until June 2017.

## **PRAYER**

WHEREFORE, plaintiff, CCM, respectfully pray that after due proceedings are had there be judgment in their favor and against Defendants for the following:

(1) return of the $16,750,000 purchase price of the Securities on the basis of a rescissionary measure of damages (as opposed to actual rescission), less any amounts actually received by Plaintiff by any guarantor or Sqor for payments on the Securities (to the extent that a "tender" of any securities is required by law under a rescissionary measure of damages or remedy, then plaintiff hereby tenders the Securities, along with all judgments in any other proceedings related thereto);

(2) consequential damages;

(3) attorneys' fees as provided by law;

(4) interest as provided by law; and

(5) all appropriate relief.

Respectfully submitted,
CARA STONE, LLP

_____
Adam Vickers (34992)
Mark Graffagnini (30527)
Jeffrey Thomas (28460)
William Large (34837)
Cara Stone, LLP
650 Poydras Street
Suite 1130
New Orleans, LA 70130
(504) 265-9955 (phone/fax)

**PLEASE PREPARE SERVICE AND SUMMONS:**
BRIAN WILHITE
EMMALEIGH WILHITE
MICHAEL WORLEY
BRIAN MAY
JOHN DURHAM
BRETT FAVRE
DIMITRIOS BACHADAKIS
JON GREGG
MIKE HAMMER
PONTCHARTRAIN CAPITAL, LLC
ANDREW GARCIA