## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CALLAIS CAPITAL MANAGEMENT, LLC | * <br> * | CIVIL ACTION NO. 17-12039 |
| VERSUS | * <br> * | SECTION "N" (5) |
| BRIAN WILHITE, EMMALEIGH WILHITE, MICHAEL WORLEY, BRIAN MAY, JOHN DURHAM, BRETT FAVRE, DIMITRIOS BACHADAKIS, JON GREGG, MIKE HAMMER, PONTCHARTRAIN CAPITAL, LLC, AND ANDREW GARCIA | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | DISTRICT JUDGE ZAINEY <br><br> MAGISTRATE JUDGE NORTH |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff, Callais Capital Management, LLC ("CCM") respectfully alleges as follows:

## <u>PARTIES</u>

### 1.

CCM is a limited liability company operating and doing business in the Parish of Lafourche, State of Louisiana.

### 2.

Defendant Brian Wilhite is a person of the full age of majority, domiciled in the State of California.

### 3.

Defendant Emaleigh Wilhite is a person of the full age of majority, domiciled in the State of California.

4.

Defendant Michael Worley ("Worley") is a person of the full age of majority, residing in the State of Louisiana.

5.

Defendant Brian May ("May") is person of the full age of majority, domiciled in the State of Louisiana.

6.

Defendant John Durham ("Durham") is a person of the full age of majority, domiciled and residing in the State of California.

7.

Defendant Dimitrios Bachadakis ("Bachadakis) is a person of the full age of majority, domiciled and residing in Munich, Germany.

8.

Defendant Jon Gregg ("Gregg") is a person of the full age of majority, domiciled and residing in the State of California.

9.

Defendant Brett Favre ("Favre," together, with Brian Wilhite, Emaleigh Wilhite, Worley, May, Durham and Gregg, the "Sqor D&O Defendants") is a person of the full age of majority, domiciled and residing in the State of Mississippi.

10.

Defendant Pontchartrain Capital, LLC ("Pontchartrain") is a Louisiana limited liability company doing business in the State of Louisiana.

11.

Defendant Michael Hammer ("Hammer") is a person of the full age of majority, domiciled and residing in the State of Louisiana.

12.

Defendant Andrew Garcia ("Garcia"), (together, with Hammer and Pontchartrain, the "Pontchartrain Defendants") is a person of the full age of majority, domiciled and residing in the State of Louisiana. Collectively, the Pontchartrain Defendants and the Sqor D&O Defendants are referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

13.

Defendants are liable to CCM for violations of the Securities Act of 1933, 15 U.S.C. § 77a et seq; the Securities and Exchange Act of 1934, 15 U.S.C. § 78a et seq; the Louisiana Securities Law, La. R.S. 51:701 et seq; and intentional and negligent misrepresentation under Louisiana state law.

14.

Jurisdiction is proper under 28 U.S.C. §1331, as this is an action arising under the laws of the United States, namely, the Federal Securities laws. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

15.

Venue is proper under 28 U.S.C. §1391(b), as a substantial part of the events or omissions giving rise to the claim occurred in this District, and a substantial part of the property at issue is situated in this District.

## SQOR, INC.

### 16.

Sqor described itself and the product it offered in its business summary that was presented to CCM in July 2015:

> The Status quo of digital media for the Sports Enterprise is severely broken. Sqor is a platform that is built for the Sports Enterprise (Teams, Athletes, leagues, and Global Events) to recapture the IP they have given away to Facebook and other platforms over the past few years. At the same time Sqor turns what is currently a cost center into a profit center for the Sports Enterprise. This economic phenomenon has occurred in Broadcast sports too, and is the reason the SEC and PAC 12 created their own broadcast networks. Sqor has a total potential reach of 350MM+ fans and growing. Sqor's mission is to become the best enterprise solution for Sports in the world, while delivering the most engaging sports platform for Global sports fan. Connecting Athletes, Teams, Leagues, Events, and Sports Professionals with their fans and sponsors wherever they are. Sqor is a market place platform for sports.

It was in the venture described above that CCM invested $16+ million over the period of a year. CCM's investment was lost entirely due to artificially inflated value ascribed to Sqor due to the acts and omissions of Sqor, its employees, officers, directors, shareholders and agents as set forth below.

## THE SECURITIES

### 17.

In July 2015, Sqor, through the efforts of Wilhite, the Pontchartrain Defendants, Worley and May, solicited CCM to invest in Sqor.  Gregg contributed toward these efforts beginning in November 2015.  Sqor thereafter issued to CCM securities in the total principal amount of $16,900,000.00 from July 31, 2015 through June 15, 2016.  Collectively, the instruments described in ¶¶ 18-22, *infra*, shall be referred to as the "Securities."

### 18.

The "First Investment" on July 31, 2015, was a Loan and Security Agreement for $6,000,000.00.  The First Investment carried a high interest rate of 12% and the right to purchase

shares of preferred stock in a subsequent financing round. The borrower, Sqor, was permitted to request "Growth Capital Loans" of $500,000.00 or more up to a cumulative amount of $6,000,000.00. The First Investment also included a Series A Preferred Stock Warrant for 2,095,791 shares at a price of $0.19086 per share. As part of the First Investment, Sqor was required to provide to CCM a monthly "Business Summary Update" in addition to financial statements, projections and "other information as reasonably required by Lender."

19.

The "Second Investment" on December 3, 2015, was Supplement to Loan and Security Agreement for an additional $6,000,000.00. The Second Investment carried a high interest rate of 12% and the right to purchase shares of preferred stock in a subsequent financing round. The borrower, Sqor, was permitted to request "Growth Capital Loans" of $500,000.00 or more up to a cumulative amount of $6,000,000.00. The Second Investment also included a Series A Preferred Stock Warrant for 11,922,279 shares at a price of $0.14997 per share. As part of the Second Investment, Sqor was required to provide to CCM a monthly "Business Summary Update" in addition to financial statements, projections and "other information as reasonably required by Lender."

