**LOAN AND SECURITY AGREEMENT**

**BORROWER:**    Sqor, Inc.                                    **DATE:   JULY 31, 2015**

This **LOAN AND SECURITY AGREEMENT** (this "Agreement") is entered into as of the date set forth above (the "Effective Date") by and between **CALLAIS CAPITAL MANAGEMENT, LLC**, a Louisiana limited liability company ("Lender"), and the borrower(s) named above (collectively, "Borrower"). Capitalized terms used but not otherwise defined herein shall have the meanings given them on Schedule C. The parties agree as follows:

1.    Loans. Lender will make non-revolving extensions of credit or other financial accommodations for Borrower's benefit for general corporate purposes (individually, a "Loan" and collectively, "Loans"), and Borrower promises to pay to the order of Lender the amount of all Loans and other debts, principal, interest, Lender Expenses and other amounts Borrower owes Lender now or later, including interest accruing after any insolvency proceedings begin, and debts, liabilities, and obligations of Borrower assigned to Lender pursuant to the terms and conditions of this Agreement or any Loan Document and as set forth on Schedule A. Lender's obligation to make any Loan is subject to its receipt of the agreements, documents and fees it reasonably requires, including without limitation the agreements, documents and fees set forth on Schedule A.

2.    Security Interest. As security for all present and future Obligations and for Borrower's performance for each of its duties hereunder, Borrower grants Lender a continuing security interest in all of Borrower's interest in the Collateral (as defined in Schedule B).

3.    Representations, Warranties and Covenants of Borrower. Except as set forth under Schedule D attached hereto, Borrower represents, warrants and covenants to Lender as follows, as of the Effective Date and with respect to covenants, for so long as this Agreement is in effect or any Obligations remain outstanding.

   3.1    Corporate Existence; Authority. Each of Borrower and its Subsidiaries is and will continue to be, duly existing and in good standing in its state of formation and qualified and licensed to do business in, and in good standing in, any state where such qualification is necessary, except for jurisdictions in which failure to do so would not have a material adverse effect on Borrower. The execution, delivery and performance by Borrower of this Agreement and all other related documents have been duly and validly authorized, do not conflict with Borrower's formation documents, and do not constitute an event of default under any agreement by which Borrower is bound and which has a value in excess of $15,000.

   3.2    Collateral. Lender has and will at all times continue to have a first-priority perfected security interest in all of the Collateral except for Permitted Liens. Borrower has, and will continue to have, good title to the Collateral, free of any liens except Permitted Liens. Borrower will immediately advise Lender in writing of any material loss or damage to the Collateral. If, at any time, Borrower has knowledge that it shall have acquired a commercial tort claim, Borrower shall promptly provide written notice thereof to Lender and grant to Lender in writing a security interest therein and in the proceeds thereof.

   3.3    Financial Matters. Borrower has delivered (or will deliver prior to the Effective Date) to Lender copies of the audited financial statements of Borrower as of December 31, 2013 and December 31, 2014 and the internally prepared financial statements of Borrower as of June 30, 2015. All financial statements (including notes and schedules) now or in the future delivered to Lender, (i) have presented, and will present, fairly in all material respects Borrower's financial condition and its results of operations, and (ii) have been, and will be, prepared in conformity with generally accepted accounting principles ("GAAP"). Since the last date covered by any such statement, there has been no material impairment in the financial condition or business of Borrower. Borrower will promptly provide Lender with all financial reports as set forth on Schedule A attached hereto, as well as any other financial information reasonably requested by Lender from time to time, including budgets, projections and plans.

   3.4    Statement of Borrower's Information. All of Borrower's information set forth on Schedule D is true and correct as of the Effective Date, and Borrower shall provide written notice to Lender of any material changes within the prescribed periods of time set forth therein.

3.5     <u>Taxes; Legal Compliance</u>.  Borrower has filed, and will file, when due, all tax returns and reports required by applicable law.  Borrower has paid, and will pay when due, all taxes, assessments, deposits and contributions now or in the future owed (except for taxes and assessments being contested in good faith with adequate reserves under GAAP). Borrower has complied, and will comply, in all material respects, with all applicable laws, rules and regulations.

3.6     <u>Insurance.</u>  Borrower shall at all times insure all of the tangible personal property Collateral and carry such other business insurance (of the same type and amounts) as is customary for companies similarly situated to Borrower.  All property policies will have a lender's loss payable endorsement showing Lender as a lender loss payee and all liability policies will show Lender as an additional insured and provide that the insurer must give Lender at least twenty days' written notice before canceling its policy.

3.7     <u>Access</u>.  Upon one Business Day's prior notice, Lender or its agents shall have the right to inspect the Collateral and to audit and copy Borrower's books and records during Borrower's regular business hours.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, Lender shall not be required to provide notice to Borrower of any inspection or audit.

3.8     <u>Insolvency</u>.  Borrower is able, and will continue to be able, to pay its debts (including trade debts) as they mature.

3.9     <u>Additional Agreements</u>.  Borrower will not, and will not permit any of its Subsidiaries to, without Lender's prior written consent (which shall be a matter of Lender's good faith business judgment), do any of the following: (i) convey, sell, lease, transfer or otherwise dispose of ("<u>Transfer</u>") any property other than Permitted Transfers; (ii) engage in any business other than the business currently engaged in by Borrower or reasonably related thereto; (iii)  merge or consolidate with any party, or acquire all or substantially all of the capital stock or assets of another party; (iv) incur or become liable for any indebtedness other than Permitted Indebtedness; (v) assign or convey any rights to income or incur or allow any lien, security interest or other encumbrance on any of its property other than Permitted Liens; (vi) make any investments except for Permitted Investments; (vii) pay or declare any dividends on Borrower's stock; (viii) redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Borrower's stock other than stock repurchased in connection with the termination of employment or service as a consultant or director; or (ix) directly or indirectly enter into any material transaction with any affiliate except in the ordinary course of business upon reasonable terms no less favorable than those in an arm's-length transaction with a non-affiliate.  Borrower shall not, without at least thirty (30) days' prior written notice to Lender, relocate its principal offices from Borrower's address set forth on the signature page hereof or change its state of formation or name.  Borrower shall take or authorize any further actions (including Lender's filing of financing statements to perfect Lender's security interest in the Collateral) and execute any further instruments as Lender reasonably requests to perfect or continue Lender's security interests or to effect the purposes of this Agreement.

