**SQOR, INC.**

**SERIES A-1 PREFERRED STOCK AND WARRANT PURCHASE AGREEMENT**

**October 28, 2015**

**SQOR, INC.**

**SERIES A-1 PREFERRED STOCK AND WARRANT PURCHASE AGREEMENT**

This Series A-1 Preferred Stock and Warrant Purchase Agreement (this "Agreement") is made as of October 28, 2015 by and among Sqor, Inc., a Delaware corporation (the "Company"), and the investors listed on Exhibit A attached hereto (each a "Purchaser" and together the "Purchasers").

The parties hereby agree as follows:

1. **Purchase and Sale of Preferred Stock and Warrants.**

    1.1 **Sale and Issuance of Series A-1 Preferred Stock and Warrants.**

    (a)     The Company shall adopt and file with the Secretary of State of Delaware on or before the Initial Closing (as defined below) the Amended and Restated Certificate of Incorporation in the form attached hereto as Exhibit B (the "Restated Certificate").

    (b)     Subject to the terms and conditions of this Agreement, each Purchaser agrees to purchase at the Initial Closing and the Company agrees to sell and issue to each Purchaser at the Initial Closing that number of shares of Series A-1 Preferred Stock set forth opposite each such Purchaser's name on Exhibit A attached hereto at a purchase price of $0.16986 per share and, subject to the terms and conditions of Section 1.1(c), below, a warrant in the form attached hereto as Exhibit D to purchase that number of shares of Series A-1 Preferred Stock indicated with respect to such Purchaser on Exhibit A at a purchase price of $0.01 per share of Series A-1 Preferred Issuable upon exercise of the warrant. The shares of Series A-1 Preferred Stock and the warrants issued to the Purchasers pursuant to this Agreement shall be hereinafter referred to as the "Stock" and the "Warrants," respectively, and the shares of Series A-1 Preferred Stock issuable upon exercise of the Warrants shall be hereinafter referred to as the "Warrant Stock". The Stock, the Warrants, the Warrant Stock, and the Common Stock issuable upon conversion of the Stock and the Warrant Stock shall be hereinafter referred to as the "Securities."

    (c)     A warrant shall only be issuable to a Purchaser hereunder, if such Purchaser purchases at least 5,887,202 shares of Series A-1 Preferred Stock in one or more Closings (as defined in Section 1.2(c) below) on or before October28. 2015.   Upon such time as a Purchaser has purchased such aggregate minimum amount of Series A-1 Preferred Stock, such Purchaser shall be issued a Warrant exercisable for such number of Series A-1 Preferred Stock equal to the product of 2.08 and the number of Series A-1 Preferred Stock issued to such Purchaser at the Initial Closing.

    1.2 **Closing; Delivery.**

    (a)     The purchase and sale of the Stock and the Warrants shall take place on the date of this Agreement, or at such other time as the Company and the Purchasers mutually agree upon, orally or in writing (which time and place are designated as the "Initial Closing"), upon the physical or electronic exchange among the parties and their counsel of all documents and deliverables required under this Agreement.   In the event there is more than one closing, the term "Closing" shall apply to each such closing unless otherwise specified herein.

    (b)     At each Closing, the Company shall deliver to each Purchaser (i) a certificate representing the Stock being purchased thereby and (ii) a Warrant, in each case against payment of the purchase price therefor by cancellation or conversion of indebtedness of the Company to Purchaser,

including interest, check payable to the Company or by wire transfer to a bank account designated by the Company.   If cancellation of indebtedness of the Company to the Purchaser is explicitly referenced on Exhibit A, each Purchaser with such a reference hereby elects to cancel the aggregate amount of outstanding principal and interest of such indebtedness and each of the promissory notes explicitly referenced on Exhibit A as consideration for Stock at the Initial Closing.

