# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

CALLAIS CAPITAL MANAGEMENT, LLC    CIVIL ACTION

VERSUS            NO. 17-12039

BRIAN WILHITE, ET AL.       SECTION D (5)

## ORDER AND REASONS

Before the Court is the Motion to Dismiss filed by Defendants Brian Wilhite, Emaleigh Wilhite, Brian May, John Durham, Brett Favre and Jon Gregg.[1]  Plaintiff Callais Capital Management, LLC has filed an Opposition,[2] and Defendants have filed a Reply.[3]  After careful review of the parties' memoranda, the record, and the applicable law, the Court grants the Motion.

## I.    FACTUAL BACKGROUND

This is a securities fraud case arising out of investments in a digital media company which focused on sports.  The following factual allegations are drawn from

---

[1] R. Doc. 179.  For ease of reference the Court refers to the Defendants who filed the instant Motion collectively as "Defendants."  Three other Defendants (Mike Hammer, Pontchartrain Capital, LLC, and Andrew Garcia) have already been dismissed in this matter.  Accordingly, the only remaining Defendant not a party to the instant Motion to Dismiss is Michael Worley, who seemingly never appeared in this matter, presumably because of his oft-discussed bankruptcy.  Worley was a board member of Sqor, see R. Doc. 74 at 26 ¶ 75, and presumably would have been within the scope of the Sqor D&O Defendants.  The arguments the instant Defendants make for dismissal of Plaintiff's Complaint apply with the same force to Worley.
[2] R. Doc. 184.
[3] R. Doc. 193.

Plaintiff's First Amended Complaint[4] and must be considered true for the purposes of this Motion.

Sqor was a business which created a digital platform designed for sports fans.[5] Sqor aspired to be "the best enterprise solution for Sports in the world, while delivering the most engaging sports platform for the Global sports fan."[6]  In July 2015, Sqor solicited Plaintiff Callais Capital Management ("CCM") to invest in Sqor.[7] In its Complaint, CCM often focuses on the actions of Brian Wilhite, Sqor's co-founder.  CCM also levies claims against Jon Gregg, a shareholder and Sqor's Chief Revenue Officer,[8] Michael Worley, a major investor and a board member of Sqor,[9] Brian May, a major investor and board member of Sqor,[10] John Durham, another shareholder and investor in Sqor,[11] Emaleigh Wilhite, a co-founder of Sqor who was in charge of the company's finances,[12] Dimitrios Bachadakis, a shareholder and board member of Sqor who was "in charge of continuing efforts to attract European football (soccer) teams and enter into contracts with them for Sqor,"[13] and Brett Favre, a former professional football player who purportedly leant his "prestige and legitimacy" to the organization.[14]

Over the course of a year, CCM engaged in four transactions with Sqor:

---

[4] R. Doc. 74 (sometimes referred to as "Complaint" herein).
[5] R. Doc. 74 at 4 ¶ 16.
[6] *Id.*
[7] *Id.* at 4 ¶ 17.
[8] R. Doc. 74 at 26 ¶ 76.
[9] *Id.* at 26 ¶ 75.
[10] *Id.* at 26 ¶ 74.
[11] *Id.* at 28-29 ¶ 82.
[12] *Id.* at 28 ¶ 81.
[13] *Id.* at 24 ¶ 70.
[14] *Id.* at 25 ¶ 71.

- First, on June 12, 2015, CCM entered a Loan and Security Agreement ("LSA") for $6,000,000. The transaction gave CCM the right to purchase shares of preferred stock in a subsequent financing round. The transaction also included a Series A Preferred Stock Warrant for 2,095,791 shares at a price of $0.19086 per share. As a result of the transaction, Sqor could request "capital growth loans" of $500,000 up to a cumulative amount of $6,000,000.[15]

- Second, on December 3, 2015, CCM entered a Supplement to the LSA for an additional $6,000,000. The transaction gave CCM the right to purchase shares of preferred stock in a subsequent financing round. The transaction also included a Series A Preferred Stock Warrant for 11,922,279 shares at a price of $0.14997 per share. As a result of the transaction, Sqor could request "capital growth loans" of $500,000 up to a cumulative amount of $6,000,000.[16]

- Third, on April 1, 2016, CCM entered Supplement No. 2 to the LSA for an additional $2,000,000. The transaction gave CCM the right to purchase shares of preferred stock in a subsequent financing round. The transaction also included a Series A Preferred Stock Warrant for 6,157,736 shares at a price of $0.14518 per share. As a result of the transaction, Sqor could request "capital growth loans" of $500,000 up to a cumulative amount of $2,000,000.[17]

---

[15] *Id.* at 4-5 ¶ 18. The Loan and Security Agreement is attached to Defendants' Motion to Dismiss. *See* R. Doc. 179-3.

[16] *Id.* at 5 ¶ 19. Supplement No. 1 to the Loan and Security Agreement is attached to Defendants' Motion to Dismiss. *See* R. Doc. 179-4.

[17] *Id.* at 5 ¶ 20. Supplement No. 2 to the Loan and Security Agreement is attached to Defendants' Motion to Dismiss. *See* R. Doc. 179-5.

- Fourth, on June 15, 2016, CCM entered Supplement No. 3 to the LSA for an additional $2,750,000.  The transaction gave CCM the right to purchase shares of preferred stock in a subsequent financing round.  The transaction also included a Series A Preferred Stock Warrant for 6,593,013 shares at a price of $0.14518 per share.  As a result of the transaction, Sqor could request "capital growth loans" of $500,000 up to a cumulative amount of $2,750,000.[18]

The thrust of CCM's Complaint is that Sqor's directors and management, as well as the members of Pontchartrain Capital, LLC (Sqor's investment bank), misled CCM into investing more than $16,000,000 in Sqor.  CCM contends Defendants artificially inflated the value of Sqor, and had CCM been properly advised, it would not have invested in Sqor.  CCM points to a plethora of alleged misrepresentations, each explored below.

<u>The Business Plan</u>

CCM's first set of allegations revolve around the 2015 Business Plan presented to CCM before it made its initial investment.[19]  In July 2015, Defendants sent a Business Plan to CCM to solicit its investment in securities.[20]  The Business Plan made clear that Sqor was looking for a growth loan to "continue operations, while expanding capacity to capture a larger market."[21]  CCM alleges that "Sqor represented to CCM that it would raise additional growth equity capital to repay and

---

[18] *Id.* at 5 ¶ 21.  Supplement No. 3 to the Loan and Security Agreement is attached to Defendants' Motion to Dismiss.  *See* R. Doc. 179-6.
[19] The Business Plan is attached to Defendants' Motion to Dismiss.  *See* R. Doc. 179-8.
[20] R. Doc. 74 at 10 ¶ 39.
[21] *Id.* at 10-11 ¶ 40.

'cover all loans and continued global growth opportunities.'"[22]  The Business Plan also included a growth chart that represented that Sqor's net income for 2016 to be $1.3 million, and projected a 2017 net income of $12.7 million, and a 2018 net income of $44 million.[23]  The Business Plan further represented that it had a "total potential reach of current combined social reach of 350MM+ fans and growing."[24]

CCM alleges that the Business Plan contained numerous false representations.  It contends that "Sqor would not or could not fund immediate international growth or secure up to ten (10) major Sports Enterprises over the next six (6) months" and that "Sqor could not raise round of equity capital of up to $25,000,000."[25]  CCM also alleges that the numbers on the growth chart were "simply not true"[26] and that various defendants "knew at the time they provided the Business Plan to CCM that Sqor did not have 325,000,000 fans or users, and Sqor did not have a social reach of 350MM fans or users."[27]

<u>Users</u>

CCM also alleges that Defendants regularly misrepresented the number of users Sqor had by attributing professional athletes' social media followers as "users" of Sqor.[28]  Plaintiff specifically alleges that Defendants were inflating the social media followers of Defendant Brett Favre (a former professional football player) with

---

[22] *Id.* at 11 ¶ 41.
[23] *Id.* at 12 ¶ 43.
[24] *Id.* at 12 ¶ 44.
[25] R. Doc. 74 at 11 ¶ 42.
[26] *Id.* at 12 ¶ 43.
[27] *Id.* at 13 ¶ 45.
[28] R. Doc. 74 at 15 ¶ 49.