20.

The "Third Investment" on April 1, 2016, was Supplement No. 2 to Loan and Security Agreement for an additional $2,000,000.00. The Third Investment carried a high interest rate of 8% and the right to purchase shares of preferred stock in a subsequent financing round. Sqor was permitted to request "Growth Capital Loans" of $500,000.00 or more up to a cumulative amount of $2,000,000.00. The Third Investment also included a Series A Preferred Stock Warrant for 6,157,736 shares at a price of $0.14518 per share. As part of the Third Investment, Sqor was required

to provide to CCM a monthly "Business Summary Update" in addition to financial statements, projections and "other information as reasonably required by Lender."

21.

The "Fourth Investment" on June 15, 2016, was Supplement No. 3 to Loan and Security Agreement for an additional $2,750,000.00. The Fourth Investment carried a high interest rate of 8% and the right to purchase shares of preferred stock in a subsequent financing round. Sqor was permitted to request "Growth Capital Loans" of $500,000.00 or more up to a cumulative amount of $2,750,000.00. The Fourth Investment also included a Series A Preferred Stock Warrant for 6,593,013 shares at a price of $0.14518 per share. As part of the Fourth Investment, Sqor was required to provide to CCM a monthly "Business Summary Update" in addition to financial statements, projections and "other information as reasonably required by Lender."

22.

In or around October 2015, CCM purchased $150,000 of Series A-1 Preferred Stock.

23.

The "Business Plan" from July 2015 (described in detail *infra* ¶¶ 55-64) revealed other details of Sqor showing how risky the Securities were. Though the Investments were "secured," as represented by Sqor, the value of its assets were less than $2.5 million. This "security" was not even half enough to cover the amount of the First Investment, much less the Second, Third and Fourth Investment.

24.

The Business Plan showed a negative cash flow in July 2015; the cash flow remained negative throughout the period of the investments. It was therefore understood by all that repayment of the principal of the Investments could not come from income generated from operations. Instead, the

Business Plan touted an imminent capital raise of $25 million, and this was the Sqor's plan by which CCM would recover its principal amounts invested.

25.

During the period of mid-2015 through mid-2016, BB rated junk bond yields ranged between 4.5% and 7 %.  B rated junk bonds' yields were between 6% and 10% for the same period.  Therefore the 12% and 8% interest rates for the Investments were uncontrovertibly risky at the time of they were made.

26.

Prior to investing, CCM carefully scrutinized the Business Plan and all information provided to it by Sqor, the Pontchartrain Defendants, Wilhite Worley, May and later Gregg and Durham. CCM relied upon the information provided to it in making its decision to invest in a highly risky venture.  From prior to the First Investment through the Fourth Investment and beyond, CCM diligently asked for and received and considered information provided to it.

27.

Based upon the characteristics and terms of the Securities, CCM purchased them seeking a high return of multiples on their invested principal.  It was a risky venture, but CCM – based upon the false information provided to it – calculated that the potential of high investment returns warranted the investments and that the company had significant present value.  CCM never would have made these investments had it been provided accurate and truthful information and data.

28.

The Securities are "securities" under the federal and state securities laws.

29.

All Defendants are considered "sellers" under the federal and state securities laws.

## SOLICITING INVESTORS: PONTCHARTRAIN DEFENDANTS, SQOR, WILHITE, WORLEY AND MAY

30.

The Pontchartrain Defendants had direct communications with CCM for the purpose of soliciting them to purchase Securities. In all such communications, the Pontchartrain Defendants were self-interested in receiving compensation for arranging for the sale of the Securities. The Pontchartrain Defendants are both "sellers' and "substantial factors" in the sale of the Securities to CCM.

31.

The communications and solicitations by the Pontchartrain Defendants, as well as by Wilhite, Worley and May commenced in July 2015 and continued until May 2017.  Communications with Gregg and Durham and CCM commenced sometime after the First Investment.

32.

The Pontchartrain Defendants are not licensed as brokers or dealers or as an investment bank under any federal or state securities laws nor are they licensed with any self-regulatory organization such as Financial Industry Regulatory Authority or the National Association of Securities Dealers.

33.

Sqor paid the Pontchartrain Defendants compensation for structuring, soliciting and facilitating the investment by CCM in the Securities being issued by Sqor, and the compensation paid to the Pontchartrain Defendants by Sqor was a percentage commission on the Investment Amount invested by CCM, all of which is illegal under the federal and state securities laws. The Pontchartrain Defendants, upon information and belief, accepted all such commission-based compensation relating to the sale of the Securities to CCM.

34.

The Securities purchased by CCM were not registered with the Securities and Exchange Commission, and the solicitation and sales of these Securities did not satisfy any of the exemptions from registration provided for by the Securities Act of 1933.

35.

In inducing CCM to purchase the Securities, Defendants failed to disclose all the material facts surrounding the purchases. CCM relied on the representations and omissions of Defendants in deciding to purchase the Securities.

36.

Defendants had no private placement exemption for the offer or sale of the Securities for the following non-exclusive reasons (in addition to others to be shown through discovery and/or trial):

•     Defendants pursued a manner and method of offering devoid of establishing a substantive, pre-existing relationship with prospective investors;

•     The Sqor D&O Defendants used an unlicensed broker-dealer, the Pontchartrain Defendants, to offer and sell the Securities, which eliminates reliance on any private placement exemption as a matter of law and fact;

•     The Pontchartrain Defendants received an illegal commission on the sale of the Securities, which the Securities and Exchange Commission and several courts have determined eliminates any reliance on the private placement exemption;

•     Defendants offered the Securities to a large number of prospective investors, using several links in a chain of distribution involving both the Pontchartrain Defendants and contacts of the Sqor D&O Defendants;

•     Defendants failed to make any filing which would give rise to a presumption that there was a private placement exemption; and

•     Defendants used the means and facilities of interstate commerce, such as emails sent to a wide audience, in connection with the offer and sale of the Securities.