3.10    <u>Full Disclosure</u>.  No written representation, warranty or other statement of Borrower in any certificate or written statement given to Lender (other than the "Annual Financial Projections, Data Analytics" information and the "Business Summary Update" described in Schedule A) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statement contained in such certificates or statements not misleading.

4.      Term.  Unless terminated prior thereto, this Agreement shall continue in effect until the maturity date set forth in <u>Schedule A</u> (the "<u>Maturity Date</u>").  On the Maturity Date or on any earlier effective date of termination of this Agreement, Borrower shall pay in cash all Obligations in full, whether or not such Obligations are otherwise then due and payable.  No termination shall in any way affect or impair any security interest or other right or remedy of Lender, nor shall any such termination relieve Borrower of any obligation to Lender, until all of the Obligations have been paid and performed in full.

5.      Conditions Precedent.

5.1     <u>Conditions Precedent to the Initial Loan</u>.  The obligation of Lender to make its initial Loan hereunder is, in addition to the conditions precedent specified in <u>Section 5.2</u> hereof and on <u>Schedule A</u>, subject to the fulfillment of the following conditions and to the receipt by Lender of the documents described below, duly executed and in form and substance reasonably satisfactory to Lender and its counsel:  (i) a Corporate Borrowing Certificate, substantially in the form attached hereto as <u>Schedule F</u>, duly executed and delivered by Borrower, together with (a) copies of the organizational and charter documents of Borrower (e.g., Articles or Certificate of Incorporation and Bylaws), as amended through the Effective Date and (b) a copy of the resolutions of the Board of Directors of Borrower authorizing the execution, delivery

and performance by Borrower of the Loan Documents; (ii) original counterparts of this Agreement and the other Loan Documents (including, without limitation, the Warrant, substantially in the form attached hereto as Schedule E), with all schedules completed and attached thereto, and disclosing such information as is reasonably acceptable to Lender; (iii) UCC lien, judgment, bankruptcy and tax lien searches of Borrower from such jurisdictions or offices as Lender may reasonably request, all as of a date reasonably satisfactory to Lender and its counsel; (iv) a certificate of status or good standing of Borrower as of a date acceptable to Lender from the jurisdiction of Borrower's organization and any foreign jurisdictions where Borrower is qualified to do business and the failure to be so qualified could reasonably be expected to have a Material Adverse Effect; (v) insurance certificates showing Lender as loss payee or additional insured, as applicable, on Borrower's commercial general liability and business personal property insurance policies; (vi) filing copies (or other evidence of filing satisfactory to Lender and its counsel) of such UCC financing statements, collateral assignments, account control agreements, and termination statements, with respect to the Collateral as Lender shall reasonably request; (vii) Borrower entering into a written contract with FC Bayern Munich ("FCB"), an international football team in Germany, to provide Borrower with certain exclusive rights to partner with FCB for business development; and (viii) such other documents and instruments as Lender may reasonably request to effectuate the intents and purposes of this Agreement and the other Loan Documents.

5.2     Conditions Precedent to All Loans.  The obligation of Lender to make its initial Loan and each subsequent Loan is subject to the following further conditions precedent: (i) no Default or Event of Default has occurred and is continuing or will result from the making of any such Loan, and the representations and warranties of Borrower contained in this Agreement and the other Loan Documents are true and correct in all material respects as of the Funding Date, except to the extent such representations and warranties are made as of a specified date in which case such representations and warranties shall be true and correct in all material respects as of such specified date; (ii) no event has occurred that has had or could reasonably be expected to have a Material Adverse Change; (iii) Borrower shall have delivered to Lender a Loan Request Form for such Loan; (iv) Borrower shall have delivered an original executed Promissory Note evidencing such Loan, substantially in the form attached hereto as Schedule H; and (v) Borrower shall have executed and delivered such amendments or supplements to this Agreement and additional Loan Documents, financing statements and third party waivers as Lender may reasonably request in connection with the proposed Loan, in order to create, protect or perfect or to maintain the perfection of Lender's Liens on the Collateral.

6.     Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (i) Borrower fails to deliver the financial statements and other information pursuant to Section 3.3 above within the prescribed period of time; (ii) Borrower violates any of the covenants set forth in Section 3.9 above; (iii) Borrower fails to pay when due any Loan or other monetary Obligation within three (3) Business Days after the due date (during which time no additional Loans shall be made by Lender); (iv) Borrower fails to perform any obligation (other than payment of any Loan or other Obligations or those pursuant to Sections 3.3 and 3.9 above) or covenant hereunder, which is not cured within ten (10) days after the date due (or a later date, as approved in writing by Lender); (v) there is a material impairment in the perfection or priority of Lender's security interest in the Collateral or in the value of such Collateral (other than normal depreciation) which is not covered by adequate insurance; (vi) any representation, or written statement given to Lender by or on behalf of Borrower, now or in the future, is untrue or misleading in a material respect; (vii) a default in any agreement between Borrower and a third party that gives the third party the right to accelerate any indebtedness exceeding the Threshold Amount or that could reasonably be expected to cause any material impairment in Borrower's business, operations or financial or other condition of Borrower; (viii) one or more fines, penalties or executable  judgments, orders or decrees for the payment of money in an amount, individually or in the aggregate, of at least Five Hundred Thousand Dollars ($500,000) (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower by any governmental authority, and the same are not, within ten (10) days after the entry, assessment or issuance thereof, discharged, satisfied, or paid, or after execution thereof, stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay (provided that no Loans will be made prior to the satisfaction, payment, discharge, stay, or bonding of such fine, penalty, judgment, order or decree); (ix) the attachment, seizure, levy or possession by a trustee or receiver of any material portion of Borrower's assets which is not removed within ten (10) days from its occurrence; (x) the enjoinment, restraint or prevention by court order from conducting a material part of Borrower's business, which is not terminated within ten days of its occurrence; (xi) the dissolution, winding up, or insolvency of Borrower; or (xii) the appointment of a receiver, trustee or custodian, for all or part of the property of Borrower or an assignment for the benefit of creditors by Borrower, (xiii) Borrower begins an Insolvency Proceeding or an Insolvency Proceeding is begun against Borrower and not dismissed or stayed within thirty (30) days (but no Loans shall be made while of any of the conditions described in this clause (xiii) exist and/or until any