(c)     If fewer than 27,851,249 shares of Series A-1 Preferred Stock and/or Warrants to purchase up to an aggregate of fewer than 36,665,880 shares of Series A-1 Preferred Stock are sold at the Initial Closing, the Company shall have the right, any time for 90 days after the Initial Closing, to sell such remaining shares of Series A-1 Preferred Stock and such remaining Warrants to one or more additional purchasers as determined by the Company and who are existing stockholders of the Company or to any Purchaser hereunder who wishes to acquire additional shares of Series A-1 Preferred Stock and Warrants at the price and on the terms set forth herein, provided that any such additional purchaser shall (i) become a party to this Agreement and the related Transaction Agreements (as defined in Section 1.3 below), and (ii) have the rights and obligations hereunder and thereunder, by executing and delivering to the Company an additional counterpart signature page to each of the Transaction Agreements.   Any additional purchaser so acquiring shares of Series A-1 Preferred Stock and Warrants shall be considered a "Purchaser" for purposes of this Agreement, and any Series A-1 Preferred Stock or Warrants so acquired by such additional purchaser shall be considered "Stock," "Warrants" or "Warrant Stock," as applicable, for purposes of this Agreement and all other agreements contemplated hereby.   Exhibit A to this Agreement shall be updated to reflect the Stock and Warrants purchased at each such Closing and the parties purchasing such Stock and Warrants.

1.3     **Defined Terms Used in this Agreement.**   In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

"Affiliate" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Intellectual Property" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases as are necessary to the Company in the conduct of the Company's business as now conducted and as presently proposed to be conducted.

"Founder" means Brian Wilhite.

"Investors' Rights Agreement" means the Amended and Restated Investors' Rights Agreement among the Company, the Founder and the Purchasers, dated as of the date of the Initial Closing, in the form of Exhibit C attached hereto.

"Key Employee" means any executive-level employee (including division director and vice president-level positions) as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property.

-2-

"Material Adverse Effect" means a material adverse effect on the business, assets (including intangible assets), liabilities, condition (financial or otherwise) property or results of operation of the Company.

"Person" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

"Purchaser" means each of the Purchasers who are initially party to this Agreement as well as any additional Purchaser who becomes party to this Agreement.

"Right of First Refusal and Co-Sale Agreement" means the Amended and Restated Right of First Refusal and Co-Sale Agreement among the Company, the Purchasers, and certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit E attached to this Agreement.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Transaction Agreements" means this Agreement, the Investors' Rights Agreement, the Right of First Refusal and Co-Sale Agreement, the Voting Agreement and the Indemnification Agreements.

"Voting Agreement" means the Amended and Restated Voting Agreement among the Company, the Purchasers and certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit F attached to this Agreement.

2.      **Representations and Warranties of the Company.**   The Company hereby represents and warrants to each Purchaser that, except as set forth on a Schedule of Exceptions delivered separately by the Company to each Purchaser, which exceptions shall be deemed to be part of the representations and warranties as if made hereunder, the following representations are true and complete as of the date of the Initial Closing, except as otherwise indicated.

2.1     **Organization, Good Standing and Qualification.**   The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted.  The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2     **Capitalization.**   The authorized capital stock of the Company consists, or will consist, immediately prior to the Initial Closing, of:

(a)     260,000,000 shares of Preferred Stock, 180,000,000 shares of which have been designated Series A Preferred Stock (the "Series A Preferred Stock"), 140,680,083 shares of which are issued and outstanding prior to the Initial Closing, 80,000,000 shares of which have been designated Series A-1 Preferred Stock (the "Series A-1 Preferred Stock"), none of which shares are issued and outstanding prior to the Initial Closing.

(b)     400,000,000, shares of Common Stock, 43,604,660 shares of which are issued and outstanding immediately prior to the Initial Closing.

(c)     The Company has reserved 36,665,880 shares of Series A-1 Preferred Stock for issuance upon exercise of the Warrants and 36,665,880 shares of Common Stock upon conversion thereof.

(d)     The rights, preferences and privileges of the Preferred Stock are as stated in the Restated Certificate and as provided by the Delaware General Corporation Law.   All of the outstanding shares of Preferred Stock and Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws.   The Company holds no Common Stock in its treasury.