Sqor users.[29]  CCM also alleges that various controlling persons, including Wilhite,

"regularly misrepresented monthly active users ("MAUs") and daily active users

("DAUs") – fundamental and critical metrics for online social platforms,"[30]  factors

which had the effect of making CCM's investment look more valuable to CCM.[31]

### Business Dealings with Sports Clubs

CCM alleges that Defendants misrepresented the likelihood that Sqor would

enter into business developments or agreements with sports clubs and

organizations.[32]  In particular, CCM alleges that Sqor touted its relationship with

FC Bayern Munich, a soccer club.[33]  In 2015, Defendants Wilhite and Hammer

provided an unsigned draft "Sports and Enterprise Agreement" between FC Bayern

Munich and Sqor to CCM.[34]  The agreement was described by Wilhite as "standard

and used for all teams."[35]  But the finalized agreement—entered into after the LSA

was signed—contained small but material changes that CCM contends did not bind

FC Bayern to "anything meaningful."[36]

CCM further alleges that a Sqor representative provided detailed projections

(with dollar figures) regarding negotiations with sports clubs and organizations and

misrepresented to CCM how close the negotiations were to cumulating in a deal that

would be profitable to Sqor.[37]  Plaintiff singles out ESPN as an example.  According

---

[29] *Id.* at 21 ¶ 61.
[30] *Id.* at 22 ¶ 64.
[31] *Id.* at 15 ¶ 49.
[32] R. Doc. 74 at 16 ¶ 50.
[33] *Id.* at 16 ¶ 51.
[34] *Id.* at 16-17 ¶ 52.
[35] *Id.*
[36] *Id.* at 17-18 ¶¶ 53-54.
[37] R. Doc. 74 at 18-19 ¶ 56.

to CCM, Wilhite represented that ESPN was "very interested" in Sqor and had considering buying Sqor.[38]  But CCM later learned that this potential agreement ended with a "preliminary meeting" with a "mid-level person" at ESPN, and that there was no deal to be had.[39]  CCM also alleges that Wilhite and Hammer made various other false representations about potential deals with other sports organizations, including the Dallas Cowboys, NFL Players Association, and Under Armor.[40]

<u>Brand Capabilities Deck</u>

CCM alleges that Defendants sent CCM a "Brand Capabilities Deck" that contains various misrepresentations, including conflating Favre's social media followers as Sqor's user base.[41] CCM further alleges that the Brand Capabilities Deck falsely asserted that "Conor McGregor to drive 16 million ad impressions with 344,000 users engaged; Ron Gronkowski to drive downloads of the Mobile Strike game with 7.5 million impressions and 71,000 users engaged; and partnerships with NFL Athletes (Richard Sherman, Rob Gronkowski and Odell Beckham, Jr.), NFL Retirees (Brett Favre, Matt Hasselback and Steve Marinucci) And "Sports Icons" (Allen Iverson, Conor McGregor and Pele)."[42]  CCM alleges that the Brand Capabilities Deck misrepresented the endorsement of NBA players "and the actual

---

[38] *Id*. at 19 ¶ 57.
[39] *Id*. at 19-20 ¶¶ 57-58.
[40] *Id*. at 20 ¶¶ 59-60.  The Brand Capabilities Deck is attached to Defendants' Motion to Dismiss at R. Doc. 179-9.
[41] R. Doc. 74 at 21 ¶ 61.
[42] *Id*. at 21-22 ¶ 62.

prospects and existence of a 'Road to the Draft' program, which was to provide an online Q&A Chat and Custom Content program on Sqor's social medial platform."[43]

Aftermath and Litigation

In sum, Plaintiff alleges that "Sqor, Wilhite, and Gregg at least, knew at the time they made the aforementioned representations to CCM that they were false. Nevertheless, Sqor, Wilhite, the Pontchartrain Defendants, May and Worley continued to make and reiterated these misrepresentations during in-person meetings, telephone conferences and through written correspondence" before CCM's transactions with Sqor.[44]   According to CCM, it only learned of these misrepresentations in April 2017, when a representative of Defendant Bachadakis "relayed that Wilhite and Gregg routinely told third-party potential investors and customers that Sqor's MAU was generally around 10 million, a key threshold for receiving advertising revenue, but in Sqor's case, the number was not true."[45]

Plaintiff alleges that "[b]ecause it turned out that there was no imminent $25 million third party investment, and because there were no revenue generating deals, the value of Sqor at the time of investment was likely $0."[46]  On October 3, 2017, Sqor filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of California.[47]  Plaintiff alleges that "[a]s the matter progressed, CCM, along with the other creditors, has learned that the bankruptcy estate is

---

[43] *Id.* at 22 ¶ 63.
[44] R. Doc. 74 at 23 ¶ 66.
[45] *Id.* at 23 ¶ 67.
[46] R. Doc. 74 at 29-30 ¶ 86.
[47] *Id.* at 30 ¶ 87.

essentially worth nothing."[48]   Plaintiff has filed the instant suit against various directors and managers of Sqor, as well as Pontchartrain Capital LLC,  Sqor's investment bank, alleging claims for violations of Section 10(b) of the Securities and Exchange Act and Rule 10b-5, violations of Louisiana securities law, and negligent and intentional misrepresentation.[49]

Defendants now move to dismiss Plaintiff's Complaint.[50]   Defendants first argue that CCM cannot base its securities claims on the LSA and its Supplements because they are not securities.   Defendants argue that the LSA and its Supplements are in fact loans, and are structured as such, and therefore do not constitute notes under *Reves v. Ernst & Young*,[51] or investment contracts under *SEC v. W.J. Howey Co.*[52]   Defendants also argue that CCM has judicially admitted that the LSA and Supplements are loans in a separate bankruptcy proceeding.

Defendants next argue that CCM fails to properly plead each essential element of a private securities fraud claim under the heightened standard of the Private Securities Litigation Reform Act ("PSLRA"), specifically because CCM has failed to plead actionable misrepresentations or omissions, reasonable reliance, or loss causation.   Defendants march through CCM's various allegations and argue as to each one that Plaintiff fails to properly plead an actionable misrepresentation or omission as required by the PSLRA and Federal Rule of Civil Procedure 9(b).

---

[48] *Id.*
[49] *Id.* at 30-33 ¶¶ 89-99.  Pontchartrain Capital, Hammer, and Garcia have settled.  *See* R. Doc. 91.
[50] R. Doc. 179.
[51] 494 U.S. 56 (1990).
[52] 328 U.S. 293 (1946).

Defendants also argue that CCM failed to adequately plead facts that establish control person liability.  Finally, Defendants contend that CCM's state-law securities claims fail for the same reasons CCM's federal claims purportedly fail.

CCM has filed an Opposition.[53]  It first argues that the transactions at issue involved securities under both *Reves* and *Howey* and attempts to distinguish cases relied on by Defendants.  CCM also argues that nothing it argued in a separate litigation constituted a judicial admission that would be dispositive of the issue here.  CCM further argues that it set forth allegations that satisfy the PSLRA and Rule 9(b).  It contends that it has set forth allegations which support a finding of scienter, in part due to its allegations of personal monetary benefits to Defendants and its allegations of severe recklessness.  CCM further avers that it also pleaded reasonable reliance, and that the statements of Defendants went beyond simple "puffery."  Finally, Plaintiff argues that it has adequately pleaded economic loss and loss causation and that its allegations establish control person liability for all Defendants.

Defendants have filed a Reply.[54]  Defendants argue that CCM attempts to improperly argue that the entire transaction falls within the gambit of federal securities laws, when not all instruments involved were securities.  Defendants relatedly contend that CCM misapplies the *Reves* test.  Defendants further argue that CCM's allegations regarding first-year growth, false financials, athlete partnerships, partners raising capital, and relationships with teams and other organizations are

---

[53] R. Doc. 184.
[54] R. Doc. 193.

inadequate under the PSLRA and Rule 9(b).  Defendants also reiterate their arguments regarding scienter, reasonable reliance, loss causation, and control person liability.