37.

The Securities were sold to CCM by Sqor for its general business use, and the Securities were sold to CCM as intended to produce a large profit from Sqor's general operations and "global" expansion and growth. In all respects, the Securities were marketed and intended as a source of capital (characterized as a "bridge loan" or "bridge capital") in the nature of a venture capital deal for what was portrayed as a growing technology company.

## THE FACTS: MATERIALLY FALSE STATEMENTS, RECKLESSLY OR KNOWINGLY MADE

38.

Commencing in July 2015 and continuing until April 2017, Sqor, Wilhite, Worley, May and Gregg made a series of continuing reckless and/or fraudulent misrepresentations (both verbal and written) to CCM to induce it to purchase the Securities.

39.

Prior to any CCM investments, in July 2015, Defendants sent a document entitled "Business Plan" (the "Business Plan") to CCM to solicit its interest in the Securities. The Business Plan was created and/or approved by Sqor, the Pontchartrain Defendants, Wilhite, May and Worley.

40.

The Business Plan provided to CCM clearly describes the investment being sought by CCM and others as a growth loan designed to help Sqor "fund immediate international growth, and allow the company to secure up to 10 major Sports Enterprises over the next six months." In addition, Sqor, represented to CCM that it would "be in the market raising a round of equity capital of up to $25mm in Q1 2016, and it is the company's intention to use this capital to repay all loans, and continued global growth opportunities." Further, Sqor represented to CCM as follows: "Sqor is seeking financing in order to continue operations, while expanding capacity to capture a larger market." In

addition, Sqor provided an Executive Summary to CCM describing the investment as a "bridge loan" to raise equity financing, which would make underlying and additional Warrants and Stock being issued to investors extremely valuable. In emails, such as one sent from Hammer to CCM and Wilhite on July 17, 2015, the Investments were referred to as "bridge loans."

41.

In several places, Sqor represented to CCM that it would raise additional growth equity capital to repay and "cover all loans and continued global growth opportunities." The Executive Summary further describes the Securities as an investment in "growth capital [to] fund our immediate international growth[.]" CCM believed that an investment in the Securities brought with it the promise of extremely high profits, far in excess of secured business loans or other types of loans more common to banking activities.

42.

Sqor, Wilhite, the Pontchartrain Defendants, Worley and May knew at the time they provided the Business Plan to CCM that Sqor would not or could not fund immediate international growth or secure up to ten (10) major Sports Enterprises over the next six (6) months. At the same time, Sqor, Wilhite, the Pontchartrain Defendants, Worley and May knew Sqor could not raise round of equity capital of up to $25,000,000. They also knew Sqor would not be able to repay all loans because Sqor would not be able to raise the $25,000,000 equity capital. Nevertheless, Sqor, Wilhite, the Pontchartrain Defendants, Worley and May made and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities. Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, and later Gregg, continued make these misrepresentations to CCM

through April 2017, in the attempt to conceal these misrepresentations, forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional Securities to CCM's detriment and Sqor's benefit. Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, and Gregg misrepresented these facts to CCM so that  they would prosper from CCM's Investments and Securities purchases.  This was true for all, as they were all shareholders.  It was particularly true for May and Worley because, unbeknownst to CCM, the plan was to take CCM's $6 million investment and pay back $4.1 million to Worley and May for previous loans they had made to CCM.  Not much of the First Investment ended up going to "growth."

43.

Sqor's Business Plan also included a growth chart that recklessly and/or fraudulently misrepresented Sqor's net income for 2016 to be $1.3 million, projected 2017 net income as $12.7 million, and projected 2018 net income as $44 million. The numbers on the chart were driven by from certain measures and data Sqor touted that simply were not true (as discussed in the paragraphs following below).

44.

Sqor materially misrepresented the number of its "fans" (which are the names of its "users") at 325,000,000 in the Business Plan.  In other sections of the Business Plan, Sqor materially misrepresented that "Sqor has a total potential reach of current combined social reach of 350MM+ fans and growing." The Business Plan further falsely states, "In April of 2014 the first version of Sqor launched with Brett Favre as the featured athlete, now a little over a year later the company has over 1000 athletes, is on its fourth version, and has reached over 50 million fans."

45.

Sqor, Wilhite, the Pontchartrain Defendants, Worley, and May knew at the time they provided the Business Plan to CCM that Sqor did not have 325,000,000 fans or users, and Sqor did not have a social reach of 350MM fans or users. At the same time, Sqor, Wilhite, the Pontchartrain Defendants, Worley and May knew Sqor did not have over 1,000 athletes and had not reached over 50 million fans. Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, and later Gregg, made and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities, and through April 2017.   These misrepresentations were concealed in order to forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional Securities to CCM's detriment and Sqor's benefit. These facts were misrepresented to CCM to induce CCM to invest in the Securities so that Sqor, alone would prosper from CCM's Investments and Securities purchases.

46.

The Business Plan even went so far as to misrepresent that the Sqor social media platform's user growth metrics exceeded that of many well-known and established technology companies, such as Twitter, LinkedIn, and others in its Business Plan, showing CCM and other investors the following social media growth metrics, none of which were accurate:



In April 2017, CCM learned from Bachadakis' associate that this data was phony.

47.

Sqor, Wilhite, the Pontchartrain Defendants, Worley, and May knew at the time they provided the Business Plan to CCM that Sqor's user growth metrics did not exceed that of many well-known and established technology companies, such as Twitter, LinkedIn, and others in its Business Plan. Nevertheless, they, and later Gregg, made and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities. Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, and later Gregg, continued make these misrepresentations to CCM through April 2017, in the attempt to conceal these misrepresentations, forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional Securities to CCM's detriment and Sqor's benefit.