Insolvency Proceeding is dismissed); (ix) a sale of all or substantially all of the assets or equity interests of Borrower; (x) Borrower fails to pledge the Life Insurance Policy (or any Additional Life Insurance Policy if applicable) to Lender as additional Collateral in accordance with the provisions of Section 8.11; or (xi) Borrower is in default under that certain Series A Preferred Stock Purchase Warrant in favor of Lender, as Registered Holder (as defined therein), executed contemporaneously herewith.

7.      Rights and Remedies.  If an Event of Default occurs and continues, Lender may, without notice or demand do any or all of the following: (i) accelerate and declare all of the Loans and other Obligations to be immediately due and payable (but if an Event of Default described in Sections 6(xii) or 6(xiii) occurs, all Obligations are immediately due and payable without any action by Lender); (ii) stop advancing money or extending credit for Borrower's benefit under this Agreement or any other agreement between Borrower and Lender; (iii) settle or adjust disputes and claims directly with account debtors for amounts, on terms and in any order that Lender considers advisable; (iv) make any payments and do any acts it considers necessary or reasonable to protect its security interest in the Collateral (and Borrower will reasonably cooperate with Lender accordingly); (v) apply to the Obligations any balances and deposits of Borrower that Lender holds or any amount held by Lender owing to or for the credit or the account of Borrower; (vi) increase the then-existing interest rate by an additional five (5) percent per annum, to be compounded monthly if delinquent; (vii) ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell or otherwise dispose of the Collateral; (viii) deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any control agreement or similar agreements providing control of any Collateral; and/or (ix) exercise any other rights and remedies permitted by applicable law.  Effective only when an Event of Default occurs and continues, Borrower irrevocably appoints Lender as its lawful agent and attorney-in-fact to:  (a) endorse Borrower's name on any checks or other forms of payment or security; (b) sign Borrower's name on any invoice or bill of lading for any account or drafts against account debtors, (c) make, settle, and adjust all claims under Borrower's insurance policies; (d) settle and adjust disputes and claims about the accounts directly with account debtors for amounts and on terms Lender determines reasonable; and (e) transfer the Collateral into the name of Lender or a third party as the applicable Uniform Commercial Code permits.  Lender may exercise the power of attorney to sign Borrower's name on any documents necessary to perfect or continue the perfection of any security interest regardless of whether an Event of Default has occurred.  Lender's appointment as Borrower's attorney in fact, and all of Lender's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed.  All of Lender's rights and remedies under this Agreement or any other agreement between Lender and Borrower are cumulative.  Borrower waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Lender on which Borrower is liable.

8.      General.

8.1      No Waivers; Amendments.  The failure of Lender at any time to require Borrower to comply strictly with any of the provisions of this Agreement shall not waive Lender's right to later demand and receive strict compliance.  Any waiver of a default shall not waive any other default.  None of the provisions of this Agreement may be waived except by a specific written waiver signed by Lender and delivered to Borrower.  The provisions of this Agreement may not be amended except in a writing signed by Borrower and Lender.

8.2      Indemnification.  Borrower will indemnify, defend and hold harmless Lender and its affiliates, and each of their officers, directors, employees, attorneys, accountants and agents against: (i) all obligations, demands, claims, and liabilities asserted by any other party in connection with the transactions contemplated hereunder; and (ii) all losses and expenses incurred, or paid by Lender arising from transactions between Lender and Borrower contemplated by the Loan Documents (including reasonable attorneys' fees and expenses), except, as to both "(i)" and "(ii)" in this Section 8.2, for losses caused by Lender's gross negligence or willful misconduct.  This Section 8.2 shall survive termination of this Agreement and the payment and performance of the Obligations.

8.3      Binding Effect; Assignment.  This Agreement is binding upon and for the benefit of the successors and permitted assignees of each party.  Borrower may not assign any rights under this Agreement without Lender's prior written consent.

8.4      Notices.  All notices by any party required or permitted under this Agreement or any other related agreement must be in writing and be personally delivered or sent by overnight delivery, certified mail (postage prepaid and return receipt requested), or facsimile to the addresses and numbers below.

8.5     <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by the laws of the State of Louisiana without regard to principles of conflicts of law.

8.6     <u>Other</u>.  If any provision hereof is unenforceable, the remainder of this Agreement shall continue in full force and effect.  This Agreement (including the schedules attached hereto) and any other written agreements and, documents executed in connection herewith are the complete agreement between Borrower and Lender and supersede all prior and contemporaneous negotiations and oral representations and agreements, all of which are merged and integrated herein.  This Agreement may be executed in one or more counterparts, all of which when taken together will constitute one agreement.