(e)     The Company has reserved 48,257,000 shares of Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to its 2012 Stock Plan duly adopted by the Board of Directors and approved by the Company's holders of outstanding voting stock (the "Stock Plan").   Of such reserved shares of Common Stock, no shares have been issued pursuant to restricted stock purchase agreements, options to purchase 11,091,250 shares have been granted and are currently outstanding, the Company has committed to issue options to purchase 37,165,750 shares of Common Stock and no shares of Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan.   The Company has furnished to the Purchasers complete and accurate copies of the Stock Plan and forms of agreements used thereunder.

(f)     There is $3,600,000 in aggregated indebtedness owed by the Company to Purchasers which will convert into an aggregate of approximately 21,991,813 shares of Series A-1 Preferred Stock.

(g)     Subsection 2.2(g) of the Schedule of Exceptions sets forth the capitalization of the Company immediately following the Initial Closing including the number of shares of the following: (i) issued and outstanding Common Stock, including, with respect to restricted Common Stock, vesting schedule and repurchase price; (ii) granted stock options, including vesting schedule and exercise price; (iii) shares of Common Stock reserved for future award grants under the Stock Plan; (iv) each series of Preferred Stock; and (v) warrants or stock purchase rights, if any.   Except for the Warrants, conversion privileges of the Preferred Stock, and the outstanding options issued pursuant to the Stock Plan, and except as set forth in the Investors' Rights Agreement (as defined below), there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, for the purchase or acquisition from the Company of any shares of its capital stock or securities convertible or exchangeable for shares of its capital stock.   All outstanding shares of the Company's Common Stock and all shares of the Company's Common Stock underlying outstanding options are subject to (i) a right of first refusal in favor of the Company upon any proposed transfer (other than transfers for estate planning purposes); and (ii) a lock-up or market standoff agreement of not less than one hundred eighty (180) days following the Company's initial public offering pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act.

(h)     None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events, including without limitation in the case where the Company's Stock Plan is not assumed in an acquisition.   The Company has never adjusted or amended the exercise price of any stock options previously awarded, whether through amendment, cancellation, replacement grant, repricing, or any other means.   Except as set forth in the Restated Certificate, the Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

-4-

(i)     The Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "409A Plan") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the knowledge of the Company, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

2.3     **Subsidiaries.**  The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association or other business entity.   The Company is not a participant in any joint venture, partnership or similar arrangement.

2.4     **Authorization.**  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into the Transaction Agreements, and to issue the Stock and Warrants at the Closing and the Common Stock issuable upon conversion of the Stock and the Series A-1 Preferred Stock issuable upon conversion of the Warrants, has been taken or will be taken prior to the Initial Closing.   All corporate action on the part of the Company, its officers, directors and holders of capital stock necessary for the authorization, execution and delivery of the Transaction Agreements, the performance of all obligations of the Company thereunder and the authorization, issuance and delivery of the Securities has been taken or will be taken prior to the Initial Closing, and the Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (c) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws (the "Enforceability Exceptions").

2.5     **Valid Issuance of Securities.**  The Stock and the Warrants, when issued, sold and delivered in accordance with the terms hereof for the consideration expressed herein, will be duly and validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.   The Common Stock issuable upon conversion of the Stock has been duly and validly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate, will be duly and validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.   The Warrant Stock and the Common Stock issuable upon conversion of the Warrant Stock has been duly and validly reserved for issuance, and upon issuance in accordance with the terms of the Warrants and the Restated Certificate, will be duly and validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.   Based in part upon the representations of the Purchasers in Section 3 of this Agreement and subject to the provisions of Section 2.6 below, the Stock, the Common Stock issuable upon conversion of the Stock, the Warrants, the Warrant Stock and the Common Stock issuable upon conversion of the Warrant Stock will be issued in compliance with all applicable federal and state securities laws.