## II.    LEGAL STANDARD

To overcome a defendant's motion to dismiss, a plaintiff must plead a plausible claim for relief.[55]  A claim is plausible if it is pleaded with factual content that allows the court to reasonably infer that the defendant is liable for the misconduct alleged.[56]  But, no matter the factual content, a claim is not plausible if it rests on a legal theory that is not cognizable.[57]  In ruling on a motion to dismiss, the Court accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff.[58]  However, the allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.[59]  "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[60]

In considering a Motion to Dismiss, a Court must typically limit itself to the allegations of the Complaint, including its attachments.[61]  That said, a Court may consider documents attached to a motion to dismiss if the documents are referred to

[55] *Romero v. City of Grapevine, Tex.*, 888 F.3d 170, 176 (5th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).
[56] *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017) (citing *Iqbal*, 556 U.S. at 678).
[57] *Shandon Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010) (per curiam).
[58] *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 513 (5th Cir. 2018).
[59] *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007).
[60] *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (internal citations omitted).
[61] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

in the Complaint and are central to the plaintiff's claims.[62]  Here, those documents include the LSA and its Supplements, the Business Plan, and the Brand Capabilities Deck.

## III.   ANALYSIS

### A.   Definition of Securities

A security is broadly defined in the Securities Exchange Act, and the statutory definition includes "any note, stock, [or] investment contract."[63]  Here, the parties primarily dispute whether the instruments (namely, the LSA and its supplements) fall within the definition of a security as notes or investment contracts.

The Court first addresses whether the LSAs and their supplements are "notes." "To determine whether a note is a security within the meaning of the Securities Acts, the Supreme Court has established the 'family resemblance' test."[64]  "A note is presumed to be a 'security' and that presumption may be preliminarily rebutted by a showing that it more closely resembles the 'family' of instruments found not to be securities."[65]  The "family" of instruments includes:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.[66]

---

[62] *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

[63] 15 U.S.C. § 78c(a)(10).

[64] *Trust Co. of Louisiana v. N.N.P.*, 104 F.3d 1478, 1489 (5th Cir. 1997) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 65-67 (1990)).

[65] *Id.* (citing *Reves*, 494 U.S. at 67).

[66] *Reves*, 494 U.S. at 65.

Here, Defendants argue that the LSA and its Supplements closely resemble "short-term notes secured by a lien on a small business or some of its assets."[67] Specifically, it argues that the LSA and its Supplements were "short-term notes secured by a pledge of Sqor's business property that formalizes an open account debt incurred to address Sqor's cash-flow deficiencies."[68]  But as CCM points out, the LSA and its Supplements contain a number of terms that would not be included were the instruments easily categorized as "short-term notes secured by a lien on a small business or some of its assets."[69]  For example, the "Right to Invest,"[70] which provided CCM the right to purchase shares of preferred stock in a subsequent financing round and high interest rate of 12% (suggesting a relatively high-risk) differentiate the LSA from your typical short-term note secured by a lien on a small business or its assets. Moreover, when faced with an instrument that is similar in many respects to the instruments at issue here, the Sixth Circuit declined to "struggle to fit an atypical peg into a standardized hole when the Supreme Court has provided, in its four factor test [discussed below], a tool for custom fitting."[71]  Accordingly, the Court finds that the instruments at issue here are not sufficiently similar to a short-term note secured by a lien on a small business or its assets to end the inquiry into whether the instruments are "notes."

---

[67] *Id.*
[68] R. Doc. 179-1.
[69] *Reves*, 494 U.S. at 65.
[70] R. Doc. 179-3.
[71] *Bass v. Janney Montgomery Scott*, 210 F.3d 577, 585 (6th Cir. 2000).

Because the Court determines that the instruments in question are not sufficiently similar to an item on the family resemblance list, it must examine four factors to determine "whether the instrument at issue is another category that should be added to the list of non-securities."[72]  These factors are:

> (1) the transaction is examined to assess the motivations that would prompt a reasonable seller and buyer to enter into it;
>
> (2) the "plan of distribution" of the instrument is examined to determine whether it is an instrument in which there is a "common trading for speculation or investment;"
>
> (3) the reasonable expectations of the investing public are considered; [and]
>
> (4) an inquiry into the existence of another regulatory scheme, which would significantly reduce the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.[73]

The Court examines each factor in turn.

### i.   *Economic Realities*

The first factor asks the Court to examine "[t]he motivations that would prompt a reasonable seller and buyer to enter into [the transaction]."[74]  Here, as in *Bass*,[75] the Court finds that application of this factor is not straightforward.  From Sqor's point of view, the motivation was almost certainly "to raise interim funds to launch a new enterprise,"[76] however from CCM's point of view, the transaction "looks

---

[72] *Trust Co.*, 104 F.3d at 1489.

[73] *LeBrun v. Kuswa*, 24 F. Supp. 2d 641 (E.D. La. 1998) (citing *Reves*, 494 U.S. at 66-67) (emphases removed).

[74] *Reves*, 494 U.S. at 66.

[75] 210 F.3d at 585.

[76] *Id.*

more like a transaction for profit."[77]  Importantly, the Fifth Circuit has held that high

interest rates a buyer may receive on an instrument can be "profit."[78]  Here, CCM

has alleged that "the 12% and 8% interest rates for the Investments were

uncontrovertibly risky at the time of [sic] they were made."[79]  Moreover, as described

above, the instruments had a number of terms indicating that CCM entered the

transaction to gain a profit, including the right to purchase stock in a subsequent

financing round.  Accordingly, the Court finds that this factor slightly favors a finding

that the instruments are notes.

### ii.    *Plan of Distribution*

The second factor of the *Reves* test asks whether the instrument is one for

which there is "common trading for speculation and investment."[80]  In order to

establish "common trading" a plaintiff need only allege that the notes were "offered

and sold to a broad segment of the population."[81]  However, the Fifth Circuit has

explicitly held that "[a] debt instrument may be distributed to but one investor, yet

still be a security."[82]

In its Opposition, CCM argues that "investments in Sqor was [sic] offered to

many people over an extended period, by a company purporting to broker and sell

'investment securities.'"[83]  But CCM does not allege as much in its First Amended

Complaint, and therefore this statement by CCM is not entitled to an assumption of

---

[77] *Id.*
[78] *Trust Co.*, 104 F.3d 1478, 1489.
[79] R. Doc. 74 at 7 ¶ 25.
[80] *Reves*, 494 U.S. 56, 66 (1990) (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943)).
[81] *Id.* at 68.
[82] *Trust Co. of La. v. N.N.P., Inc.*, 104 F.3d 1478, 1489 (5th Cir. 1997).
[83] R. Doc. 184 at 7.

truth.  At any rate, although CCM argues that "investments" were offered to various parties over time, it leaves "investments" undefined, and does not argue that the opportunity to enter into similar LSAs was offered to others on the same or similar terms.  Accordingly, CCM has not established that the instruments were "offered and sold to a broad segment of the population," and the Court therefore finds that this factor weighs against the characterization of the instruments as notes.  This is not, however, fatal to CCM's argument that the instruments are notes, as the Fifth Circuit has held that this factor is not dispositive.[84]  Further analysis of the remaining *Reves* factors is therefore required.

### iii.  *Expectations of the Public*

The third factor of the *Reves* test asks how an investor would reasonably view the obligations.[85]  As with the first factor, the Court finds that application of the third factor is not straightforward.  "The reasonable expectation of the investing public would normally be that bridge loans are not securities,"[86] yet here the LSA and its Supplements are drafted with various terms (and a very high interest rate) that suggest that the instruments are not typical bridge loans, and may be more properly described as securities.  Accordingly, the Court finds this factor neutral or may lean in favor of finding an instrument is a security.