14

48.

Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, and later Gregg, actively or passively participated in the marketing of the Securities to CCM through various misrepresentations in July 2015 before CCM funded the first round under the First Investment and continuing through the Fourth Investment, up until Spring June 2017, as Sqor's controlling persons and sellers continued to solicit CCM for further investment. They engaged in these misrepresentations in person meetings with CCM, via telephone and via email communications transmitting materially misleading information and/or information which contained material omissions regarding the business of Sqor. In a series of continuing written and verbal misrepresentations spanning from July 2015 until July 2017, Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, Gregg recklessly and/or fraudulently misrepresented Sqor's ability to attract additional investor capital, which only became apparent in April 2017 when it was revealed by Defendants that various investors had declined to invest further funds, that deals allegedly in the pipeline had collapsed and/or that investment bankers were unable or unwilling to market Sqor for further financing.

49.

From July 2015 until July 2017, Defendants consistently misrepresented the number of "users" of the Sqor application and platform, apparently attributing certain professional athletes' social media followers as "users" of Sqor for purposes of evaluating growth metrics. These misrepresentations and/or omissions relating to the actual number of users were made in verbal and written materials presented to CCM on a continuing basis and used to portray the Securities and Sqor as more valuable to CCM. Each of the Defendants at various points throughout these investment rounds misrepresented to CCM the number of users and potential users of the Sqor technology, realistic prospects for alleged deals in the pipeline and the financial projections. Until July 2017,

none of the Defendants informed CCM of material facts that were omitted that would allow it to determine that the misrepresentations were untrue (for example, that it was conflating the "followers" of certain athlete's social media accounts as Sqor "users" or "fans" for purposes of fundraising metrics). It was only revealed to CCM in April 2017 that Sqor had misrepresented the number of its users by conflating the social media followers of its athletes with its supposed users of its technology.

50.

From July 2015 through May 2017, Defendants (in particular, Brian Wilhite, May, Worley, Gregg and the Pontchartrain Defendants) misrepresented the likelihood of several potential business developments such as the likelihood other sports clubs and organizations join Sqor and use its technology.  Some of these included: the LA Clippers, LA Angels, Chicago Bulls, Chicago Bears, Chicago Cubs, Chicago Blackhawks, NASCAR.  In an email on March 2, 2016, Wilhite went so far as to say he had engaged the NFL Players' Union and that they "parted with an understanding and agreement (Verbal MOU) to move forward to an "official" partnership between us."  All of this was untrue.  There were no deals or reasonable prospects of deals.

51.

From the beginning of Sqor's solicitation of CCM's investments, one of the most highly touted relationships was with FC Bayern Munich, the fourth most valuable football (soccer) club in the world and reported to generate the most commercial revenue of any football club globally.  This gave Sqor the appearance of status and achievement.  But the FC Bayern Munich play was a sham, perfectly executed by Wilhite.

52.

During the courting of CCM in July 2015, CCM was shown a "Sports Enterprise Service Agreement" with FC Bayern Munich listed as Sqor's partner; in the upper right-hand corner was the

16

heard, "Privileged and Confidential, 04 June 2015" ("June 4 Draft").  The document was unsigned, but was provided by Wilhite and Hammer, to demonstrate that it was "close" to closing the deal as depicted in the document and expected the deal with FC Bayern Munich to be completed imminently. Wilhite described it as such: "this is standard and used for all teams" in an email to CCM and cc'ing Hammer.

53.

What CCM did not know, and did not realize until after its investments had been made, it was the victim of a bait and switch by Wilhite.  After the First Investment was secured, Wilhite emailed a Spots Enterprise Agreement with FC Bayern Munich ("FCB") dated August 3, 2015 (the "August 3 Agreement"), and it looked exactly the same – same type, same formatting, same number of sections and subsections, same signature block, same attachments; but it had some critical differences made by changes to just a handful of words.  And neither Wilhite or any of the D&O Defendants pointed out that the "standard used for all teams" was not what FCB signed.  Here are the critical differences:

- The June 4 Draft states, FCB "shall post all important information" on Sqor.  What the August 3 Agreement actually stated was, FCB "intends to post all important information" on Sqor.

- The June 4 Draft states, FCB "will use the Sqor Platform as the primary social media channel."  What the August 3 Agreement actually stated was, FCB " intends to use the Sqor Platform as social media channel at least as equally as its other primary social media channels."

- The June 4 Draft states: FCB "Shall ensure to obtain the necessary rights from athletes to post" their pictures, press releases, comments, etc. on Sqor.  What the August 3 Agreement actually stated: FCB "will use its reasonable effort to obtain the necessary rights from athletes to post" their pictures, press releases, comments, etc. on Sqor.

- The June 4 Draft states: FCB "shall post at least 5 (five) new pieces of Sports Enterprise Content and 5 (five) pieces of Athletes Content per day on the Sqor Platform. What the August 3 Agreement actually stated: FCB "intends to post at least 5 (five) new pieces of Sports Enterprise Content and 5 (five) pieces of Athletes Content per day on the Sqor Platform."

54.

Thus, the Agreement did not bind FCB to anything meaningful; because in reality, this was at best an "MOU" mislabeled as an "agreement."  It certainly was not the standard agreement used for all teams as previously represented by Wilhite. But with money now secured, Wilhite had wagered that CCM would not notice these sleight of hand changes that vastly undercut the value of the deal.  And since not Wilhite, nor anyone else, pointed it out to CCM, he got away with his deception.

55.