8.7

8.7     Confidentiality.  In handling any confidential information, Lender will exercise reasonable care, but no less care than the manner in which Lender handles its own highly sensitive information, but disclosure of information (other than Data Analytics and the Business Summary Updates, as such terms are defined herein) may be made: (i) to Lender's Subsidiaries or affiliates; (ii) to prospective transferees or purchasers of any interest in the loans (provided that Lender shall use reasonable efforts in obtaining such transferee's or purchaser's agreement of the terms of this provision); (iii) as required by law, regulation, subpoena, or other order; (iv) as required in connection with Lender's examinations and audits; (v) as Lender considers appropriate in exercising remedies under this Agreement; or (vi) to third-party service providers of Lender so long as such service providers agree to terms no less restrictive than those contained herein.  Confidential information does not include information that is either: (a) in the public domain or in Lender's possession when disclosed to Lender or becomes part of the public domain after disclosure to Lender; or (b) disclosed to Lender by a third party, if Lender does not know that the third party is prohibited from disclosing the information.

9.      Mutual Waiver of Jury Trial.  BORROWER AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT OR ANY RELATED DOCUMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT.  EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

10.     Assignment of Insurance Policy as Collateral.

10.1     Borrower hereby covenants and agrees that it will, within a reasonable time (but not more than 30 days) following the Effective Date (or, in the event of the issuance of an Additional Life Insurance Policy, no later than 30 days following the issuance of such policy), pledge, collaterally assign, transfer, grant and deliver unto Lender a first-priority security interest in the Life Insurance Policy (and in any Additional Life Insurance Policy, if applicable), and all claims, options, privileges, rights, title and interest therein, subject to the terms and conditions of the Life Insurance Policy. Without limiting the generality of the foregoing, it is agreed that the following specific rights will be included in any assignment made pursuant to this Section 10.1: (i) the sole right to collect from the insurer the net proceeds of the policy when it becomes a claim by death or maturity; (ii) the sole right to surrender the policy and receive the surrender value thereof at any time provided by the terms of the policy and of such other times as the insurer may allow; (iii) the sole right to obtain one or more loans or advances on the policy and to pledge or assign the policy as security for such loans or advances; and (iv) the sole right to collect and receive all distributions made with respect to the policy.  Borrower hereby covenants and agrees that it will execute any and all documents necessary and proper to effectuate the assignment contemplated under this Section 10.1.

10.2     The Life Insurance Policy (and any Additional Life Insurance Policy, if applicable) shall be held as collateral security for any and all Obligations of Borrower as set forth in this Agreement.  Lender hereby covenants and agrees (i) that the balance of any amounts received from the insurer pursuant to an assignment of the Life Insurance Policy (or any Additional Life Insurance Policy, if applicable) which remains after satisfaction of all outstanding Obligations of Borrower under this Agreement shall be paid according to the provisions of the applicable policy and (ii) that it will not exercise its rights to surrender the Life Insurance Policy (or any Additional Life Insurance Policy, if applicable) or its rights to obtain policy loans from the insurer unless Borrower fails to pay any of its Obligations hereunder when due.

[Signature page follows.]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date.

**BORROWER:**

SQOR, INC.

*Brian Wilhite*

By: _____

Name:  Brian Wilhite

Title:  Chief Executive Officer

Address:        _____

                _____

                Attn:  Brian Wilhite, Chief Executive Officer

                Facsimile: _____

**LENDER:**

CALLAIS CAPITAL MANAGEMENT, LLC

By: _____

Name:  Harold J. Callais, II

Title:  Managing Director

Address:        PO Box 584

                Thibodaux, LA 70302

**SCHEDULE A**
**LOAN TERMS**

**BORROWER: Sqor, Inc.**

| LOANS | |
|---|---|
| Total Commitment: | $6,000,000 |
| Facility Availability End Date: | 9 MONTHS |
| Maturity Date: | 9 MONTHS, extendable at the option of the Borrower, upon thirty (30) days prior written notice, for a period of ninety (90) days, provided that the conditions described in Section 5.2 have been satisfied as of the Maturity Date and an Event of Default has not occurred. |
| Interest Only Period: | The period beginning on the Effective Date and ending on the Maturity Date as may be extended pursuant to the terms hereof.. |
| Growth Capital Loans: | On or prior to the Facility Availability End Date, from time to time and upon the delivery to Lender by Borrower of a completed and executed irrevocable Loan Request Form (in a form acceptable to Lender), and any additional information as Lender may reasonably request at least five (5) Business Days before the proposed funding date, one or more term loans (each a "Growth Capital Loan") in an aggregate principal amount not to exceed the Unused Availability. |
| | Each Growth Capital Loan must be in a minimum amount of $500,000, other than the final Growth Capital Loan.  Once repaid, Growth Capital Loans may not be re-borrowed. |
| | Except as otherwise provided herein, Lender will be obligated to make a Growth Capital Loan so long as the conditions precedent set forth in Section 5 of the Agreement have been satisfied and an Event of Default has not occurred. |
| Repayment: | Each Growth Capital Loan shall be payable as follows:  Accrued interest shall be payable on the first day of the month after the date of such Growth Capital Loan, and on the first day of each month thereafter during the Interest-Only Period.  The final payment due on the Maturity Date shall include all outstanding principal and all unpaid accrued interest. |
| Voluntary Prepayment: | Borrower shall have the option to prepay all Growth Capital Loans in full, provided Borrower (i) shall provide written notice to Lender of its election to prepay the Growth Capital Loans at least ten (10) days prior to such prepayment and (ii) pays, on the date of such prepayment, an amount equal to the sum of:  (a) all accrued and unpaid interest on such Growth Capital Loans as of the date of prepayment; plus (b) an amount equal to the total amount of all scheduled but unpaid payments of principal and interest that would have been payable from the date of prepayment through the stated maturity of the Growth Capital Loans had they remained outstanding and been paid in accordance with the terms of the related Promissory Note(s); plus (c) all other sums, including Lender Expenses, if any, then outstanding. |

| | |
|---|---|
| Mandatory Prepayment: | If the Growth Capital Loans are accelerated following the occurrence and during the continuance of an Event of Default, Borrower shall immediately pay to Lender an amount equal to the sum of (i) all outstanding principal and accrued but unpaid interest, plus (ii) all other sums, including Lender Expenses (including, without limitation, reasonable attorneys' fees and all other costs of collection), if any, that shall have become due and payable. |
| Interest: | Growth Capital Loans accrue interest on the outstanding principal balance at a fixed rate per annum of twelve percentage points (12%), to be compounded monthly if delinquent.  Interest is computed on a 360 day year for the actual number of days elapsed.