2.6     **Governmental Consents and Filings.**  Assuming the accuracy of the representations made by the Purchasers in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental

OHSUSA:762992254.3

authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings pursuant to applicable state securities laws and Regulation D of the Securities Act, which have been made or will be made in a timely manner.

2.7    **Litigation.**   There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened in writing (i) against the Company or any officer, director or Key Employee of the Company arising out of their employment or board relationship with the Company; or (ii) to the Company's knowledge, that questions the validity of the Transaction Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements; or (iii) to the Company's knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or Key Employees, such as would affect the Company).   There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate.   The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

2.8    **Compliance with Other Instruments.**   The Company is not in violation or default (i) of any provisions of its Restated Certificate or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Schedule of Exceptions, or (v) to its knowledge, of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect.   The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.9    **Agreements; Actions.**

(a)    Except for the Transaction Agreements, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $100,000, (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company, (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(b)    The Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $25,000 or in excess of $100,000 in the aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business.   For the purposes of (b) and (c) of

-6-

this Section 2.11, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsection.

(c)     The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

2.10   **Certain Transactions**.

(a)     Other than (i) standard employee benefits generally made available to all employees, (ii) standard director and officer indemnification agreements approved by the Board of Directors, and (iii) the purchase of shares of the Company's capital stock and the issuance of options to purchase shares of the Company's Common Stock, in each instance, approved in the written minutes of the Board of Directors (previously provided to the Purchasers or their counsel), there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

(b)     The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees. None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, to the Company's knowledge, have any (i) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors, (ii) direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation which competes with the Company except that directors, officers, employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company; or (iii) financial interest in any material contract with the Company.

2.11   **Rights of Registration and Voting Rights**.     Except as provided in the Investors' Rights Agreement, the Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities.   To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of capital shares of the Company.

2.12   **Property**.   The property and assets that the Company owns are free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets.   With respect to the property and assets it leases, the Company is in compliance with such leases and, to its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets.   The Company has never owned, and does not own, any real property.

2.13   **Financial Statements**.     The Company has delivered to each Purchaser its unaudited financial statements as of August 31, 2015 (including balance sheet, income statement and statement of

OHSUSA:762992254.3

cash flows) (collectively, the "<u>Financial Statements</u>").   The Financial Statements have been prepared in accordance with generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by GAAP.   The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject in the case of the unaudited Financial Statements to normal year-end audit adjustments. Except as set forth in the Financial Statements, the Company has no material liabilities or obligations, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to October 31, 2013; (ii) obligations under contracts and commitments incurred in the ordinary course of business; and (iii) liabilities and obligations of a type or nature not required under GAAP to be reflected in the Financial Statements, which, in all such cases, individually and in the aggregate would not have a Material Adverse Effect.   The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with GAAP.

    2.14   **Changes**.  Since August 31, 2015 there has not been:

    (a)   any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect;

    (b)   any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

    (c)   any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

    (d)   any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

    (e)   any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

    (f)   any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

    (g)   any resignation or termination of employment of any officer or Key Employee of the Company;

    (h)   any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

    (i)   any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

    (j)   any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

OHSUSA:762992254.3

(k)     any sale, assignment or transfer of any Company Intellectual Property that could reasonably be expected to result in a Material Adverse Effect;

(l)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)     to the Company's knowledge, any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(n)     any arrangement or commitment by the Company to do any of the things described in this Section 2.16.

2.15    **Employee Matters**.

(a)     The Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(b)     To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee, nor does the Company have a present intention to terminate the employment of any of the foregoing.   The employment of each employee of the Company is terminable at the will of the Company. Except as set forth in Subsection 2.17 of the Schedule of Exceptions or as required by law, upon termination of the employment of any such employees, no severance or other payments will become due. Except as set forth in Subsection 2.17 of the Schedule of Exceptions, the Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(c)     The Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Company's board of directors.

(d)     Each former Key Employee whose employment was terminated by the Company has entered into an agreement with the Company providing for the full release of any claims against the Company or any related party arising out of such employment.