---

[84] *Trust Co.*, 104 F.3d at 1489.
[85] *Id.* at 1489-90.
[86] *Bass*, 21 F.3d at 585.

iv.    *Another Regulatory Scheme*

The fourth and final factor of the *Reves* test asks "whether there is some factor that reduced the risk of the instrument, rendering application of securities law unnecessary."[87]   In *Reves*, the Supreme Court focused on whether the note was collateralized, whether the note was insured, and whether any other federal legal regime applied to the note such that application of securities laws was unnecessary.[88]

Here, the instruments were not insured, and no party identifies any other legal regime (other than Louisiana securities laws[89]), which would apply to the instrument. The only risk-reducing factors at play are (1) that the instruments were personally guaranteed by Michael Worley; and (2) that the instruments were secured by the value of Sqor's assets.   The First Amended Complaint acknowledges that Worley provided a personal guarantee by Worley.[90]   That said, the First Amended Complaint also alleges that the personal guarantee "eventually turned out to be worthless once Worley declared bankruptcy."[91]   Moreover, the First Amended Complaint also alleges that although the transactions were "secured" by the assets of Sqor, the $16 million investment of CCM far exceeded the $2.5 million value of Sqor's assets.[92]   Further, the First Amended Complaint makes numerous allegations in which it acknowledges that the investments were "risky" without discussion of any risk-reducing factors.[93]

---

[87] *Matthew v. Stolier*, 207 F. Supp. 3d 678, 686 (E.D. La. 2016) (citing *Reves*, 494 U.S. at 68-69).
[88] *Reves*, 494 U.S. at 68-69.
[89] State securities regulations generally do not suffice as another regulatory scheme under *Reves*.  *See Chao Xiz Zhang-Kirkpatrick v. Layer Saver, LLC*, 84 F. Supp. 3d 757, 765 (N.D. Ill. 2015) (citing *S.E.C. v. Thompson*, 732 F.3d 1151, 1169 (10th Cir. 2013)).
[90] R. Doc. 74 at 26 ¶ 75.
[91] *Id.*
[92] *Id.* at 6 ¶ 23.
[93] *See, e.g., id.* at 7 ¶ 27.

Rather, CCM alleges that it was willing to enter such a "risky" transaction because the "potential of high investment returns warranted the investments and [because the] company had significant present value."[94]  In short, the only two factors that can be viewed as reducing the risk of the transactions did little in practice to reduce CCM's risk at all.  This differs from similar cases, such as *Bass v. Janney Montgomery Scott, Inc.*,[95] where the Sixth Circuit found that the notes at issue were "heavily secured."[96]  Accordingly, the Court finds that this factor weighs in favor of finding the instruments are notes.

While the analysis thus far has revealed support on both sides of the question as to whether the instruments are notes, the Court finds that considered together the *Reves* factors tilt toward finding that the LSA and its Supplements are "notes" and therefore "securities."  However, this does not end the inquiry, as Defendants make additional arguments separate from the *Reves* factors.  The Court therefore continues to analyze Defendants' arguments before making a final determination.

v.    *Judicial Admissions or Estoppel*

Finally, the Court addresses the argument that CCM is barred from arguing that the instruments are notes because CCM argued in Worley's bankruptcy proceedings that the instruments were simply loans.  Defendants point to filings by CCM in Worley's bankruptcy where CCM described the instruments as "loans,"[97] and

---

[94] *Id.*
[95] 210 F.3d 577 (6th Cir. 2000).
[96] *Id.* at 585.
[97] *See* R. Doc. 179-11 at 4.

moved for a nondischargeability judgment in which it repeatedly suggested that the instruments were loans.[98]

Defendants first argue that CCM is barred by collateral estoppel from arguing that the instruments are anything other than "loans." "To establish collateral estoppel under federal law, one must show: (1) that the issue at stake be identical to the one involved in the prior litigation; (2) that the issue has been actually litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action."[99] As CCM points out, Defendants have failed to establish that the issue at hand was "actually litigated" in Worley's bankruptcy. Accordingly, the doctrine of collateral estoppel is not at issue here.

Next, Defendants argue that that CCM's bankruptcy filings should judicially estop CCM from arguing that the instruments are securities. For judicial estoppel to apply, three criteria must be met: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently."[100] The Court does not find that CCM's filings in Worley's bankruptcy are "plainly inconsistent" with its instant argument that the instruments are securities. Although CCM characterizes the instruments as loans in the Worley bankruptcy proceeding, virtually all "notes" (which are by statutory definition

---

[98] *See* R. Doc. 179-12 and 179-13.
[99] *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d 348, 353 (5th Cir. 2009).
[100] *Love v. Tyson Foods*, 677 F.3d 258, 261 (5th Cir. 2012) (quoting *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc)).

securities) are debt instruments. Moreover, CCM makes many of the same arguments in Worley's bankruptcy regarding Worley's misrepresentations as it does here.[101] In short, the passing characterization of the Loan and Security Agreement as a loan in the setting of Worley's bankruptcy proceedings is not sufficiently inconsistent with the arguments that the LSA (with its Supplements) are notes that judicial estoppel is warranted here.

Finally, Defendants argue that CCM's bankruptcy filings are a judicial admission. The Fifth Circuit has defined a judicial admission as a "formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them."[102] In order to qualify as a judicial admission, a statement must be "deliberate, clear, and unequivocal."[103] Indeed, "for a statement of counsel to qualify as a judicial admission it must be made intentionally as a waiver, releasing the opponent from proof of fact."[104]

For much the same reason that the Court does not find judicial estoppel applicable, the Court does not find that CCM's filings in Worley's bankruptcy constitute "formal concessions" or "deliberate, clear, and unequivocal" admissions that the instruments at issues are not securities. Further, even if such a concession can be gleaned from CCM's filings in the bankruptcy proceeding, there is no evidence that CCM intended to waive any argument that the instruments were security agreements in future proceedings. Accordingly, the Court does not find that CCM

---

[101] *See, e.g.*, R. Doc. 179-12 at 3 ¶ 16.
[102] *Martinez v. Bally's Louisiana*, 244 F.3d 474, 476 (5th Cir. 2001).
[103] *Heritage Bank v. Redcom Laboratories, Inc.*, 250 F.3d 319, 329 (5th Cir. 2001).
[104] *United States v. Chavez-Hernandez*, 671 F.3d 494, 501 (5th Cir. 2012).

has made a judicial admission that bars it from arguing that the instruments are securities.

In summary, the Court has found that the *Reves* factors, on balance, weigh in favor of finding that the instruments are "notes" and therefore securities. The Court has further found that CCM is not barred or estopped from arguing otherwise. Because the Court finds that the instruments are "notes" the Court does not address whether the instruments are also "investment contracts" under the test articulated in *SEC v. W.J. Howey Co.*[105]

## B.      Securities Fraud Claims

Plaintiff's securities fraud claims are governed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which was enacted to prevent the abuse of federal securities laws by plaintiffs.[106]  "In order to state a claim under section 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury.'"[107]  A private securities fraud claim is also subject to the heightened pleading standard of Rule 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud

---

[105] 328 U.S. 293 (1946).

[106] 15 U.S.C. § 78u-4.  Plaintiff seems to suggest at numerous times that because its complaint is not a "nuisance filing" the heightened standards of the PSLRA should not apply to it.  Plaintiff cites no authority for this proposition, and such an argument would conflict with black-letter law.

[107] *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-407 (5th Cir. 2001) (quoting *Tchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[108]

In interpreting the pleading requirements under the PSLRA, the Fifth Circuit has held that to state a claim for securities fraud, a plaintiff must "state not only the time, place, and identity of the speaker, and the context of the alleged misrepresentation, but also . . . explain why the challenged statement or omission is false or misleading."[109]  "Directly put, the who, what, when, and where must be laid out *before* access to the discovery process is granted."[110]

Further, the Fifth Circuit disapproves of "group pleading."[111]  Accordingly, "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded."[112]  That said, "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue."[113]  Such facts could include a signature on the document or allegations of facts regarding an individuals participation in forming the document or a specific portion of the document.[114]

Certain types of statements merit yet another level of protection.  For example, "it is well-established that generalized positive statements about a company's

---

[108] Fed. R. Civ. P. 9(b).
[109] *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004).
[110] *Williams v. WMX Technologies*, 112 F.3d 175, 178 (5th Cir. 1997) (emphasis in original).
[111] *Southland*, 365 F.3d at 364-65.
[112] *Id.* at 365.
[113] *Id.*
[114] *Id.*

progress are not a basis for liability."[115] Such statements are "non-actionable puffery" if they are "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation."[116] The PSLRA also includes a safe harbor for a "forward looking statement."[117]  The safe harbor provides that a forward-looking statement is not actionable if it is identified as a forward looking statement, and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."[118]  Alternatively, if the statement was made by a natural person, a plaintiff must allege that it was "made with actual knowledge by that person that the statement was false or misleading" or if made by a business entity, that it was made by or with the approval of an executive officer of that entity that had actual knowledge that the statement was false or misleading.[119]

Additionally, a plaintiff must properly allege scienter.  The PSLRA provides that a plaintiff must allege "with particularity facts giving rise to a strong inference

---

[115] *Nathanson*, 267 F.3d at 419.