The highly anticipated contract with FC Bayern Munich, conveniently closing concurrently with CCM's First Investment, was represented as the achievement for Sqor which would give it a huge leg up on the competition and generate significant cash flow.  It was the subject of email traffic between CCM and Wilhite and Hammer for the following year, with many promises and prognostications made.  However, no revenues of any significance seemed to ever be realized from the Agreement with FCB, which was supposed to be the crown jewel of Sqor from the time of the First Investment.  It became clear later why the deal with FCB never amounted to much: the "deal" promised nothing of substance and was not what CCM was told the deal would be.

56.

Sqor and its controlling persons provided very detailed projections that were more than simple projections.  At their base, the projections started with sports team "targets" and stated what stage of negotiation they were each in.  Some were mutual interest, some were "in negotiations," some were supposed to close soon, somewhere scheduled to close imminently.  Dollar figures were attached to each of these prospective deals and they were assigned a percentage chance of them closing.  The problem is that these were not just rosy scenarios or puffery.  These were projected

18

deals with impressive, identified third parties that Wilhite and Gregg knew were not going to happen. Over a 2-year period, out of perhaps a hundred major "deals," none ever occurred.  That is not just bad luck, and it is not just a failure of optimism.  It is simply knowing misrepresentation to hint that these prospects were close. At no point in time did any of the Defendants correct this reality, while in fact portraying the opposite to be true. Wilhite and Gregg received skepticism from CCM on these matters, but CCM was adamantly reassured by other Defendants, such as Hammer, May and Worley, that these deals were all real.

57.

One example is ESPN.  Wilhite represented that ESPN was very interested in Sqor and had in fact discussed eventually buying Sqor.  This purported opportunity was put forth by email on December 13, 2016 and continued through summer 2016.  CCM learned later that, the reality as was later found out, was that there was a preliminary meeting with a mid-level person at ESPN, but the relationship with ESPN did not get past that point, and therefore there never was a potential deal to be had.

58.

On or about March 1, 2016, Hammer and/or Wilhite sent an email to CCM conveying that a prospective investor, the Mailman Group, was interested in investing in Sqor and purchasing a franchise license to Sqor China and other Asian countries (Hammer even suggested a price tag of $50 million for the right, but suggested Yao Wen, Bachadakis' co-founder of CIP Holding, AG, would pursue China or not wish to engage with the Mailman Group). On or about that same day, Wilhite sent an email to CCM showing Sqor's "Global Footprint" by illustrating a "heatmap" of users across the globe. Later, on or about May 4, 2016, Hammer forwarded an email to CCM from Wilhite and Gregg to provide a business development update, stating that ESPN was interested in

discussing the Series B and other business development opportunities with Sqor. Further, on or about May 13, 2016, Hammer emailed CCM saying that Sqor heard some very good news from their conversations with Chase Bank.   These misrepresentations, which were ever-changing, were diversionary.

59.

On or about March 2, 2016, Wilhite sent an email to CCM saying that he met with the president of NFL Players, Inc. a subsidiary of NFL Players Association and that they "parted with an understanding and agreement (a 'Verbal MOU') to move forward to an 'official' partnership between us."  Not true.

60.

Defendants made the following additional material misrepresentations to CCM:

•   November 19, 2015: In an email correspondence between Hammer and CCM, Hammer asked CCM if it wanted to proceed with a second round of funding, and in the same email stated that Sqor met for a second time with the Dallas Cowboys organization, which he stated was going to sign up with Sqor.  This was untrue.

•   December 1, 2015: Wilhite misrepresented to CCM via emails from Defendants that Sqor had undertaken a new revenue opportunity pipeline, which would provide Sqor with $5.5 million in revenue.

•   May 25-31, 2016: Defendants Hammer and Wilhite misrepresented to CCM via emails and telephone conferences that Sqor would partner with Under Armor, which would significantly enhance Sqor's user reach, popularity and value.  CCM later learned this was a deal not remotely close to happening.

20

•      May 25, 2016: Wilhite and Gregg misrepresented Sqor's "revenue velocity" via spreadsheet and emails and phone calls to CCM.

61.

During all relevant times, Favre knew or should have known Sqor was conflating Favre's social media followers and fans with those of Sqor and misstating the influence of Sqor based on Favre's own social media and advertising reach. For example, the Defendants sent CCM a "Brand + Capabilities + Deck- 5.2016.pdf" (the "Brand Capabilities Deck") which specifically states that Sqor had a "social post reach" of 2.5 million followers, with "10x" higher average engagement. The Brand Capabilities Deck prominently displays a photo of Favre as an endorser of Sqor, and that Favre was a director and shareholder of Sqor during all of these times. In conversations and in written materials, Sqor portrayed the social media followers and users of other platforms (such as Favre's) as Sqor's own user base, confusing CCM and causing it to believe that Sqor's technology enjoyed widespread adoption among millions of users. Favre received benefits from Sqor in the form of equity, athlete payments and private jet costs, among other things.

62.

Sqor provided CCM with several financial statements and projections, beginning in October 2015 and until June 2017, which contained material misstatements and omissions relating to the actual number of users of Sqor technology, revenue pipeline and opportunities, use of funds by employees and other flaws, to be proven at trial.  The Brand Capabilities Deck contained a host of other misrepresentations: Conor McGregor to drive 16 million ad impressions with 344,000 users engaged; Ron Gronkowski to drive downloads of the Mobile Strike game with 7.5 million impressions and 71,000 users engaged; and partnerships with NFL Athletes (Richard Sherman, Rob Gronkowski and Odell Beckham, Jr.), NFL Retirees (Brett Favre, Matt Hasselback and Steve

Marinucci) and "Sports Icons" (Allen Iverson, Conor McGregor and Pele). As it turned out, none of these NFL, Retirees Athletes (except for Favre) or Icons used the Sqor online social media platform, nor did the social media platform have millions of users or hundreds of thousands of users engaged on it.