Any amounts outstanding during the continuance of an Event of Default shall bear additional interest at the rate of 5% per annum, to be compounded monthly if delinquent. |
| Application of Payments: | Payments received after 12:00 noon East Coast time are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment is due the next Business Day and additional interest shall accrue. |
| Right to Invest: | Borrower hereby grants to Lender a one-time right (but not an obligation) (the "Right to Invest") to purchase the number of shares of Preferred Stock proposed to be offered by the Company in its next Preferred Stock financing of at least $1,000,000 (a "Qualified Financing") equal to 25% of the number of shares of Preferred Stock proposed to be sold in such Qualified Financing (excluding any shares issued to Lender pursuant to this Right to Invest), on the terms and conditions (including but not limited to the price per share paid by the purchasers of a majority of the shares sold for cash in such Qualified Financing) described in the documentation for such Qualified Financing, which such purchase may be completed at a subsequent closing of the Qualified Financing.  Borrower shall give Lender notice of the Qualified Financing (the "Financing Notice") no later than ten (10) days following the closing of the first sale of Preferred Stock sold in the Qualified Financing which notice shall (a) identify the investors participating in such private equity financing and contain the terms, conditions and pricing of the private equity financing and (b) be delivered to Lender's address set forth herein.  This right shall terminate on the date (the "Right to Invest Termination Date") that is the earliest to occur of (a) twenty (20) days following the date the Financing Notice is delivered, and (b) ninety (90) days following the date on which all Growth Capital Loans are repaid in full.  This Right to Invest shall not be applicable if (i) at the time of the Qualified Financing, (A) Lender is not an "accredited investor," as that term is then defined in Rule 501(a) under the Securities Act, and (B) such issuance of Preferred Stock is otherwise being offered only to accredited investors, or if (ii) Lender is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended.  Lender agrees that its purchase of shares pursuant to this Right to Invest is contingent upon Lender's execution and delivery to Borrower of all transaction documents related to the Qualified Financing, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including a lock-up agreement in connection with an initial public offering), and any failure to execute and deliver the transaction documents and deliver the purchase price for any such shares of Preferred Stock prior to the Right to Invest Termination Date shall constitute an |

|  | irrevocable waiver of such Right to Invest. |
| --- | --- |

## LIMITATION TO LENDER 'S OBLIGATIONS

| Limitation: | Lender's obligation to lend the undisbursed portion of the Total Commitment will terminate if Lender determines, in the exercise of its good faith business judgment, that it is the clear intention of Borrower's investors in the aggregate to not continue to fund Borrower in the amounts and timeframe necessary to enable Borrower to satisfy its Obligations, as they become due and payable. |
| --- | --- |

## WARRANT

| Warrant: | Concurrently on the Effective Date, Borrower will issue to Lender a warrant in the form attached hereto as <u>Schedule E</u>. |
| --- | --- |

## FINANCIAL REPORTING REQUIREMENTS

| Financial and Other Reports: | Borrower shall provide Lender : |
| --- | --- |
|  | ▪ *Monthly Financial Statements.* Within 30 days after the end of each month, monthly financial statements for such applicable month prepared by Borrower in accordance with GAAP. |
|  | ▪ *Annual Audited/Reviewed Financial Statements.* If Borrower's Board of Directors requires CPA-audited or reviewed annual financial statements, then, as soon as available, and in any event within 180 days following the end of Borrower's fiscal year beginning with the 2014 fiscal year, annual, audited or reviewed, consolidated financial statements prepared under GAAP, consistently applied, together with (i) an unqualified opinion in the financial statements from independent public accountants acceptable to Lender , in the case of CPA-audited financial statements, or (ii) a report on the financial statements from independent public accountants acceptable to Lender , in the case of CPA-reviewed financial statements. |
|  | ▪ *Annual Company-Prepared Financial Statements.* If Borrower's Board of Directors does not require CPA-audited or reviewed annual financial statements, then, as soon as available, and in any event within 60 days after the end of Borrower's fiscal year beginning with the 2014 fiscal year, company-prepared consolidated financial statements prepared in accordance with GAAP for such fiscal year, certified by a Responsible Officer. |
|  | ▪ *Annual Financial Projections.* As soon as available, but no later than 30 days after fiscal year-end, annual Board-approved financial projections for the following fiscal year commensurate in form and substance with those provided to Borrower's venture capital investors. |
|  | ▪ *Data Analytics.* Borrower shall provide Lender with reasonable access to data analytics on platform performance. Borrower makes no representations or warranties with respect to the information provided pursuant to this paragraph. |
|  | ▪ *Business Summary Update.* Promptly following the end of each month, Borrower shall provide Lender with a copy of Borrower's Business Summary Update for such month (or for such preceding month in the event delivered in |

the following month) in substantially the form provided to Borrower's leadership team.  It is anticipated that the Business Summary Update will include general information about Borrower and its business, such as Borrower's performance against the Annual Financial Projections.  Borrower makes no representations or warranties with respect to the information delivered in the Business Summary Update.

▪   *Other Information.*   Other information as may reasonably be required by Lender.