(e)     Subsection 2.15 of the Schedule of Exceptions sets forth each employee benefit plan maintained, established or sponsored by the Company, or which the Company participates in or contributes to, which is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA").   The Company has made all required contributions and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA,   and has complied in all material respects with all applicable laws for any such employee benefit plan.

2.16   **Intellectual Property.**   To its knowledge, the Company owns or possesses sufficient legal rights to all inventions, know-how, patents, trademarks, service marks, tradenames, copyrights, trade secrets, licenses, information and proprietary rights and processes necessary for its business without any conflict with, or infringement of, the rights of others.   Company will use best efforts to secure and maintain its rights in all present or future inventions, know-how, patents, trademarks, service marks, tradenames, copyrights, trade secrets, licenses, information and any other proprietary rights and processes necessary for its business.   The Company is not a party to any licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes or intellectual property rights of any other person or entity, in each case, other than licenses or other agreements entered into in the ordinary course of business.   The Company has not received any communications alleging that the Company has violated or, by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets or other proprietary rights or processes of any other person or entity.   The Company is not aware that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of such employee's best efforts to promote the interest of the Company or that would conflict with the Company's business.   Neither the execution or delivery of this Agreement, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as currently conducted and as proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.   The Company does not believe it is or will be necessary to use any inventions of any of its employees (or persons it currently intends to hire) made prior to their employment by the Company.

2.17   **Tax Returns; Payments; Status.**   There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid.   There are no accrued and unpaid federal, state, county, local or foreign taxes of the Company which are due, whether or not assessed or disputed.   There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency.   The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.   The Company is not an "S Corporation" within the meaning of Section 1361 of the Internal Revenue Code.    The Company's status as an S Corporation was revoked in 2011, the revocation was accepted and acknowledged by the Internal Revenue Service and the Company has not filed any election to re-elect S Corporation status.

2.18   **Insurance.**   The Company has in full force and effect fire and casualty insurance policies with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed.

2.19   **Employee Agreements.**   Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms delivered to the counsel for the Purchasers (the "Confidential Information Agreements").   No current or former Key Employee has excluded works or inventions from his or her assignment of inventions pursuant to such Key Employee's Confidential Information Agreement.   The Company is not aware that any of its Key Employees is in violation of any agreement covered by this Section 2.19.

2.20   **Permits.**   The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a

Material Adverse Effect.   The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.21   **Corporate Documents**.   The Restated Certificate and Bylaws of the Company are in the form provided to the Purchasers.   The copy of the minute books of the Company provided to the Purchasers contains minutes of all meetings of directors and stockholders and all actions by written consent without a meeting by the directors and stockholders since the date of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and stockholders with respect to all transactions referred to in such minutes.

2.22   **Disclosure.**   The Company has made available to the Purchasers all the information reasonably available to the Company that the Purchasers have requested for deciding whether to acquire the Shares, including certain of the Company's projections describing its proposed business plan (the "**Business Plan**").   No representation or warranty of the Company contained in this Agreement, as qualified by the Schedule of Exceptions, and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or, to the Company's knowledge, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.   The Business Plan was prepared in good faith; however, the Company does not warrant that it will achieve any results projected in the Business Plan.   It is understood that this representation is qualified by the fact that the Company has not delivered to the Purchasers, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities.

2.23   **No Other Representations.**   The Purchasers are relying solely on the representations and warranties in this Section 2 in connection with the purchase of the securities under this Agreement.

3.   **Representations and Warranties of the Purchasers.**   Each Purchaser hereby represents and warrants to the Company, severally and not jointly, that:

3.1   **Authorization.**   The Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which the Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by the Enforceability Exceptions.