[116] *Southland*, 365 F.3d at 372 (quoting *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000)).

[117] A "forward-looking statement" is defined in the PSLRA as "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;  (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission."  15 U.S.C. § 78u-5(c)(i)(1).

[118] 15 U.S.C. § 78u-5(c)(1)(A).

[119] *Id*. § 78u-5(c)(1)(A).

that the defendant acted with the required statement of mind."[120]  The Fifth Circuit has held that "the required statement of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness."[121]  Allegations of scienter must be "'cogent and compelling' not simply 'reasonable' or 'permissible.'"[122]

With these legal concepts in mind, the Court turns to Plaintiff's Complaint to determine whether it adequately states a claim for securities fraud.

        1.   *Business Plan*

The Court first turns to CCM's allegations regarding the Business Plan.  The first step in this analysis is to determine the statements in the Business Plan that CCM alleges are false.  CCM's allegations regarding the Business Plan are largely found in Complaint paragraphs 38-47.[123]  These include:

- "Sqor now seeks a bridge of up to $10 million for the B round of financing.  This bridge capital will fund immediate international growth, and allow the company to secure up to 10 major Sports Enterprises over the next six months.  Sqor expects to be in the market raising a round of equity capital of up to $25mm in Q1 2016, and it is the company's intention to use this capital to repay all loans, and continued global growth opportunities."[124]

---

[120] *Id.* § 78u-5(b)(2).

[121] *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014) (quoting *Lomand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009)).

[122] *Local 731B of T. Excavators and Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016) (quoting *Indian Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 573 F.3d 527, 533 (5th Cir. 2008)).

[123] Related allegations in Paragraphs 43, 45, and 47 are discussed below.

[124] R. Doc. 179-8 at 5.  CCM's allegations can be found at R. Doc. 74 at 10-11 ¶¶ 40-41.

- A "growth chart" reflecting "Sqor's net income for 2016 to be $1.3 million, projected 2017 net income as $12.7 million, and projected 2018 net income as $44 million."[125]

- "Sqor boasts more than 1,000 registered athletes worldwide, actively using the platform."[126]  Relatedly, "Sqor currently has 325M fans/total potential reach."

- Sqor's social media growth metrics chart.[127]

Accordingly, and contrary to Defendants' assertion, CCM has alleged that certain specific statements in the Business Plan are false.  The question before the Court is whether CCM's allegations that these statements in the Business Plan are false are sufficient to state a claim under the PSLRA.

CCM has failed to adequately allege a speaker with respect to the Business Plan.  Plaintiff first states that "Prior to any CCM investments, in July 2015, Defendants sent a document entitled "Business Plan" (the "Business Plan") to CCM to solicit its interest in the Securities."[128]  This is impermissible group pleading.  But CCM immediately follows this sentence with another:  "The Business Plan was created and/or approved by Sqor, the Pontchartrain Defendants, Wilhite, May and Worley."[129]  "[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at

---

[125] R. Doc. 179-8 at 18.  CCM's allegations (quoted here) can be found at R. Doc. 74 at 12 ¶ 43.
[126] *Id.* at 9.  CCM's allegations can be found at R. Doc. 74 at 12-13 ¶¶ 44-45.
[127] *Id.* at 12.  CCM's allegations can be found at R. Doc. 74 at 13-14 ¶¶ 46-47.  The Court notes that the chart is empty in the version attached to Defendants' Motion to Dismiss, but has been reproduced in a populated form in Plaintiff's Complaint.
[128] R. Doc. 74 at 10 ¶ 39.
[129] *Id.*

issue."[130]  "Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individuals involvement the formulation of either the entire document, or that specific portion of the document, containing the statement."[131]

Here, Plaintiff's barebone statement that the Business Plan "was created and/or approved by Sqor, the Pontchartrain Defendants, Wilhite, May and Worley" is insufficient to state a claim as Wilhite, May, and Worley.  As an initial matter, CCM's allegation does not so much name a speaker as "it merely narrows the range of speakers."[132]  Further, CCM fails to allege what statements in the Business Plan are attributable to Wilhite, May, or Worley.  This too is insufficient.[133]  Accordingly, CCM's allegation regarding the Business Plan fail under the PSLRA.

CCM's allegations regarding the Business Plan suffer from other defects as well.  For example, certain forward-looking statements in the Business Plan fall within the PSLRA's safe harbor.  The PSLRA provides that when forward-looking statements is made by a natural person, a plaintiff must allege that it was "made with actual knowledge by that person that the statement was false or misleading."  Alternatively, if such statements are made by a business entity, that it was made by or with the approval of an executive officer of that entity that had actual knowledge

---

[130] *Southland Sec. Corp.*, 365 F.3d at 365.

[131] *Id.*

[132] *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) (cleaned up).

[133] *See, e.g., In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2006 WL 3747560, at *12 (E.D. La. Dec. 14, 2006);  *see also Southland*, 365 F.3d at 365 (holding allegations insufficient because the plaintiff "fails to specify which of the[] documents is attributable to each individual defendant, let alone which portions or statements within the[] documents are assignable to each individual defendant").

that the statement was false or misleading.[134]   Sqor's growth chart discussed in Paragraph 43 is undoubtably a forward-looking statement, yet CCM includes no allegation that it was made by a person with actual knowledge that the statement was false or misleading, or that it was approved by an executive officer that had actual knowledge that the statement was false and misleading.

Because the Court finds that CCM's allegations regarding the Business Plan fail due to CCM's failure to adequately allege a speaker, the Court does not address Defendants' host of other arguments for why CCM's allegations regarding the Business Plan fail, including puffery and failure to allege scienter.

### 2.   *FC Bayern Munich Sports Enterprise*

The Court next turns to CCM's allegations regarding FC Bayern, detailed in paragraphs 51-55.   In sum, CCM alleges that Wilhite and Hammer showed CCM an unsigned draft agreement in June 2015.[135]   CCM alleges that Wilhite and Hammer represented that the agreement was standard, and that it was "close" to closing a deal with FC Bayern.[136]   In August 2015, Wilhite emailed an executed agreement to CCM,

---

[134] 15 U.S.C. § 78u-5(c)(1)(A).   The Court puts to the side here the argument that Defendants are entitled to a safe harbor as a result of a cautionary statement.   The Business Plan does include a "Notice and Disclaimer" which provides that: "This Business Plan incorporates management's forecast of how the Company might perform.   The projects do not include an evaluation of the support of management's assumptions.   There will usually be differences between projected and actual results because events and circumstances frequently do not occur as expected, and those differences may be material."   R. Doc. 179-8 at 2.   But such language is not "meaningful" as it does not contain "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372 (internal quotation omitted).   Accordingly, the forward-looking statements in the Business Plan are not afforded the PSLRA's safe harbor based on this this boilerplate language.
[135] R. Doc. 74 at 16-17 ¶ 52.
[136] *Id.*

which looked similar but contained a series of "critical differences"[137] which resulted in an agreement that "did not bind FCB to anything meaningful."[138]

CCM fails to state the alleged misrepresentation(s) here. At best, what Plaintiff has alleged is that Wilhite sent a draft contract to CCM, and that once the contract was executed, Wilhite sent the finalized agreement without pointing out key alterations. There is no allegation that Wilhite withheld material information or misrepresented the terms of the finalized contract. The closest that CCM gets to an actionable misrepresentation in these Paragraphs is in alleging that Wilhite represented that the draft agreement was the "standard used for all teams."[139] It is unclear from the Complaint whether this was false; all that is clear is that the finalized agreement with FC Bayern was different.