63.

The Brand Capabilities Deck also misrepresented the endorsement of NBA Players and the actual prospects and existence of a "Road to the Draft" program, which was to provide an online Q&A Chat and Custom Content program on Sqor's social media platform. Sqor misrepresented that it "has a collection of NBA Athletes, NBA Retirees and Sports Icons to activate content and Fan-based experiences" and that these sports mega stars "will create content, provide unique giveaway prizes and drive promotional support through their millions of Fan connections," all of which was false.

64.

Sqor, through various controlling persons, including Wilhite, regularly misrepresented monthly active users ("MAUs") and daily active users ("DAUs") – fundamental and critical metrics for online social platforms – of the "Sqor Platform" to CCM, including in various presentations, spreadsheets and conversations over the course of 2015 until it became clear in April or May of 2017 that Sqor's platform did not have the number of MAUs or DAUs that Defendants portrayed to CCM. By the time that CCM invested, Sqor was representing its MAUs and DAUs as numbering in the millions when, in fact, it was a fraction of that.

65.

Sqor severely misstated or omitted material information regarding supposed agreements, beginning in August 2016 (or, possibly July 2016) with Omnicom Media Group, which Sqor said

22

would yield $7.5 million in revenue in the first year, $15 million in revenue in the second year and $25 million in the third year.  In an email to CCM on August 17, 2016, Wilhite even referred to "our recent Omnicom Media Group (OMG) deal (Expected $7.5mm over next 12 mos)."  There never was such a deal.

66.

Sqor, Wilhite and Gregg at least, knew at the time they made the aforementioned representations to CCM that they were false. Nevertheless, Sqor, Wilhite, the Pontchartrain Defendants, May and Worley continued to make and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence leading up to and very soon before CCM's First Investment, Second Investment, Third Investment and Fourth Investment, and all other investments which comprise the Securities. Defendants continued to make these misrepresentations to CCM through April 2017, in the attempt to conceal these misrepresentations, forestall legal action, and induce CCM to sink further investments into Sqor and purchase additional securities to CCM's detriment and Sqor's benefit. Defendants misrepresented these facts so that Defendants alone would prosper from CCM's Investments and Securities purchases, both past and future.

67.

The various misrepresentations, omissions and deceptions only became reasonably knowable to CCM in April 2017, when a representative of Bachadakis met with CCM to reveal the truth, particularly with respect to the MAUs and DAUs. Bachadakis' representative relayed that Wilhite and Gregg routinely told third-party potential investors and customers that Sqor's MAU was generally around 10 million, a key threshold for receiving advertising revenue, but in Sqor's case, the number was not true.

23

68.

The Sqor D&O Defendants misrepresented the use of funds invested by CCM in various Securities by using such funds to pay back loans to certain individual directors, such as May and Worley and inflated salaries of Wilhite, Emaleigh, and Gregg (and possibly, others), compensation to directors and "athletes", in violation of applicable law. At the very least, if this fact was not intentionally concealed to CCM, the Defendants failed to disclose this fact to CCM even though each Defendant had a duty to disclose this information to CCM.

**CONTROLLING PERSONS**

69.

As shown by the information set forth above, Wilhite and the Pontchartrain Defendants were controlling persons.  They had the direct and indirect power to control the direction of management and policies of Sqor.

70.

Dimitrios Bachadakis ("Bachadakis") was a shareholder and board member of Sqor.  He was in charge of continuing efforts to attract European football (soccer) teams and enter into contracts with them for Sqor.  A substantial portion of anticipated revenues for Sqor would be through Bachadakis' efforts, as Sqor represented to CCM and investors that Sqor was making great strides in securing deals with clubs like Paris St. Germain, FC Barcelona, and Real Madrid.  Furthermore, Bachadakis solicited potential investors, including CCM.  As such, Bachadakis directly and indirectly controlled Sqor, its policy and had great influence over the direction of Sqor.  Bachadakis is therefore a control person.

71.

Brett Favre ("Favre") was a shareholder, board member and arguably was the most important person at Sqor.  Favre had been with Sqor since near the very beginning of Sqor's existence, and he routinely signed board resolutions.  Being a major endorser of famous brands, such as Wrangler, Nike, Mastercard, Remington, Snapper and Prilosec, the prestige and legitimacy Favre leant as "the face" of Sqor was critical to any success it might have. Favre had a contract with Sqor from the beginning to be its "Official Spokesperson."  An article in USA Today ion July 18, 2014, highlighted Favre's involvement with Sqor and that he was a member of Sqor's board.   In the article the misleading, and false, figure of "1,500 current and former pro athletes" were members of Sqor.  On August 20, 2014, Sqor was highlighted in an article on venturebeat.com, stating "Sqor delivers the most entertaining content publishing platform for athletes in digital sports."

72.

Favre was not passive and remined involved as Sqor's ambassador through 2016, appearing at various times with Wilhite on ESPN and CNBC talk shows.  Favre, Wilhite and Sqor were featured in a USA Today article on August 4, 2016, noting that Favre sat on Sqor's board of directors and was "very selective" in choosing which brands to endorse and promote.

73.

It was Favre's user/follower figures that Sqor improperly used and conflated with its own numbers to, for misrepresenting Sqor's footprint and user base.  Finally, Favre personally met with investors and was a major factor in Sqor being able to raise funds.  As such, Favre directly and indirectly controlled Sqor and had a tremendous influence over the direction and success or failure of Sqor.

74.