▪

**SCHEDULE B**
**COLLATERAL**

The Collateral consists of all of Borrower's right, title and interest in and to the following personal property as such terms are defined under the California Uniform Commercial Code:

All goods, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles (including payment intangibles), accounts (including health-care receivables), documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

all Borrower's Books relating to the foregoing and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

all Intellectual Property, including all accounts, license and royalty fees and other revenues, proceeds, or income arising out of or relating to any of the foregoing Intellectual Property. The Life Insurance Policy and any Additional Life Insurance Policy shall be included in the Collateral to the extent provided in Section 10.1.

For purposes hereof, the following terms have the following meanings:

"Borrower's Books" means all Borrower's books and records including ledgers, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition and all computer programs or discs or any equipment containing the information.

"Intellectual Property" means any copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same, trademarks, trade names, service marks and applications therefor, whether registered or not, and the goodwill of the business of Borrower connected with and symbolized thereby, know-how, operating manuals, trade secret rights, rights to unpatented inventions, and any claims for damage by way of any past, present, or future infringement of any of the foregoing.

# SCHEDULE C
## DEFINITIONS

As used in this Agreement, the following words shall have the following meanings:

"Additional Life Insurance Policy" means any insurance policy (and any supplementary contracts associated therewith) issued to Borrower after the Effective Date which insures the life of Brian Wilhite.

"Business Day" is any day that is not a Saturday, Sunday or a day on which Lender is closed.

"Default" means an event which with the giving of notice, passage of time, or both would constitute an Event of Default.

"Funding Date" shall mean any date on which a Loan is made to or on account of Borrower under this Agreement.

"Insolvency Proceeding" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Lender Expenses" are, collectively, all costs, fees, charges, commissions, and other expenses of any and every kind incurred or paid by Lender, including, but not limited to, reasonable attorneys' fees, in connection with the Obligations, Lender's enforcement and protection of its rights and claims relating to or arising out of the Obligations, and the collection of amounts owed by Borrower to Lender.

"Life Insurance Policy" means Insurance Policy Number _____ owned by Borrower, in the amount of $_____, on the life of _____, issued by _____, and any supplementary contracts issued in connection therewith.

"Loan Documents" are, collectively, this Agreement, any subordination agreement, any note, or notes or guaranties executed by Borrower or any guarantor, and any other present or future agreement between Borrower and/or for the benefit of Lender in connection with this Agreement, all as amended, extended or restated.

"Material Adverse Change" means the occurrence of (a) any material impairment in the business, operations, or financial condition of Borrower, (b) a material impairment of the prospect of repayment of any portion of the Obligations; or (c) a material impairment in the perfection or priority of Lender's security interest in the Collateral or in the value of such Collateral (other than normal depreciation) which is not covered by adequate insurance.

"Obligations" are Borrower's obligation to pay when due any debts, principal, interest, Lender Expenses, and other amounts Borrower owes Lender now or later, whether under this Agreement, the other Loan Documents, or otherwise, including, without limitation, any interest accruing after Insolvency Proceedings begin and debts, liabilities, or obligations of Borrower assigned to Lender, and the performance of Borrower's duties under the Loan Documents.

"Permitted Indebtedness" means (a) Borrower's indebtedness to Lender ; (b) indebtedness existing on the Effective Date and shown on Schedule D; (c) indebtedness incurred by Borrower owed to a third-party subordinated to Borrower's indebtedness owed to Lender which subordination is reflected in a written agreement as accepted and approved by Lender prior to the incurrence of such third-party indebtedness; (d) indebtedness to trade creditors incurred in the ordinary course of business; (e) indebtedness secured by Permitted Liens; (f) indebtedness arising from the endorsement of instruments in the ordinary course of business; and (g) extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness described in (a) through (f) above, provided that the principal amount thereof is not increased or the terms thereof are not modified to impose materially more burdensome terms upon Borrower or its Subsidiaries, as the case may be.

"Permitted Investments" means (a) investments shown on Schedule D and existing on the Effective Date; (b) (i) marketable direct obligations issued or unconditionally guaranteed by the United States or its agency or any

State maturing within 1 year from its acquisition, (ii) commercial paper maturing no more than 1 year after its creation and having the highest rating from either Standard & Poor's Ratings Service or Moody's Investors Service, Inc., (iii) certificates of deposit issued maturing no more than 1 year after issue, (iv) investments permitted by Borrower's investment policy, as amended from time to time, provided that such investment policy (and such amendments thereto) has been approved by Lender in writing (which approval may be withheld at Lender's sole discretion); (c) investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; (d) investments consisting of travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business; (e) deposit and investment accounts of Borrower in which Lender has a lien prior to any other lien (other than liens securing customary fees and expenses (but no credit/debt relationship or margin account) of the depository or investment intermediary); and (f) investments not otherwise permitted in an aggregate amount of not more than $1,000,000 in each fiscal year.

"Permitted Liens" means (a) liens existing on the Effective Date and shown on Schedule D or that are in favor of Lender ; (b) liens for taxes, fees, assessments or other government charges or levies, either not delinquent or being contested in good faith and for which Borrower maintains adequate reserves on its books, if they have no priority over any of Lender 's security interests; (c) purchase money liens (i) on equipment and related software acquired or held by Borrower or its Subsidiaries incurred for financing the acquisition of the equipment and related software, if any, including the financing of the costs of shipping, taxes and installation, or (ii) existing on equipment and related software when acquired, if the lien is confined to such property, improvements thereon, and proceeds thereof; (d) liens in favor of other financial institutions arising in connection with Borrower's deposit or investment accounts held at such institutions to secure customary fees and charges (but not credit/debt relationships or margin accounts), provided that the lender has a perfected security interest in the amounts held in such deposit accounts; (e) statutory liens securing claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other Persons imposed without action of such parties, provided, they have no priority over any of Lender 's security interests and the aggregate amount of such liens does not at any time exceed $250,000; (f) liens arising from the filing of any financing statement on operating leases, to the extent such operating leases are permitted under this Agreement; (g) liens on cash collateral securing reimbursement obligations to Lender under letters of credit; (h) easements, reservations, rights-of-way, restrictions, minor defects or irregularities in title and other similar charges or encumbrances affecting real property not likely to result in a Material Adverse Change; and (i) licenses and sublicenses granted by Borrower in the ordinary course of its business and not otherwise prohibited by this Agreement.