3.2   **Purchase Entirely for Own Account.**   This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Securities to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.   By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities.   The Purchaser either has not been formed for the specific purpose of acquiring the Securities, or each beneficial owner of equity securities of or equity interests in the Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.3   **Disclosure of Information.**   The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Stock and the Warrants with the Company's management and has had an opportunity to review the Company's facilities.   The Purchaser understands that such discussions, as well as the Business Plan and

OHSUSA:762992254.3

any other written information delivered by the Company to the Purchaser, were intended to describe the aspects of the Company's business which the Purchaser and the Company believes to be material.   The foregoing, however, does not limit or modify the representations or warranties of the Company in Section 2 of this Agreement or the right of Purchaser to rely thereon.

3.4   **Restricted Securities.**   The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein.   The Purchaser understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.   The Purchaser acknowledges that the Company has no obligation to register or qualify the Securities for resale except as set forth in the Investors' Rights Agreement.   The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.5   **No Public Market.**   The Purchaser understands that no public market now exists for any of the securities issued by the Company, and that the Company has made no assurances that a public market will ever exist for the Securities.

3.6   **Legends.**   The Purchaser understands that the Securities, and any securities issued in respect thereof or exchange therefor, may bear one or all of the following legends:

(a)   "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.   NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(b)   Any legend set forth in or required by the other Transaction Agreements.

(c)   Any legend required by the securities laws of any state to the extent such laws are applicable to the Securities or any securities issued in respect thereof or exchange therefor.

3.7   **Accredited Investor.**   The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.8   **Foreign Investors.**   If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code, such Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the purchase of the Securities, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Securities.   Such

OHSUSA:762992254.3

Purchaser's subscription and payment for and continued beneficial ownership of the Securities, will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

3.9     **No General Solicitation.**   Neither the Purchaser, nor any of its officers, directors, employees, agents, holders of capital stock or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Stock.

3.10     **Exculpation Among Purchasers.**   Each Purchaser acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its investment or decision to invest in the Company.   Each Purchaser agrees that no Purchaser nor the respective controlling persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Securities.

3.11     **Disqualification.**   Each Purchaser represents that neither such Purchaser, nor any person or entity with whom such Purchaser shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as <u>Annex I</u>).

4.     **Conditions of the Purchasers' Obligations at Closing.**   The obligations of each Purchaser to the Company under this Agreement are subject to the fulfillment, on or before the Initial Closing, of each of the following conditions, unless otherwise waived:

4.1     **Representations and Warranties.**   The representations and warranties of the Company contained in Section 2 shall be true and correct in all respects on and as of the Initial Closing with the same effect as though such representations and warranties had been made on and as of the date of the Initial Closing.

4.2     **Performance.**   The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Initial Closing.

4.3     **Compliance Certificate.**   The President of the Company shall deliver to the Purchasers at the Initial Closing a certificate certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

4.4     **Qualifications.**   All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Stock and the Warrants pursuant to this Agreement shall be obtained and effective as of the Initial Closing.

4.5     **Board of Directors.**   As of the Initial Closing, the authorized size of the Board shall be six, and the Board shall be comprised of Brian Wilhite, John Durham, Brian May, Michael Worley and Brett Favre and Dimitrios Bachadakis.

4.6     **Investors' Rights Agreement.**   The Company, the Founder and the Purchasers shall have executed and delivered the Investors' Rights Agreement in substantially the form attached as <u>Exhibit C</u>.

OHSUSA:762992254.3

4.7 **Right of First Refusal and Co-Sale Agreement.** The Company, the Founder, the Purchasers and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

4.8 **Voting Agreement.** The Company, the Founder, the Purchasers and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

4.9 **Secretary's Certificate.** The Secretary of the Company shall have delivered to the Purchasers at the Initial Closing a certificate certifying (i) the Bylaws of the Company, (ii) resolutions of the Board of Directors of the Company approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, and (iii) resolutions of the stockholders of the Company approving the Restated Certificate.

4.10 **Restated Certificate.** The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to the Initial Closing, which shall continue to be in full force and effect as of the Initial Closing.