Indeed, the entirety of this set of allegations requires the inference that Wilhite was engaging in a "bate and switch" by showing CCM a draft contract, purposely negotiating different terms with FC Bayern, and then sending CCM the finalized contract hoping they would not notice any changes. Even at the 12(b)(6) pleading stage,[140] that inference is a step too far on the facts alleged, particularly given that Wilhite sent CCM the executed FC Bayern agreement after it was finalized and did not misrepresent or hide any of the finalized terms.[141] Accordingly, CCM fails to

---

[137] *Id.* at 17 ¶ 53.

[138] *Id.* at 18 ¶ 54.

[139] R. Doc. 74 at 16-17 ¶ 52.

[140] The Court need not "strain to find inferences favorable to the plaintiffs." *Southland*, 365 F.3d at 361 (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)).

[141] The Court notes that despite CCM's myriad allegations of misstatements in emails, CCM attaches only a singular email to its Motion to Dismiss. *See* R. Doc. 184-1 at 17. This email fails to adequately support CCM's allegations. Rather it is only a representation by Wilhite that the "Contract is

allege a claim sufficient under the PLSRA or Rule 9(b) with respect to the FC Bayern agreement.

### 3. *Brand Capabilities Deck*

The Court next turns CCM's allegations regarding the Brand Capabilities Deck, largely found in Complaint Paragraphs 61-63.[142]   CCM alleges that "the Defendants sent CCM a "Brand + Capabilities + Deck- 5.2016.pdf" (the "Brand Capabilities Deck") which specifically states that Sqor had a "social post reach" of 2.5 million followers, with "10x" higher average engagement."[143]  CCM contends that this was false, and that the Brand Capabilities Deck "contained a host of other misrepresentations" including that certain athletes would drive traffic to Sqor and that various NBA players endorsed a "Road to the Draft" program.[144]

As with the Business Plan, CCM fails to demonstrate a speaker with respect to the Brand Capabilities Deck.  CCM again engages in impermissible group pleading, alleging only that "Defendants sent CCM" the Brand Capabilities Deck, without any analysis as to who drafted, edited, or approved the Brand Capabilities Deck (and certainly without any analysis of who drafted, edited, or approved particular statements in the Brand Capabilities Deck).  As the Fifth Circuit has held, this is plainly insufficient.   Accordingly, CCM fails to allege a sufficiently particularized claim with respect to the Brand Capabilities Deck.

---

approved," without any discussion as to the terms of the contract.  Indeed, it was only shortly after this email that Wilhite allegedly emails the finalized contract to CCM.
[142] Separate allegations in Paragraphs 61 and 62 of the Complaint are discussed below.
[143] R. Doc. 74 at 21 ¶ 61.
[144] *Id.* at 21-22 ¶¶ 62-63.

4.    *Additional Statements*

Finally, CCM makes various other allegations, which are not easily classified. The Court addresses each below.

- In Paragraphs 42, 45, and 47, CCM alleges that Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, and later Gregg made and reiterated misrepresentations in the Business Plan[145] during "in-person meetings, telephone conferences and through written correspondence leading up to" CCM's investments.[146]

  o The allegations in these Paragraphs fail to pass muster under the particularity requirement of the PSLRA and Rule 9(b).   The allegations do not specify which purported misrepresentations were reiterated.   Further, they do not adequately allege a speaker, relying instead on group pleading.   Additionally, the allegations do not specify when or where a given misrepresentation took place, relying instead on generalities.   Accordingly, these paragraphs fail to state a claim.

- In Paragraph 48, CCM alleges that "Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, and later Gregg, actively or passively participated in the marketing of the Securities to CCM through various misrepresentations in July 2015 . . . and continuing through . . . up until Spring June [sic] 2017.  They engaged in these misrepresentations in person

---

[145] These alleged misrepresentations dealt with whether Sqor could or would raise capital as promised, Sqor's fans and users, and Sqor's user growth metrics.
[146] R. Doc. 74 at 11-14 ¶¶ 42, 45, and 47.

[sic] meetings with CCM, via telephone and via email communications transmitting materially misleading information . . . . In a series of continuing written and verbal misrepresentations spanning from July 2015 until July 2017, Sqor, Wilhite, the Pontchartrain Defendants, Worley, May, [and] Gregg recklessly and/or fraudulently misrepresented Sqor's ability to attract additional investor capital. . . ."[147]

- o The allegations in Paragraph 48 fail to comply with the particularity requirement of the PSLRA and Rule 9(b). They do not specify a misrepresentation, instead describing the purported misrepresentation in only the most general of terms. Again, these allegations fail to properly allege a speaker, relying instead on group pleading. Plaintiff fails to plead with particularly when the misrepresentation occurred, instead relying on a two-year time period. Accordingly, this Paragraph fails to state a claim.

- In Paragraph 49, CCM alleges that "[f]rom July 2015 to July 2017, Defendants consistently misrepresented the number of 'users' of the Sqor application and platform" and that these misrepresentations were "made in verbal and written materials presented to CCM on a continuing basis."[148] CCM further alleges that "Each of the Defendants at various points throughout these investment rounds misrepresented to CCM the number of

---

[147] R. Doc. 74 at 15 ¶ 48.
[148] R. Doc. 74 at 15-16 ¶ 49.

users and potential users of the Sqor technology, realistic prospects for alleged deals in the pipeline and the financial projections."[149]

- o For the same reasons as the allegations in Paragraph 48, the allegations in Paragraph 49 also fail to comply with the particularity requirement of the PSLRA and Rule 9(b). They do not specify a misrepresentation, they impermissibly rely on group pleading, and they do not adequately state when or where a misstatement occurred. Accordingly, this Paragraph fails to state a claim.

- In Paragraph 50, CCM alleges that "[f]rom July 2015 through May 2017, Defendants (in particular, Brain Wilhite, May, Worley, Gregg and the Pontchartrain Defendants) misrepresented the likelihood of several potential business developments such as the likelihood other sports clubs and organizations join Sqor and use its technology."[150] CCM offers some examples, and alleges that "[i]n an email on March 2, 2016, Wilhite went so far as to say he had engaged the NFL Players' Union and that they had 'parted with an understanding and agreement (Verbal MOU) to move forward to an 'official' partnership between us.'"[151] CCM makes the same allegation regarding the NFL Players Union in Paragraph 59.[152]

- o The allegations in Paragraph 50 that various Defendants misrepresented the likelihood of business developments fails as CCM

---

[149] *Id.*
[150] R. Doc. 74 at 16 ¶ 50.
[151] *Id.*
[152] *Id.* at 20 ¶ 59.

fails to properly allege a speaker, a misstatement, or specifically when the misstatement was made.  The allegations regarding Wilhite's March 2, 2016 statement that Sqor had a Verbal MOU with the NFL Players Union do not suffer from the same defects, but do suffer from others.  For example, although CCM alleges that Wilhite's statement was "not true," CCM fails to allege what the truth of the matter was.  Further, the representation is at best vague as it involved only an "understanding and agreement" to "move forward" with a partnership, not that any formal agreement or partnership had been reached.  Accordingly, this Paragraph fails to state a claim.

- In Paragraphs 56 and 57, CCM alleges that "Sqor and its controlling persons provided very detailed projections that were more than just simple projections" and that "[d]ollar figures were attached to each of these prospective deals and they were assigned a percentage chance of them closing."[153]  CCM further alleges that "[o]ne example is ESPN" and that "[t]his purported opportunity [ESPN's purchase of Sqor] was put forth by email on December 13, 2016 and continued through summer 2016.  CCM later learned that . . . there was a preliminary meeting with a mid-level person at ESPN, but the relationship with ESPN did not get past that point, and therefore there never was a potential deal to be had."[154]

---

[153] R. Doc. 74 at 18-19 ¶ 56.
[154] *Id.* at 19 ¶ 57.