Brian May ("May") was a shareholder, board member and lender to Sqor.  Prior to CCM's First Investment, May had loaned a substantial amount of money to Sqor.  Along with loans from Mike Worley and a third person, those loans totaled $4.1 million, but were improperly paid back with the lion's share of CCM's First Investment of $6 million.  May worked on Sqor business on a near-daily basis, allocating more of his time to Sqor than his regular business, Diversified Healthcare, L.L.C.  In order to induce CCM to invest more money in Sqor, May relayed to CCM that if Sqor should more funds, he, along with Worley, stood ready to lend money to the company. May also contributed his time and efforts to seeking additional investors in Sqor to raise capital.  As such, May had the power to influence the direction of Sqor.

75.

Michael Worley ("Worley") was a major investor and board member of Sqor.  Worley was active in soliciting investors for Sqor, including CCM.  He induced CCM to invest more money by providing a personal guaranty of CCM's investment, which eventually turned out to be worthless after Worley declared bankruptcy.  At the bankruptcy it has become clear that Worley had deceived CCM in providing false financial information to induce CCM to make the Investments.

76.

Jon Gregg ("Gregg") was shareholder and the Chief Revenue Officer for Sqor.  He was involved in the day-to-day operations of Sqor.  Gregg oversaw sales for Sqor and was the person in charge of generating, charting and forecasting revenues from various partnerships with sports teams and associations.  Gregg had direct control over the direction of the company, as he primarily was responsible for the misleading and false financial projections based upon deals and sales that never eventually occurred.  CCM and other investors relied to their detriment on Gregg's knowingly false and inflated projections.  For instance, in the midst of Sqor's death spiral, Gregg generated a  forecast

of "receivables summary" on May 25, 2016 that showed over $10,000,000 in "bookings" revenue in June of 2016, thus inducing CCM to make the Fourth Investment, according to Wilhite and Gregg, this $10 million did not "include the handful of bigger items such as Havas Media and Chase Bank."

77.

Gregg managed and generated what he knew to be unrealistic and misleading "leads" and potential revenue source partners for Sqor. One such instance was in late May 2016, in which Gregg touted, along with Wilhite, a potential deal with Under Armor that turned out to be nothing but pure speculation. CCM suggested that Wilhite and Gregg might want to pursue "lower hanging fruit" (i.e., smaller potential partners more "eager" to make a deal), but Wilhite shook off that suggestion. These smaller deals, like Havas, Machine Zone, and Cricket had been represented to be deals is the making months earlier. But those, it was discovered later, were not viable either. CCM later learned that Sqor's contact at Under Armor specifically told Sqor that Under Armor was not looking at doing any new acquisitions, including Sqor.

78.

In May 2016, Gregg and Wilhite relayed to CCM as "VERY CONFIDENTIAL" that a multi-million-dollar deal with the MLB Players Union was imminent. Gregg created the charts used to show CCM, and Wilhite forwarded it. Only later did CCM learn that like so many other deal "targets," that were "very close," that this one was fabricated.

79.

Near the end, as CCM came to learn too late, that Gregg and Wilhite were simply making up potential partners, with which no deals were plausible, to induce CCM to invest more or not take action. In April 2016, Gregg generated and Wilhite distributed to CCM, a "Revenue Velocity" which

claimed Sqor was "in discussion" with Nike, Intel, FitBit, Nestle, Samsung, Visa and Kingsford. None of this was true, which CCM later learned.

80.

In December 2015, Gregg reported to Wilhite, who passed along to CCM, that he was going back for an "initial close" with Major League Soccer.  This was untrue, and the deal never happened.

81.

Emaleigh Wilhite ("Emaleigh") is married to Brian Wilhite and was his co-founder and Sqor's Controller.  Emaleigh worked day-to-day at Sqor.  She was in charge of the company's finances, including managing Sqor's bank accounts, requesting draws on the loans from CCM, preparing and forwarding the monthly "deliverables" (i.e., financial statements and business reports). Emaleigh was one of the very few people at Sqor that had access to the Sqor financial accounts., and upon information and belief, at times she was the only authorized signer on Sqor's bank accounts (though May and Wilhite were signors at various times). She also accompanied Brian Wilhite on trips, including to Europe, in efforts to make deals with sports organizations on behalf of Sqor.

82.

John Durham ("Durham") was a shareholder and board member of Sqor.  Durham, and his firm Catalyst SF, had been involved with Sqor from its infancy.  Durham, a professor at University of San Francisco, specialized in marketing strategies and offered to Sqor entry into markets with partners to whom he could introduce Sqor.  Durham was well-known in the media industry and held himself out as the gateway to garner partnerships and or investments with groups like Omicron Media Group.  Durham himself admitted he was a controlling person, with the ability to directly influence the direction of Sqor, when he told CCM in May 2017 that he had not realized how badly things had gone at Sqor, and that if he had, he would have done something about it.  He also pledged from that

point forward to help get Sqor back on the right path, affirming that he had the power within Sqor to do so.

83.

On November 20, 2015, Durham devised the "media plan" for Sqor advertising, which was then forwarded to CCM by Wilhite for the "Spring Launch" that would set the course for Sqor to generate enough revenues to reach positive cash flow.

84.

As set forth herein, the Sqor D&O Defendants, individually and collectively, as members of the board of directors, controlling officers and controlling shareholders of Sqor, had the right to direct and control the activities of Sqor, including the solicitations, representations, omissions and manner of offering the Securities at issue in this lawsuit. Further, the Sqor D&O Defendants did actively exercise control with respect to the actions and omissions complained of by CCM in this Complaint.

85.

Each of the Sqor D&O Defendants are "controlling persons" of Sqor within the meaning of federal and state securities laws and had the right to and did exercise control over the securities offerings upon which this lawsuit is based.

**THE DAMAGE DONE**

86.

Due to the misrepresentations, intentional and reckless, set forth above, the value of Sqor was artificially inflated at the time CCM invested.  Because it turned out that there was no imminent $25 million third party investment, and because there were no revenue generating deals, the value of Sqor at the time of investment was likely $0.  The cash burn rate was so high, and the undisclosed debt

repayments to prior investors so crippling, if the truth was put up front to CCM, they would have recognized the venture as having little or no value.