"Permitted Transfer" means Transfers of (a) Inventory in the ordinary course of business; (b) non-exclusive licenses and similar arrangements for the use of the property of Borrower or its Subsidiaries in the ordinary course of business and other non-perpetual licenses that may be exclusive in some respects, such as, by way of example, with respect to field of use or geographic territory, but that do not result, under applicable law, in a sale of all of Borrower's interest in the property that is the subject of the license; and (c) worn-out or obsolete equipment.

"Person" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company association, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Responsible Officer" is each of the Chief Executive Officer and the Chief Financial Officer  of Borrower.

"Subsidiaries" means any entity of which more than 50% of the voting stock or other equity interests is owned or controlled, directly or indirectly, by Borrower.

"Threshold Amount" means Five Hundred Thousand Dollars ($500,000).

"Total Commitment" has the meaning given to such term on Schedule A.

"Unused Availability" shall mean, with respect to a requested Loan, the Total Commitment less the Growth Capital Loan usage.

## SCHEDULE D
## STATEMENT OF BORROWER'S INFORMATION

Borrower hereby represents and warrants, as of the date of the Agreement, subject to any updates provided to Lender as required under the Agreement:  (If none, please indicate so.  Attach additional pages, if necessary.)

*1.  The exact legal name of Borrower, as set forth in its formation documents, is: _____
_____.

*2.  Borrower currently operates and has operated during the previous five years under only the following names: ____
_____
_____.

*3.  Borrower is organized in the State of _____ and is qualified to do business in the following states: _____
_____.

*4.  The following are all of Borrower's Subsidiaries and their respective states (or countries, if other than the U.S.) and dates of formation, as well as the percentage of total capital stock owned by Borrower:

**5.  The following are all actions, suits, proceedings and investigations pending, or to Borrower's knowledge, currently threatened by or against Borrower, in which a likely adverse decision could reasonably be expected to cause a Material Adverse Change in Borrower's business, operations or financial condition:

**6.  The following is a description of all returns, recoveries, disputes and claims of at least $50,000 each, received by Borrower within the last thirty (30) days:

7.  The following is all of Borrower's investments (other than Subsidiaries) existing as of the date of the Agreement:

8.  The following are all liens to which Borrower's assets and property are subject as of the date of the Agreement:

*[B0995684.1]*

9.      Other exceptions to representations and warranties under <u>Section 3</u> of the Agreement:

10.     Borrower's completed and executed IRS Form W9 is attached hereto as <u>Annex 1</u>.

---

Borrower must update Lender of any material change to information:
    **\***  at least thirty (30) days' prior to the date of occurrence of the event necessitating such update.
   **\*\***  within five (5) days' of the date of occurrence of the event necessitating such update.

**ANNEX 1**

**IRS Form W9**

**[see attached]**

**SCHEDULE E**
**WARRANT TO PURCHASE STOCK**

**[see attached]**

### SCHEDULE F
### CORPORATE BORROWING CERTIFICATE

**BORROWER**:  Sqor, Inc.                                    **DATE**: _____

**LENDER** :  **CALLAIS CAPITAL**

I hereby certify as follows, as of the date set forth above:

1.  I am the Secretary, Assistant Secretary or other officer of Borrower.  My title is as set forth below.

2.  Borrower's exact legal name is set forth above.  Borrower is a corporation existing under the laws of the State of Delaware.

3.  Attached hereto are true, correct and complete copies of Borrower's Certificate of Incorporation (including amendments), as filed with the Secretary of State of Delaware.  Such Certificate of Incorporation have not been amended, annulled, rescinded, revoked or supplemented, and remain in full force and effect as of the date hereof.

4.  The following resolutions were duly and validly adopted by Borrower's Board of Directors at a duly held meeting of such directors (or pursuant to a unanimous written consent or other authorized corporate action).  Such resolutions are in full force and effect as of the date hereof and have not been in any way modified, repealed, rescinded, amended or revoked, and [Callais Capital] ("Lender ") may rely on them until Lender receives written notice of revocation from Borrower.

**RESOLVED**, that **any one** of the following officers or employees of Borrower, whose names, titles and signatures are below, may act on behalf of Borrower:

| Name | Title | Signature | Authorized to Add or Remove Signatories |
|------|-------|-----------|------------------------------------------|
| _____ | _____ | _____ | ☐ |
| _____ | _____ | _____ | ☐ |
| _____ | _____ | _____ | ☐ |
| _____ | _____ | _____ | ☐ |

**RESOLVED FURTHER,** that **any one** of the persons designated above with a checked box beside his or her name may, from time to time, add or remove any individuals to and from the above list of persons authorized to act on behalf of Borrower.

**RESOLVED FURTHER,** that such individuals may, on behalf of Borrower:

**Borrow Money**.  Borrow money from Lender.
**Execute Loan Documents**.  Execute any loan documents Lender requires.
**Grant Security**.  Grant Lender a security interest in any of Borrower's assets.
**Negotiate Items**.  Negotiate or discount all drafts, trade acceptances, promissory notes, or other indebtedness in which Borrower has an interest and receive cash or otherwise use the proceeds.
**Issue Warrants**.  Issue warrants for Borrower's capital stock.
**Further Acts**.  Designate other individuals to request advances, pay fees and costs and execute other documents or agreements (including documents or agreement that waive Borrower's right to a jury trial) they believe to be necessary to effect these resolutions.