4.11 **Proceedings and Documents.** All corporate and other proceedings in connection with the transactions contemplated at the Initial Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Purchasers, and the Purchasers (or their counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested. Such documents may include good standing certificates.

5. **Conditions of the Company's Obligations at Closing.** The obligations of the Company to each Purchaser under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

5.1 **Representations and Warranties.** The representations and warranties of each Purchaser contained in Section 3 shall be true and correct in all respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

5.2 **Performance.** All covenants, agreements and conditions contained in this Agreement to be performed by the Purchasers on or prior to the Initial Closing shall have been performed or complied with in all material respects.

5.3 **Qualifications.** All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Stock and the Warrants pursuant to this Agreement shall be obtained and effective as of the Closing.

6. **Miscellaneous.**

6.1 **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

6.2 **Entire Agreement.** This Agreement, and the documents referred to herein constitute the entire agreement among the parties hereto pertaining to the subject matter hereof, and any and all

OHSUSA:762992254.3

other written or oral agreements relating to the subject matter hereof existing between the parties hereto are expressly canceled.

6.3    **Amendments and Waivers.**    Any term of this Agreement may be amended or waived only with the written consent of the Company and the holders of at least a majority of the Common Stock issued or issuable upon conversion of the Stock and the Warrant Stock.    Any amendment or waiver effected in accordance with this Section 6.3 shall be binding upon the Purchasers and each transferee of the Securities, each future holder of all such Securities, and the Company.

6.4    **Successors and Assigns.**    Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. No party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the other parties to this Agreement.

**Notices.**    Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.    Any such notice shall also be sent to Greg Heibel, 1000 Marsh Road, Menlo Park, CA 94025.

6.5    **Severability.**    If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.    In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

6.6    **Construction.**    This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

6.7    **Counterparts.**    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.    Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.8    **Survival of Warranties.**    Unless otherwise set forth in this Agreement, the warranties, representations and covenants of the Company and the Purchasers contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Initial Closing.

6.9    **Interpretation.**    The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.    As used in this Agreement, the phrase "to the Company's knowledge" or "to the knowledge of the Company" shall mean the actual knowledge, after reasonable investigation, of the following officers: Brian Wilhite and Joseph

Alioto Veronese.   In addition, for purposes of the representations and warranties set forth in Section 2, the term "Company" shall include any subsidiaries of the Company, as applicable.

6.10    **Finder's Fee.**   Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction.   Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which each Purchaser or any of its officers, employees, or representatives is responsible.   The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

6.11    **Attorney's Fees.**   If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

6.12    **Delays or Omissions.**   No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.   Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.   All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

6.13    **Corporate Securities Law.**   THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM THE QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.   THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED UNLESS THE SALE IS SO EXEMPT.

6.14    **Dispute Resolution.**   Any unresolved controversy or claim arising out of or relating to this Agreement, except for any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, then such controversy or claim shall be submitted to arbitration under the auspices of JAMS in San Francisco in accordance with its rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.   Each party will bear its own costs in respect of any disputes arising under this Agreement.

*[signature pages follow]*

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**THE COMPANY:**

SQOR, INC.

*Brian Wilhite*

Brian Wilhite, President

Address:

475 Sansome Street, Suite 730
San Francisco, CA 94111

Email:_____

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**PURCHASER:**

Brian May
(print name)

(Signature)

Address:

Email:

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**PURCHASER:**

Martin M. Stott, Sr.
_____
(print name)

*Martin M. Stott, Sr.*
_____
(Signature)

Address:
_____

_____

Email:_____

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**PURCHASER:**

W Resources LLC

(Print name)

_____
(Signature)

Address:

_____

_____

Email: _____

SIGNATURE PAGE TO SQOR. INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**PURCHASER:**

KATHY A WORLEY
(print name)

*Kathy A. Worley*
(Signature)

Address: 22-784 Ligon Rd
Zachary, LA 70791

Email: kathyworley@me.com

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**PURCHASER:**

Peter J. Bush

_____
(print name)

*Peter J. Bush*

_____
(Signature)

Address:

_____

_____

Email:_____

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**PURCHASER:**

Richard K. Pellerin _____
                (print name)

*Richard K. Pellerin*
_____
                (Signature)

Address:

_____

_____

Email:_____

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

PURCHASER:

Woodgate VFN Holdings LLC
(print name)
By: Woodgate Partners LP, its Manager

By: Woodgate Partners GP LLC, its General Partner

By: _____, Nathan Stedham, Manager
(Signature)

Address:
9121 Elizabeth Rd. Suite 106

Houston, TX 77055

Email: nathanstedham@gmail.com

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

**PURCHASER:**

ORTHO INVESTMENTS LLC

By: _____
    Steve Atchison, M.D.
    Managing Member

By: _____
    James S. Lillich, M.D.
    Managing Member

Address:
1367 Forest Creek Dr
Shreveport, LA 71115

Email: satchison@msil.md
    bonesfoot@aol.com

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

The parties have executed this Series A-1 Preferred Stock and Warrant Purchase Agreement as of the date first written above.

PURCHASER: *Callais Capital Mangement, LLC*

*Harold J. Callais II*

*Manager* (print name)

_____ (Signature)

Address:

*401 Focus Street*

*Thibodaux, LA 70301*

Email: *harold.Callais@CallaisCapital.com*

SIGNATURE PAGE TO SQOR, INC. SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

## **EXHIBITS**

Exhibit A -    Schedule of Purchasers

Exhibit B -    Form of Amended and Restated Certificate

Exhibit C -    Form of Investors' Rights Agreement

Exhibit D -    Form of Warrant

Exhibit E -    Form of Right of First Refusal and Co-Sale Agreement

Exhibit F -    Form of Voting Agreement

**EXHIBIT A**

**SCHEDULE OF PURCHASERS**

| Purchaser | Principal Amount of Indebtedness to be Converted | Series A-1 Shares issued upon Conversion | Series A-1 Shares issued upon New Investment | Purchase Price | Total Series A-1 Shares | Warrant Shares |
|---|---|---|---|---|---|---|
| Brian May | $1,000,000.13 | 5,887,202 | | $1,000,000.13 | 5,887,202 | 12,221,960 |
| Martin Stott | $1,000,000.13 | 5,887,202 | | $1,000,000.13 | 5,887,202 | 12,221,960 |
| W Resources LLC | $1,000,000.13 | 5,887,202 | | $1,000,000.13 | 5,887,202 | 12,221,960 |
| Kathy A. Worley | | | 642,134 | $109,072.88 | 642,134 | |
| Peter J. Bush | | | 147,180 | $24,999.99 | 147,180 | |
| Richard K. Pellerin | | | 588,720 | $99,999.98 | 588,720 | |
| Woodgate VFN Holdings LLC | | | 1,236,312 | $209,999.96 | 1,236,312 | |
| Ortho Investments LLC | | | 588,720 | $99,999.98 | 588,720 | |
| **Total** | **$3,000,000.39** | **17,661,606** | **3,203,066** | **$3,544,073.18** | **20,864,672** | **36,665,880** |

**EXHIBIT B**

**FORM OF AMENDED AND RESTATED CERTIFICATE**

## EXHIBIT C

**FORM OF AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

**<u>EXHIBIT D</u>**

**FORM OF WARRANT**

**<u>EXHIBIT E</u>**

**FORM OF AMENDED AND RESTATED RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT**

OHSUSA:762992254.3

**EXHIBIT F**

**FORM OF AMENDED AND RESTATED VOTING AGREEMENT**

## ANNEX I
### Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

    (A) At the time of such sale, bars the person from:

        (1) Association with an entity regulated by such commission, authority, agency, or officer;

        (2) Engaging in the business of securities, insurance or banking; or

        (3) Engaging in savings association or credit union activities; or

    (B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

    (A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

    (B) Places limitations on the activities, functions or operations of such person; or

    (C)Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

    (A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

    (B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.