    ○  The allegations of Paragraph 56 fail to comply with the particularity requirements of the PSLRA and Rule 9(b). CCM fails to state a speaker, instead relying on impermissible group pleading. Although CCM alleges that there existed "very detailed projections" with specific dollar figures and percentages attached to each prospective deal, the details of any misstatement are noticeably absent. CCM makes various arguments in Paragraph 56 regarding puffery, but such arguments are misplaced when CCM has failed to properly allege a misstatement in the first instance. The only allegation that CCM does allege with any degree of particularity regards ESPN. But CCM alleges that the misstatement about ESPN was made on December 13, 2016. This statement was therefore made well after all four of CCM's investments, as CCM's final investment was made in June 2016.[155] Accordingly, even if the allegation did comply with the PSLRA and Rule 9(b), CCM could not have relied on it when investing in Sqor.

- In Paragraph 58, CCM alleges that on March 1, 2016, Hammer and/or Wilhite sent an email to CCM conveying that "a prospective investor, the

---

[155] The Court notes that the Complaint reads that the opportunity "was put forth by email on December 13, 2016 and continued through summer 2016." This suggests that there was a scriveners error in the Complaint, and that Plaintiff either meant "December 13, 2015" or "though summer 2017," either of which would make sense on these facts. That CCM does not address this in its Opposition suggests that "December 13, 2016 . . . through summer 2017" is likely the correct date. In any event, Paragraph 57 fails the particularity requirement. Although it properly alleges a speaker and date, it fails to allege Wilhite's misstatement beyond vaguely stating that Wilhite "represented ESPN was very interested in Sqor and had in fact discussed eventually buying Sqor."

Mailman Group, was interested in investing in Sqor and purchasing a franchise license to Sqor China and other Asian countries" and that Wilhite sent an email to CCM showing Sqor's "global footprint" of users across the globe.[156]

- o With respect to the representation regarding Mailman Group, Plaintiff fails to properly allege a speaker, seeming to indicate that Hammer (who is no longer a party) made a misrepresentation. CCM does not explain how Wilhite or Hammer "conveyed" information about the Mailman Group, nor what the truth of the matter was. With respect to Wilhite's email regarding a "global footprint," CCM fails to allege that the statement was false or why. Accordingly, this Paragraph fails to state a claim.

- In Paragraph 60, CCM alleges that Defendants made various misrepresentations, including: (1) On November 19, 2015, Hammer misrepresented that Sqor met for a second time with the Dallas Cowboys organization, which he stated would sign up with Sqor; (2) On December 1, 2016, Wilhite misrepresented in emails that Sqor had undertaken a new revenue pipeline, which would provide Sqor with $5.5 million in revenue; (3) On May 25-31, 2016, Hammer and Wilhite "misrepresented to CCM via emails and telephone conferences that Sqor would partner with Under Armor, which would significantly enhance Sqor's user reach, popularity, and

---

[156] R. Doc. 74 at 19 ¶ 58.

value;" and (4) On May 25, 2016, "Wihite and Gregg misrepresented Sqor's 'revenue velocity' via spreadsheet and email and phone calls to CCM."[157]

o The first allegation in Paragraph 60 deals with a statement by Hammer, who is no longer a party to this action. The second allegation, that Wilhite misrepresented that Sqor had undertake a new revenue pipeline which would provide Sqor with $5.5 million in revenue, also fails as it is made in too general of terms and it does not expressly allege what Wilhite represented about the pipeline, though it comes closer than the vast majority of the allegations in CCM's Complaint to meeting the requirements of the PSLRA and Rule 9(b). The third allegation in Paragraph 60 fails to allege a misstatement beyond stating that "via emails and telephone conferences" Hammer and Wilhite stated that "Sqor would partner with Under Armor." But allegations regarding the specific statements (and which of the two Defendants made them) are still lacking. Finally, the fourth allegation, that Wilhite and Gregg misrepresented Sqor's "revenue velocity" also fails to explain how they did so and what Wilhite and Gregg represented the "revenue velocity" to be. These allegations therefore fail to comply with the particularity requirement of the PSLRA and Rule 9(b), and do not state a claim.

---

[157] R. Doc. 74 at 20-21 ¶ 60.

- In Paragraph 61, CCM alleges that "[i]n conversations and in written materials, Sqor portrayed the social medial followers and users of other platforms (such as Favre's) as Sqor's own user base, confusing CCM and causing it to believe that Sqor's technology enjoyed widespread adoption among millions of users."[158]  CCM also alleges that "Favre knew or should have known Sqor was conflating Favre's social media followers and fans with those of Sqor and misstating the influence of Sqor based on Favre's own social media and advertising reach."[159]

    o These allegations fail to comply with the particularity requirement of the PSLRA and Rule 9(b).  The allegations merely reference "conversations" and "written materials" without specifying who was speaking, when the conversations took place, or specifically what was said.  Plaintiff further fails to allege *any* actionable statement by Favre.[160]  Accordingly, this Paragraph fails to state a claim.

- In Paragraph 62, CCM alleges that "Sqor provided CCM with several financial statements and projections, beginning in October 2015 and until June 2017, which contained material misstatements and omissions relating to the actual number of users of Sqor technology, revenue pipeline and

---

[158] R. Doc. 74 at 21 ¶ 61.

[159] *Id.*

[160] The Court notes that beyond this Paragraph, Favre is hardly mentioned in the Complaint's allegations of misstatements.  Plaintiff notes that there was a representation that he was a "featured athlete" in the Business Plan, *see* R. Doc. 74 at 12 ¶ 44, and that he was included in other portions of the Brand Capabilities Deck, *see id.* at 21-22 ¶ 62.  Plaintiff also alleges that Favre was a controlling person at Sqor, an issue the Court does not reach given the myriad of pleading deficiencies in CCM's Complaint.  *See id.* at 25 ¶¶ 71-73.  The Court finds the allegations against Favre remarkably thin, even notwithstanding the heightened pleading standard of the PSLRA and Rule 9(b).

opportunities, use of funds by employees and other flaws to be proven at trial."[161]

- o These allegations fail to comply with the particularity requirement of the PSLRA and Rule 9(b). The allegations reference "several financial statements and projections" over a two-year period, without specifying who provided the financial statements, what the financial statements said, why they were false, or when specifically the financial statements were provided. Accordingly, this Paragraph fails to state a claim.

- In Paragraph 64, CCM alleges that "Sqor, though various controlling persons, including Wilhite regularly misrepresented monthly active users ("MAUs") and daily active users ("DAUs") . . . of the "Sqor Platform" to CCM, including in various presentations, spreadsheets, and conversations over the course of 2015 until it became clear in April or May 2017 that Sqor's Platform did not have the number of MAU's or DAU's that Defendants portrayed to CCM."[162]

- o These allegations fail to comply with the particularity requirement of the PSLRA and Rule 9(b). CCM alleges the speaker only as "Sqor, though various controlling persons." It fails to state with specify the misrepresentation, stating only in general terms that CCM misrepresented MAUs and DAUs in "various presentations,

---

[161] R. Doc. 74 at 21 ¶ 62.
[162] R. Doc. 74 at 22 ¶ 64.

spreadsheets, and conversations" over a two-year period. Accordingly, this Paragraph fails to state a claim.

- In Paragraph 65, CCM alleges that "Sqor severely misstated or omitted material information regarding supposed agreements, beginning in August 2016 (or, possibly June 2016) with Omnicom Media Group, which Sqor said would yield $7.5 million in revenue in the first year, $15 million in revenue in the second year and $25 million in the third year. In an email to CCM on August 17, 2016, Wilhite even referred to 'our recent Omnicom Media Group (OMG deal) Expected $7.5mm over next 12 mos).' There never was such a deal."[163]

  - Putting aside whether this Paragraph runs afoul of the particularity requirements of the PSLRA and Rule 9(b), the allegations of this Paragraph state that Sqor's misstatements took place "in August 2016 (or, possibly June 2016)" and cite only to one email from August 17, 2016. CCM's final investment was consummated on June 15, 2016, so CCM could not have relied on any purported misrepresentation in this Paragraph in making an investment. CCM's allegation that Sqor "possibly" made a misrepresentation in June 2016 is plainly insufficient. This Paragraph therefore fails to state a claim.