87.

On October 3, 2017, Sqor filed for Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the Northern District of California.  As the matter has progressed, CCM, along with the other creditors, has learned that the bankruptcy estate is essentially worth nothing.  CCM's entire $16.9 million investment, plus accrued interest of more than $2 million, has been reduced to $0.00.

88.

In order to induce CCM to make its Third and Fourth Investments, Worley personally guaranteed all of Sqor's investments in June 2016.  In January 2017, Worley declared bankruptcy in the U.S. Middle District of Louisiana Bankruptcy Court.

<strong><u>CAUSE OF ACTION NO. 1:</u></strong><br>
<strong><u>SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT OF 1934 & RULE 10b-5</u></strong>

89.

In soliciting the purchase of the Securities by CCM, Defendants failed to accurately and completely disclose all material facts. This failure to adequately disclose all material facts was made with scienter.  CCM justifiably and reasonably relied on the representations and omissions of Defendants and it believed that it could trust the various Defendants in their representations to CCM. CCM would not have invested in the Securities had it known of the misrepresentations and/or omissions being made by Defendants.  Defendants are thus liable for violations of Section 10(b) of and Rule 10b-5 promulgated pursuant to the Securities and Exchange Act of 1934, 15 U.S.C. 78a et seq. (the "'34 Act").

90.

CCM is entitled to all appropriate damages, including but not limited to return of the purchase price, consequential damages, attorneys' fees, and interest as provided by law.

91.

The violations of the '34 Act and Rule 10b-5 are timely because they are being brought within one year of the date that CCM knew or reasonably should have known of the alleged misrepresentations and within three years of the first purchase of the Securities.

92.

CCM conducted all reasonable due diligence regarding the business of Sqor in light of the circumstances, but the fraudulent and/or reckless misrepresentations of Defendants made it impossible or unreasonable for CCM to uncover the actual facts relating to Sqor's business.

93.

The Sqor D&O Defendants are all controlling persons under law by virtue of their ownership and ability to control the actions of Sqor as its Directors and Officers. The Pontchartrain Defendants are sellers of the securities under law.

94.

The Sqor D&O Defendants and the Pontchartrain Defendants further conspired to violate the '34 Act for their personal enrichment and aided and abetted each other in the violations complained of herein.  Specifically, the Pontchartrain Defendants continued to work closely with one or more Sqor D&O Defendants in order to conceal or obfuscate the true financial picture of Sqor on a continuing basis from July 2015, and the Pontchartrain Defendants further attempted to act as an intermediary to obtain more financing from CCM despite the poor performance of Sqor, all for the personal benefit of the Sqor D&O Defendants and the Pontchartrain Defendants.

## CAUSE OF ACTION NO. 2:
## VIOLATION OF THE LOUISIANA SECURITIES LAW

### 95.

The acts and omissions complained of *supra* constitute violations of the Louisiana Securities Law, La. R.S. 51:701 et seq. CCM is entitled to all appropriate damages, including return of the purchase price, consequential damages, attorney's fees, interest, and any other relief appropriate under the circumstances.

### 96.

The Sqor D&O Defendants are controlling persons under the Louisiana Securities Law, and the Pontchartrain Defendants acted as unlicensed dealers and/or salesmen under the Louisiana Securities Law.

## CAUSE OF ACTION NO. 3:
## NEGLIGENT AND INTENTIONAL MISREPRESENTATION

### 97.

The acts and omissions complained of *supra* constitute negligent and intentional misrepresentation in violation of Louisiana state law. CCM is thus entitled to all appropriate damages, including but not limited to return of the purchase price, consequential damages, interest and attorneys' fees. All Defendants knew or should have known that the information being presented to solicit investment by CCM was either false or incomplete to the point that it was clearly misleading.

### 98.

All Defendants had a duty to inform CCM of material facts relating to its investment in the Securities by virtue of their affirmative acts and statements in soliciting investment from CCM, the fact that they personally benefitted from the CCM investments, their fiduciary relationships to CCM,

the fact that they or their affiliates were in contractual privity with CCM and other legal duties imposed on them by law, among other facts and circumstances to be proven at trial.

99.

CCM reasonably relied on all of the misrepresentations and omissions to its detriment and suffered injury in the form of loss of their entire investment in CCM, attorneys' fees, professional services fees and other damages in an amount to be proven at trial.

**PRAYER**

WHEREFORE, plaintiff, CCM, respectfully pray that after due proceedings are had there be judgment in their favor and against Defendants for the following:

(1) return of the $16,750,000 purchase price of the Securities on the basis of a rescissionary measure of damages (as opposed to actual rescission), less any amounts actually received by Plaintiff by any guarantor or Sqor for payments on the Securities (to the extent that a "tender" of any securities is required by law under a rescissionary measure of damages or remedy, then plaintiff hereby tenders the Securities, along with all judgments in any other proceedings related thereto);

(2) consequential damages;

(3) attorneys' fees as provided by law;

(4) interest as provided by contract and law; and

(5) all appropriate relief under law and equity.

Respectfully submitted,

CARA STONE, LLP


/s/ William F. Large
William F. Large, Bar Roll No. 34837
Adam Vickers, Bar Roll No. 34992
Mark Graffagnini, Bar Roll No. 30527
650 Poydras Street, Suite 1130
New Orleans, LA 70130
(504) 265-9955 (phone/fax)
wlarge@carastone.com
avickers@carastone.com
mg@carastone.com

**Counsel for Plaintiff Callais Capital
Management, LLC**


## CERTIFICATE OF SERVICE

I hereby certify that on 21st day of September 2018, I caused to be served via the Court's CM/ECF system the foregoing on all counsel of record.


/s/ William F. Large