**RESOLVED FURTHER,** that all acts authorized by the above resolutions and any prior acts relating thereto are ratified.

5.      The persons listed above are Borrower's officers or employees with their titles and signatures shown next to their names.

By: _____

Name: _____

Title: _____


\*\*\* If the Secretary, Assistant Secretary or other certifying officer executing above is designated by the resolutions set forth in paragraph 4 as one of the authorized signing officers, this Certificate must also be signed by a second authorized officer or director of Borrower.


I, the _____ of Borrower, hereby certify as to paragraphs 1 through 5 above, as of the date set forth above.

By: _____

Name: _____

Title: _____

**SCHEDULE G**
**LOAN REQUEST FORM**

**Fax To: [_____]**                                **Date: _____**

☐ **LOAN:**

To Account #_____
                    (Deposit Account #)

Amount of Loan $_____

All Borrower's representations and warranties in the Loan and Security Agreement are true, correct and complete in all material respects up to and including the date of the transfer request for an advance, but those representations and warranties expressly referring to another date shall be true, correct and complete in all material respects as of that date:

**Authorized Signature:** _____ Phone Number: _____

{B0995684.1}

☐ **OUTGOING WIRE REQUEST**
**Complete only if all or a portion of funds from the *loan advance* above are to be wired.**

Beneficiary Name: _____       Amount of Wire: $_____

Beneficiary Bank: _____       Account Number: _____

City and State: _____

Beneficiary Lender Transit (ABA) #: __ __ __ __ __ __ __       Beneficiary Lender Code (Swift, Sort, Chip, etc.): _____
**(For International Wire Only)**

Intermediary Bank: _____       Transit (ABA) #: _____

For Further Credit to: _____

Special Instruction: _____

*By signing below, I (we) acknowledge and agree that my (our) funds transfer request shall be processed in accordance with and subject to the terms and conditions set forth in the agreements(s) covering funds transfer service(s), which agreements(s) were previously received and executed by me (us).*

Authorized Signature: _____       2nd Signature (If Required): _____
Print Name/Title:_____       Print Name/Title:_____
Telephone # _____       Telephone # _____

**SCHEDULE H**
**FORM OF PROMISSORY NOTE**

[Note No. X-XXX]

$_____                            _____, 200\_\_
                                                     San Francisco, California

For value received, the undersigned ("Borrower") unconditionally promises to pay to the order of [CALLAIS CAPITAL MANAGEMENT, LLC], a Louisiana limited partnership ("Lender"), at its office at [_____], or at such other place as Lender may designate in writing, in lawful money of the United States of America, the principal sum of _____ Dollars ($_____), with interest thereon from the date hereof until maturity, whether scheduled or accelerated, at a fixed rate per annum of twelve percentage points (12%), compounded monthly if delinquent (the "Designated Rate"), according to the payment schedule described herein, except as otherwise provided herein.

This Promissory Note is one of the Promissory Notes referred to in, and is entitled to all the benefits of, a Loan and Security Agreement dated as of July [\_\_], 2015, between Borrower and Lender (as amended, restated or supplemented from time to time, the "Agreement"). Each capitalized term not otherwise defined herein shall have the meaning set forth in the Agreement. The Agreement contains provisions for the acceleration of the maturity of this Promissory Note upon the happening of certain stated events.

Principal of and interest on this Promissory Note shall be payable as follows:

On the first day of the month after the Funding Date, and on the first day of each month thereafter during the Interest-Only Period, Borrower shall pay interest only at a rate of twelve percent (12%) per month, to be compounded monthly if delinquent.

Any unpaid interest, principal, fees and expenses shall be due and payable in 9 MONTHS, unless such date is extended by the Borrower by no more than ninety (90) days pursuant to the provisions of the Agreement.

This Promissory Note may be prepaid only as permitted in the Agreement.

If an Event of Default occurs and is continuing, any unpaid payments of principal and/or interest on this Promissory Note shall bear interest from the date of the occurrence of the Event of Default until paid in full, at a rate per annum equal to five percent (5%) above the Designated Rate. Borrower shall pay such interest on demand.

Interest, charges and fees shall be calculated for actual days elapsed on the basis of a 360-day year, which results in higher interest, charge or fee payments than if a 365-day year were used. In no event shall Borrower be obligated to pay interest, charges or fees at a rate in excess of the highest rate permitted by applicable law from time to time in effect.

If Borrower is late in making any payment under this Promissory Note by more than five (5) Business Days, Borrower agrees to pay a "late charge" of five percent (5%) of the installment due, but not less than two hundred fifty dollars ($250) for any one such delinquent payment. This late charge may be charged by Lender for the purpose of defraying the expenses incidental to the handling of such delinquent amounts. Borrower acknowledges that such late charge represents a reasonable sum considering all of the circumstances existing on the date of this Promissory Note and represents a fair and reasonable estimate of the costs that will be sustained by Lender due to the failure of Borrower to make timely payments. Borrower further agrees that proof of actual damages would be costly and inconvenient. Such late charge shall be paid without prejudice to the right of Lender to collect any other amounts provided to be paid or to declare a default under this Promissory Note or any of the other Loan Documents or from exercising any other rights and remedies of Lender.

In the event an Event of Default occurs, Borrower agrees to pay and shall be liable for all of Lender's reasonable attorneys' fees incurred or paid in connection with said Event of Default, to enforce and protect Lender's right and claims against Borrower, and to collect amounts owed under this Promissory Note.

This Promissory Note shall be governed by, and construed in accordance with, the laws of the State of Louisiana without reference to its conflict of laws principles.

**SQOR, INC.**

By: _____
Name:  Brian Wilhite
Its:      Chief Executive Officer