---

[163] R. Doc. 74 at 22-23 ¶ 65.

- In Paragraph 66, CCM alleges that "Sqor, Wilhite, the Ponchartrain Defendants, May and Worley continued to make and reiterated these misrepresentations during in-person meetings, telephone conferences, and written correspondence leading up to" to investments.[164]

  o These allegations fail to comply with the particularity requirement of the PSLRA and Rule 9(b). They do not specify a misrepresentation, instead describing the purported misrepresentation in only the most general of terms. They do not properly allege a speaker, relying instead on group pleading. Plaintiff fails to plead with particularly when the misrepresentation occurred, instead relying on a two-year time period. Accordingly, this Paragraph fails to state a claim.

- Paragraph 67 of the Complaint alleges only when CCM's supposed fraud was "reasonably knowable" to CCM and does not allege an actionable statement.[165]

- In Paragraph 68, CCM alleges that "Defendants misrepresented the use of funds invested by CCM in various Securities by using such funds to pay back loans to certain individual investors."[166]

  o These allegations fail to comply with the particularity requirement of the PSLRA and Rule 9(b). They do not specify a misrepresentation, instead describing the purported misrepresentation in only the most

---

[164] R. Doc. 74 at 23 ¶ 66.
[165] *Id*. at 23 ¶ 67.
[166] *Id*. at 24 ¶ 68.

general of terms. They do not properly allege a speaker, relying instead on group pleading. Plaintiff fails to plead with particularly when the misrepresentation occurred, instead relying on a two-year time period. Accordingly, this Paragraph fails to state a claim.

The Court further notes that certain Defendants are essentially absent from CCM's allegations regarding "Materially False Statements, Recklessly or Knowing Made." For example, Emaleigh Wilhite is mentioned in only one Paragraph,[167] wherein CCM alleges she was paid with the funds CCM investments, but no misstatement or involvement in a misstatement is alleged. The Complaint contains no allegations whatsoever that John Durham made a misstatement or was involved in a misstatement. And as discussed at length in the separate Order issued contemporaneously with this Order, Dimitrios Bachadakis is seldom mentioned in the Complaint. Although the Complaint alleges—on remarkably lean facts—that these Defendants are control persons, these allegations fail in light of CCM's failure to allege a primary violation, as discussed below. Their inclusion in the Complaint, along with the inclusion of Brett Favre as discussed in footnote 160, is an indication that Plaintiff "resorted to the extraordinarily uncreative and rote pleading artifice of naming every officer and director in sight—regardless of a legitimate factual basis for doing so."[168]

In short, CCM fails to meet the heightened pleading standards of the PSLRA and Rule 9(b). In its Opposition, CCM seems to argue that the heightened standards

---

[167] R. Doc. 74 at 24 ¶ 68.
[168] R. Doc. 167-1 at 2.

of the PSLRA should not be applied to it because the PSLRA was "enacted to dissuade nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers."[169]   But CCM does not—and cannot—argue that the PSLRA is not appliable by its plain language to CCM's claims here. Had Congress intended the PSLRA to apply to only class action filings, it could have included such a caveat in the statute; it did not.   When compared with more lenient pleading standards, the requirements of the PSLRA and Rule 9(b) can seem stringent in their application, as Plaintiff would likely argue is the case here.   That does not mean that they can be ignored.   Because Plaintiff's Complaint fails to state a claim under the heightened requirements of the PSLRA and Rule 9(b), it must be dismissed.

Because the Court finds that Plaintiff's Complaint fails to comply with the requirements of the PSLRA and Rule 9(b), the Court does not reach Defendants' arguments regarding scienter, reasonable reliance, or loss causation.

## C.   Control Person Liability

CCM's control person liability claims under Section 20(a) of the Securities Exchange Act similarly fail.   These claims are largely dealt with in Paragraphs 69-85 of the Complaint.[170]   Importantly here, "[c]ontrol person liability is secondary and cannot exist in the absence of a primary violation."[171]   Here, the Court has not found a primary violation.   Accordingly, these claims must be dismissed.

---

[169] R. Doc. 184 at 1 (citing *Tellabs, Inc. v. Makor Issues and Rights Ltd.*, 551 U.S. 308, 320 (2007)).

[170] R. Doc. 74 at 24-29 ¶¶ 69-85.

[171] *Southland*, 365 F.3d at 383 (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 2021 n.8 (5th Cir. 1996)).   *See also Chiaretti v. Orthodontic Centers of Am., Inc.*, No. 03-1027, 2004 WL 7345221, at *2 (E.D. La. Apr. 6, 2004) (same).

### D. State Law Claims

Defendants argue that the Court should also dismiss Plaintiff's state law claims, including its Louisiana securities law claims. Defendants point to case law holding that Louisiana courts look to federal courts in interpreting Louisiana securities laws.[172] This may be true, but the Fifth Circuit has acknowledged that the elements of a securities law violation under Louisiana law are notably different from the elements under federal law.[173] In any event, CCM's remaining claims are all pendant state-law claims. "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."[174] A district court "enjoys wide discretion in determining whether to retain jurisdiction over the remaining state law claims."[175] "The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial. . . ."[176] Here, this matter is dismissed at the pleadings stage, and only limited jurisdictional discovery was conducted. Accordingly, the Court exercises its discretion to decline supplemental jurisdiction over CCM's remaining state-law claims.

### E. Leave to Amend

At several points in its Opposition, CCM notes that it can "easily amend" its Complaint to state additional facts if necessarily, though at no point does it formally

---

[172] *State v. Powdrill*, 684 So. 2d 350, 353 (La. 1996).
[173] *See Heck v. Triche*, 775 F.3d 265, 280-81 (5th Cir. 2014).
[174] 28 U.S.C. § 1367(c)(3).
[175] *Burns-Toole v. Byrne*, 11 F.3d 1270, 1276 (5th Cir. 1994).
[176] *Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*, 554 F.3d 595 (5th Cir. 2009).

request leave to amend should the Court grant Defendants' Motion.  Generally, "[t]he court should freely give leave when justice so requires."[177]  But Plaintiff has already had a chance to amend its Complaint in response to a Motion to Dismiss on the merits, and did so.[178]  Indeed, after a *second* Motion to Dismiss was filed, Plaintiff requested that the Court defer consideration of the matter while it conducted limited discovery.[179]  The instant Motion to Dismiss was filed over a year and a half after Plaintiff instituted this suit.[180]  The Court cannot continuously grant Plaintiff leave for multiple opportunities to draft a Complaint that lives up to the standards of the PSLRA and Rule 9(b).  The Court further finds that granting an additional leave to amend would cause undue delay in an already longstanding case and cause undue prejudice to defendants.  Indeed, in somewhat analogous circumstances, the Fifth Circuit has held that denying leave to amend was well within the district court's discretion.[181]  Exercising the discretion afforded under Rule 15 and the pertinent jurisprudence, the Court will deny Plaintiff leave to Amend its Complaint yet another time.

---

[177] Fed. R. Civ. P. 15(a)(2).

[178] *See* R. Doc. 30 (First Motion to Dismiss); R. Doc. 61 (Motion for Leave to File Amended Complaint).

[179] *See* R. Doc. 90 (Second Motion to Dismiss); R. Doc. 107 (Motion for Deferral of Consideration of Second Motion to Dismiss).

[180] *Compare* R. Doc. 1 (filed on November 9, 2017) *with* R. Doc. 179 (filed on July 23, 2020).

[181] *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d at 384-85 (5th Cir. 2004).

IV.     **CONCLUSION**

**IT IS HEREBY ORDERED** that the Motion is **GRANTED**.     Plaintiff's

federal claims are **DISMISSED WITH PREJUDICE**.    Plaintiff's state-law claims

are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, March 31, 2021.


**WENDY B. VITTER**
**UNITED STATES DISTRICT JUDGE**